IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| VAUGHAN ROSS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | Civil Action No. |
| | § | 5:08-CV-174-C |
| | § | |
| NATHANIEL QUARTERMAN, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | DEATH PENALTY |
| | § | |
| Respondent. | § | |

**BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

**INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL**

The Supreme Court has routinely recognized the Sixth Amendment right to counsel exists and that it is necessary in order to protect the fundamental right to a fair trial. *Strickland v. Washington,* 466 U.S. 668, 684, 104 S. Ct. 2052, 80 L.Ed. 2d 674 (1984). The purpose of the Sixth Amendment is to ensure that criminal defendants receive a fair trial. *Id.* at 694. The standard in evaluating an ineffective assistance claim is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id.* at 686. To demonstrate a violation of this right, Petitioner must prove 1) counsel's representation fell below professional norms, and 2) a reasonable probability that, but for counsel's deficiency, the result of the

trial would have been different.  *Id.* at 687; and *Barrientes v. Johnson,*  221 F.3d 741, 754, (5th Cir. 2000).

### Deficient

Under the first prong of *Strickland,* Petitioner must establish that counsel's trial performance was deficient.  *Strickland*  at 687.  The deficiency must be so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment.  *Id.*  A defendant has a right to effective assistance of counsel and not simply a lawyer who is present alongside the accused at trial.  *Id.* at 685-686. Counsel has an overall duty to advocate the defendant's case.  *Id.* at 688. "[C]ounsel … has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."  *Id.* and *Harris v. Day,* 226 F.3d 361, 364 (5th Cir. 2000).  The Supreme Court admonished appellate courts to "keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case."  *Id* at 690.  To determine the effectiveness of counsel, an appellate court must look to the totality of the representation.

Trial counsel has a duty to thoroughly investigate the background of the defendant in preparation for trial including the punishment phase.  *Williams v. Taylor,* 529 U.S. 362, 396, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). Furthermore, the ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating

2

evidence and evidence to rebut any aggravating evidence that may be introduced

by the prosecutor." *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S. Ct. 2527, 156 L.

Ed. 2d 471 (2003).  Counsel has a significant and important duty to perform in

raising mitigating evidence to the prosecutor initially and during the punishment

phase. *Id.* at 524-525.  Even when a defendant and his family suggest that there is

no mitigating evidence, counsel still has an obligation to investigate including

material the prosecution will rely upon as aggravating evidence during

punishment. *Rompilla v. Beard,* 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360

(2005).

### Prejudice

Under the second prong of the *Strickland* test, Petitioner must show that

there is a reasonable probability that, but for counsel's deficiency, the result of the

proceeding would have been different. *Strickland* at 694.  "A reasonable

probability is a probability sufficient to undermine confidence in the outcome". *Id.*

In evaluating ineffective assistance claims, "a court must indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable

professional assistance". *Id.* at 689.  However, a Petitioner doesn't have to show

that the deficient conduct altered the outcome of the trial or even that it is more

likely than not this was the result. *Id.* at 693. A trial result may be determined to

be unreliable even if counsel's deficiencies cannot be shown by a preponderance

of the evidence to have determined the outcome. *Id.* at 694.

If a defendant challenges a death sentence the question is whether there is a reasonable probability that, absent the errors, the sentencer would have decided that the balance of aggravating and mitigating circumstances did not warrant death. *Id*. at 695. Finally, the appellate court must ensure that its ultimate focus is "on the fundamental fairness of the proceeding whose result is being challenged. *Id*. at 696. The courts should be concerned with whether the result of a particular trial or proceeding is unreliable due to a breakdon in the adversarial process. *Id*.

In the instant case, there are four separate claims that address the issue of ineffective assistance of counsel

### **Failure to Investigate and Present Rebuttal to Aggravating Evidence**

The Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases in effect at the time of this trial were adopted in 1989. In the introduction, the Guidelines instruct that "'Should' is used throughout as a mandatory term and refers to activities which are minimum requirements." While the Guidelines refer to appointed counsel, the standard for representation is the same for retained counsel.

Guideline 11.4.1(A) provides that "Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously." It is clear that the investigation in this case was an afterthought. It was conducted within one month

of the beginning of individual voir dire and did not include individual interviews or attempts to obtain records relative to Petitioner's psycho-social development.

Trial counsel does not have the option to take only what his client give him regarding either mitigation or rebuttal of aggravating circumstances. Guideline 11.4.1(C) reads "The investigation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered. This investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."

In *Rompilla v. Beard,* 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), the Supreme Court considered facts virtually identical to the facts in this case. In *Rompilla*, trial counsel was aware that the Commonwealth would attempt to establish that Rompilla had a significant history of felony convictions including the use or threat of violence which was an aggravator under state law. Counsel had been notified of the Commonwealth's intent in a "plea letter" given them before trial. A prior conviction file was a public record and available to counsel at the courthouse where the trial was to be held.

Counsel did not look at any part of the file until warned by the prosecution a second time. Within the file counsel ignored was information about another felony offense committed by Rompilla. The file relative to the other conviction contained mitigating information including evidence that alcoholism was rampant

5

in Ropilla's family, that his parents engaged in horrendous discipline practices against Rompilla as a child, that the family had no indoor plumbing in the house and that Rompilla wasn't allowed to visit other children.  The Court held that "This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. *Rompilla* 545 U.S. at 393.

The Court pointed out that the American Bar Standards describe counsel's obligation to investigate "in terms that no one could misunderstand...."  The duty is "to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case **and the penalty**..." *Rompilla* 545 U.S. at 387.

In the instant case, the State notified counsel that it intended to offer evidence of the aggravated assault in its first Notice of Extraneous Offense, Bad Acts and Prior Convictions filed on July 24, 2002.  Carlisle was also listed as a witness in the Witness List filed on the same day.  Though the St. Louis aggravated assault was similar to the case on trial, that being violence against a woman, the defense made no effort to contact Carlisle or investigate the conviction at all.

In the Petitioner's case, the defense called witnesses at the punishment phase of the trial.  The testimony given by these witnesses amounted generally to a

6

plea for mercy, there wasn o effort to impeach Officer Knobbe's testimony about the incident with Carlisle.  It is true that the dearth of witnesses may have been, at least in part, the result of instructions from Ross to his family not to cooperate with his counsel after conviction.  That, however, is not the issue.  The issue is the effectiveness of counsel's investigation.  Especially the investigation as it relates to impeaching the most important aggravating evidence to be offered by the State. Rompilla was apparently no more cooperative with his counsel than Ross was with his as the court recognized that "There were times when Rompilla was even actively obstructive by sending counsel off on false leads. *Rompilla* 545 U.S. at 381.

The result of a thorough investigation in Ross' case would have been different than that in Rompilla's case because, the useful information which would have been obtained by Ross' counsel would have gone to impeaching aggravating evidence at the punishment phase of the trial rather than developing mitigating circumstances of his upbringing.  This is a distinction without a difference.  The holding in *Rompilla* is that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on **as evidence of aggravation at the sentencing phase of the trial**." *Rompilla* 545 U.S. at 377 (emphasis added).

The question becomes, whether counsel's efforts to obtain and review material he knew the State would offer in aggravation were reasonable.  It is understood that "[s]trategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (quoting *Strickland*, 466 U.S. at 690-91).  Applying this standard, it is clear that no reasonable professional judgment would have supported a total lack of investigation into Ms Carlisle and the offense committed against her.

The court in *Rompilla* said that "The unreasonableness of attempting no more than they did was heightened by the easy availability of the file at the trial courthouse, and the great risk that testimony about a similar violent crime would hamstring counsel's chosen defense of residual doubt." *Rompilla* 545 U.S. at 389-90.  Ross' trial counsel prepared his case almost exclusively for acquittal so it cannot be said that they held sentencing hopes other than those based on residual doubt.  While it would have taken more effort in this case to obtain the information from Ms Carlisle or from the records of her criminal prosecutions, counsel made no request for assistance in obtaining this information and made no explanation of their decision not to investigate.

8

It is true that "complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978).  In the instant case there is evidence before this court on what the uncalled witnesses would have said.  Specifically, Carlisle would have admitted that "made her living stealing cars and earning good money," that she "had been arrested or convicted of fraudulent use of a credit card and assault," that she shot one boyfriend "who later died from his wounds," and that on the night of the offense Ross committed against her, "she had a 9 mm handgun in her car." (Exhibit A, Affidavit of Lisa Milstein).  The impeachment possible with this information would have borne no relationship with the single question asked at trial, inquiring whether Carlisle had been treated and released from the hospital on the night of the assault.

### Failure to Investigate and Present Mitigating Evidence

The 1989 edition of Guideline 11.4.1(7)(D) required that Counsel "secure the assistance of experts where it is necessary or appropriate for: (D) presentation of mitigation.  Experts assisting in investigation and other preparation of the defense should be independent and their work product should be confidential to the extent allowed by law.  Counsel and support staff should use all available avenues ...to obtain all necessary information."  Guideline 11.8.1 admonishes "Counsel

9

should be aware that the sentencing phase of a death penalty trial is constitutionally different from sentencing proceedings in other criminal cases." Guideline 11.8.2(D)provides that "Counsel should ensure that all reasonable mitigating and favorable information consistent with the defense sentencing theory is presented to the sentencing entity or entities in the most effective way."

Counsel fell short relative to each of these guidelines as they failed to even attempt to secure experts to assist in the presentation of mitigating facts at the punishment phase of the trial and failed to travel to St. Louis to interview witnesses . This was a conscious decision as lead counsel believed that "blaming someone remote in time and place for the way an accused turns out does not work to mitigate punishment..." The mitigating evidence to be discovered in this case was not limited to testimony that Petitioner was "not a bad guy" or that "he has had a rough life," it included testimony that a member of a victim's family did not want Petitioner to receive a death sentence. The mitigating evidence available but not sought also included testimony that Petitioner did not "have a problem with women," the State's theory of the punishment case. The failure of the defense to do any significant mitigation investigation constitutes deficient performance.

Counsel was even remiss in the manner in which they undertook what little mitigation investigation they did. Specifically, counsel interviewed family members together. The personalities and family dynamics were such that Petitioner's siblings did not feel free to disclose "their business" in front of their

10

mother.  The Supplementary Guidelines for the Mitigation Function of Defense

Teams in Death Penalty Cases now suggest that "Because the mitigation

specialist's interviews invade traumatic and sensitive areas of the client's and

witnesses' lives, one-on-one interviews are essential."  36 Hofstra L. Rev. 3, 746

(2008).  If Petitioner's siblings had been interviewed separately, they would have

disclosed the difficulty Petitioner faced growing up.

Petitioner contends that trial counsel's failure to investigate, locate and

present evidence to the jury satisfies the first prong of *Strickland, supra.*  This is

the issue which the Supreme Court addressed in *Williams, supra* and *Wiggins,*

*supra.*

In *Williams,* the Supreme Court considered the failures of trial counsel to

investigate and present mitigating evidence to the jury, even though other

mitigating evidence was presented.  The mitigating evidence which was not

presented included abuse and evidence of mental retardation:

> …[Trial counsel] failed to conduct an investigation that would have
> uncovered extensive records graphically describing Williams' nightmarish
> childhood, not because of any strategic calculation but because they
> incorrectly thought that state law barred access to such records.  Had they
> done so, the jury would have learned that Williams' parents had been
> imprisoned for the criminal neglect of Williams and his siblings, that
> Williams had been severely and repeatedly beaten by his father, that he had
> been committed to the custody of the social services bureau for two years
> during his parents' incarceration (including one stint in an abusive foster
> home), and then, after his parents were released from prison, had been
> returned to his parents' custody.

*Williams,* 529 U.S. at 395.  As in Petitioner's case, all of the evidence which the Williams trial counsel failed to investigate was not necessarily favorable to the defense.  But such is not dispositive when counsel fails to conduct the investigation itself.  Such can hardly be "strategic".  *Williams,* 539 U.S. at 396. The Supreme Court further stated in *Williams:*

> Of course, not all of the additional evidence was favorable to Williams. The juvenile records revealed that he had been thrice committed to the juvenile system – for aiding and abetting larceny when he was 11 years old, for pulling a false fire alarm when he was 12, and for breaking and entering when he was 15 … But as the Federal District Court correctly observed, the failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession.  Whether or not those omissions were sufficiently prejudicial to have affected the outcome of sentencing, they clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background.

> *Id.*

In *Wiggins,* trial counsel's investigation of the defendant's background consisted of having him evaluated by a psychologist, a review of a PSI and a Department of Social Services report.  *Wiggins,* 539 U.S. at 523.  The Supreme Court held that in light of the information contained in the reports trial counsel did review, the decision not to investigate further was unreasonable.  *Id.* at 527. Similarly, in *Sonnier v. Quarterman,* the Fifth Circuit held that trial counsel failed to make a reasonable investigation into relevant mitigating evidence including interviews with defendant's family and acquaintances.  *Sonnier v. Quarterman,* 476 F.3d 349, 358 (5th Cir. 2007), rehearing denied, 481 F.3d 288 (2007).  The

court further stated that the defendant's refusal to consent to trial counsel's more in depth interviews with family was not reasonable grounds for failure to do so.  *Id.*

In the case before the court, it is clear that trial counsel's failure to interview family,  acquaintances and others, fell below professional norms and was deficient.  One family member who wasn't interviewed knew of Petitioner's mother's mood swings and his longing for a father figure.

Petitioner would further show this Court that the prejudice prong in *Strickland* is met.  The failure to locate and present the mitigating witnesses is particularly prejudicial in Petitioner's case.  The  witnesses referred to above would have been able to provide some context to Petitioner's life and his relationships as well as elaborate on the Petitioner's good character.  A member of the family of a victim was said to have desired that Petitioner's life be spared. Women with whom Petitioner had maintained relationships would have portrayed Petitioner's peaceful side.  The failure to present these witnesses so undermined the proper functioning of the punishment phase that the trial cannot be relied on as having produced a just result.

*Williams, supra,* provides additional support for the harm in this case.  The appropriate focus must be on "the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams,* 529 U.S. at 393, n. 17.  The Court in *Williams* found that the failure to investigate and present evidence, such as the evidence not

13

presented in this case, rendered the verdict unreliable.  Likewise in *Wiggins,* the Court determined there was a reasonable probability that if the jury had been presented with the defendant's troubled past that it would have returned with a different sentence.  *Wiggins,* 539 U.S. at 536.

The jury herein was denied the ability to accurately and adequately consider Petitioner's moral culpability for this offense.  In other, similar, contexts the Supreme Court has not hesitated to strike down a death sentence.  *See, Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed. 2d 9 (2001) *and, Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed. 2d 256 (1989).  In order to fully consider Petitioner's moral culpability, the jury should have been informed of the compelling evidence of a dysfunctional family, that a member of the a victim's family did not want Petitioner executed and that Petitioner wasn't dangerous to women.  With such evidence, along with the evidence that most persons who knew Petitioner did not feel him to be dangerous, indeed were surprised by his behavior, the jury could have provided its reasoned response.  However, just as the State deprived the jury of the adequate consideration of mitigating evidence in *Penry v. Lynaugh,* trial counsel deprived Petitioner's jury of such evidence in this case.

Petitioner would respectfully show he is entitled to relief.

### Court of Criminal Appeals Unreasonable Application of Clearly Established Federal Law

14

A state court's decision is "contrary to clearly established federal law" if (1) it applied a legal rule that contradicted a prior U.S. Supreme Court holding, or if it reached a different result from a Supreme Court holding despite confronting materially indistinguishable facts from the applicable precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed. 2d 389 (2000) (O'Connor, J., concurring opinion). A state court's decision involved "an unreasonable application" of Supreme Court precedent if the court correctly identified the correct legal principle governing the case but unreasonably applied it to the facts of the case, or if the state court either unreasonably extended a legal principle to a new context where it should not apply, or unreasonably refused to extend the governing legal principle to a context in which the principle should apply. *Id*. at 407. "Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . . [and] an unreasonable application of federal law is different from an incorrect application of federal law." *Id*. at 409-10.

Pursuant to the relevant version of Texas Code of Criminal Procedure Article 37.071, § 2(e)(2)(B), the trial court, upon the written request of the attorney representing the defendant, shall charge the jury in writing as follows:

Under the law applicable in this case, if the defendant is sentenced to imprisonment in the institutional division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on

15

parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(e)(2)(B) (Vernon 1999).

In this case, Petitioner filed a written request for the foregoing instruction prior to the sentencing phase of his trial. (*See* Request for Instruction; CR 298). However, in Petitioner's trial, over Petitioner's objections, the court deviated from the mandatory language of Article 37.071, and instead substituted language related to parole and "good conduct time" from the non-capital sentencing article of the Texas Code of Criminal Procedure. The erroneous instruction read as follows:

Under the law applicable in this case, **the defendant, if sentenced to a term of life imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time carried by the prisoner.**

**It is also possible that the length of time for which the defendant will be imprisoned on a life sentence might be reduced by the award of parole.**

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, he will not become eligible for parole until the actual calendar time served, without consideration of good conduct time, equals forty (40) calendar years. Eligibility for parole does not guarantee that parole will be granted

16

**It cannot be accurately predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment for life, because the application of these laws will depend on decisions made by prison and parole authorities.**

**You may consider the existence of the parole law and good conduct time.  However, you are not to consider the extent to which good conduct time may be awarded or forfeited by this particular defendant.  You are not to consider the manner in which the parole law may be applied to this particular defendant.**

(CR 289-90; emphasis in bold added )

During the conference on the trial court's Charge to the Jury on Punishment, Petitioner's trial counsel made several objections to the erroneous language contained in the trial court's charge regarding Petitioner's eligibility for "good time credit" in the event the jury sentenced Petitioner to life in prison. (RR vol. 41, pp. 63-67).  Trial counsel's objections were based on the fact that the language used by the trial court tended to confuse the jurors and was misleading in violation of the 5th, 6th, 8th, and 14th Amendments to the United States Constitution. (RR vol. 41, pp. 66-67).  The trial court overruled Petitioner's objections to the jury instructions, finding "that the Charge as stated does present the law as required and as set forth by the Legislature and interpreted by the Court of Criminal Appeals of the State of Texas, and finds that all matters are adequately presented in the Charge to the jury." (RR vol. 41, p. 67).  By its own admission, the trial court was satisfied to substitute "adequacy" for "accuracy."

After the jury answered the Special Issues such that Petitioner was sentenced to death, the issue of Jury Charge error was presented to the Texas Court of Criminal

Appeals on automatic direct appeal. (*See* Appellant's Brief pp. 23-33).  Petitioner again

argued that the trial court's charge on punishment violated the 5th, 6th, 8th, and 14th

Amendments to the United States Constitution.  The Court of Criminal Appeals held that

the trial court erred in deviating from the mandatory language of Article 37.071, §

2(e)(2)(B), but the court then stated:

> ". . . we doubt the [objected to] portions of the charge could have
> misled the jury into believing that appellant might be eligible for parole in
> less than forty years through the award of good conduct time.  The issue
> that is dispositive of appellant's state-law and federal constitutional law
> claims is whether the jury was so misled or whether there is a reasonable
> likelihood that the jury applied the misleading parole charge in a way that
> prevented it from considering that a life-sentenced appellant would not be
> eligible for parole for forty years."

> *Ross v. State*, 133 S.W.3d 618, 623 (Tex. Crim. App. 2004).

It is somewhat unclear whether the Court of Criminal Appeals correctly identified

the controlling Supreme Court precedent because no reference to *Simmons v. South*

*Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed. 2d 133 (1994) is made in the opinion.

Assuming the Court did recognize the appropriate precedent, the application made in this

case was an unreasonable application of the precedent to the facts.  Specifically,

*Simmons* stands for the principle that the Due Process Clause of the Fourteenth

Amendment demands that a capital sentencing jury be provided with accurate information

regarding the actual duration of a term of incarceration when the State presents evidence

of the defendant's future dangerousness in arguing for a death sentence.  The *Simmons*

plurality recognized that:

18

To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration.  This grievous misperception was encouraged by the **trial court's refusal to provide the jury with accurate information regarding petitioner's parole ineligibility**, and by the State's repeated suggestion that petitioner would pose a future danger to society if he were not executed.  *Simmons*, 512 U.S. at 161-62.

The Court went further, saying

The State is free to argue that the defendant will pose a future danger to others in prison and that executing him is the only means of eliminating the threat of the safety of other inmates or prison staff.  **But the State may not mislead the jury by concealing accurate information about the defendant's parole ineligibility**. *Simmons*, 512 U.S. at 165, n. 5

Justice Stevens, in his dissenting opinion in *Ramdass v. Angelone*, 530 U.S. 156, 193-94, 120 S.Ct. 2113, 147 L.Ed. 2d 125 (2000) explained that:

Before examining what *Simmons*' due process requirements entail, however, it is important to understand the rationale behind *Simmons*: **the need for capital sentencing juries to have**

**accurate information about the defendant in the particular area of parole eligibility**.    (emphasis added).

The constitutional principal which the Court of Criminal Appeals should have

applied was, therefore, that where parole eligibility may effect the sentencer's

determination of whether one convicted of capital murder will probably commit criminal

acts of violence in the future, they must be given accurate information and to fail to

provide accurate information constitutes a deprivation of the due process of law

guaranteed by the Fourteenth Amendment to the Constitution of the United States.

19

### *Simmons v. South Carolina* Analysis

In *Simmons*, the narrow holding announced by a plurality of the Court was, "in the penalty phase of a state capital trial, where the defendant's future dangerousness is at issue, and where state law prohibits the release of one assessed a life sentence, the Fourteenth Amendment's due process clause requires that the sentencing jury be informed that the defendant is ineligible for parole under state law. *Simmons*, 512 U.S. at 156. At the time of Petitioner's capital sentencing hearing, Texas law did not provide for a life sentence without the possibility of parole as an alternative to the death penalty. However, it cannot be disputed that the then-existing sentencing structure prohibited a person serving a capital life sentence from obtaining an early release through accumulating good conduct time credit. Thus, Petitioner's case falls squarely within the legal principles espoused by *Simmons* – that a defendant's release date is relevant to the prosecution's "future dangerousness" argument in favor of death, and as a result, due process demands accurate information from the trial court regarding factors that could possibly lead to an early release. Further evidence that the *Simmons* rationale applied to Texas law is the fact that Dan Morales, the Texas Attorney General at the time *Simmons* was decided, filed an amicus curiae brief with the Supreme Court urging it to affirm Simmons' death sentence. *Simmons*, 512 U.S. at 155.

Under the applicable South Carolina capital sentencing structure, a person who was twice convicted of violent felonies was ineligible for parole upon conviction of a

third violent felony.  Simmons' capital murder conviction was his third violent felony

conviction, and he therefore would not  have been ineligible for parole had the jury

sentenced him to life in prison.  *Simmons*, 512 U.S. at 156.  Prior to jury selection, and

over objections from the defense, the prosecution successfully petitioned the trial court to

prohibit both sides from making any mention of parole during Simmons' trial.  *Id*.  The

prosecution then argued that Simmons' future dangerousness was a factor for the jury to

consider when fixing the appropriate punishment, stating that a verdict for death would be

"a response of society to someone who is a threat.  Your verdict will be an act of self-

defense."  *Id*. at 157.

In response to the prosecution's argument, defense counsel requested that

the trial court define "life imprisonment" in its charge to the jury on punishment to

accurately reflect the fact that Simmons was ineligible for parole.  In support of its

request, the defense presented evidence outside the evidence of the jury that conclusively

established that Simmons was in fact ineligible for parole, and proffered a jury instruction

that read:

> I charge you that these sentences mean what they say.  That is, if you
> recommend that the defendant Jonathan Simmons be sentenced to death, he
> actually will be sentenced to death and executed.  If, on the other hand, you
> recommend that he be sentenced to life imprisonment, he actually will be
> sentenced to imprisonment in the state penitentiary for the balance of his
> natural life.

> In your deliberations, you are not to speculate that these sentences
> mean anything other than what I have told you, for what I have told you is
> exactly what will happen to the defendant, depending on what your
> sentencing decisions is.

*Simmons*, 512 U.S. at 160.

Despite the uncontested accuracy of the proposed instruction, the trial court remained steadfast in its opposition to any mention of parole and refused to issue the instruction.  Ninety minutes into its punishment deliberations, the jury sent out a note asking, "Does the imposition of a life sentence carry with it the possibility of parole?"  *Id*.  The trial court's response was simply, "You are not to consider parole or parole eligibility in reaching your verdict.  Do not consider parole or parole eligibility.  That is not a proper issue for your consideration.  The terms life imprisonment and death sentence are to be understood in their plan [sic] and ordinary meaning."  *Id*.  Less than half an hour later the jury returned its verdict sentencing Simmons to death.

The U.S. Supreme Court's plurality opinion initially observed, "The Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to explain or deny.'"  *Id*. at 161, citing *Gardner v. Florida*, 430 U.S. 349, 362, 51 L.Ed. 2d 393, 97 S.Ct. 1197 (1977).  The plurality then cited  *Jurek v. Texas*, 428 U.S. 262, 275, 49 L.Ed. 2d 929, 96 S.Ct. 2950 (1976), to emphasize the substantial impact evidence of a defendant's future dangerousness has on a jury's sentencing determination, stating, "future dangerousness bears on all sentencing determinations made in our criminal justice system."  *Simmons*, 512 U.S. at 162.  The plurality also stated that "the actual duration of the defendant's prison sentence is indisputably relevant[,]" for a jury charged with assessing a defendant's future dangerousness, and that "there may be no greater assurance of a defendant's future

22

nondangerousness to the public than the fact that he never will be released on parole." *Id*.
at 163-64.

As noted above, although Texas did not have a life without the possibility of
parole sentencing alternative when Petitioner was sentenced to death, the trial court's
inaccurate jury instruction that "the defendant, if sentenced to a term of life
imprisonment, may earn time off the period of incarceration imposed through the award
of good conduct time[,]" (CR 289) was directly related to the "actual duration of the
defendant's prison sentence," and therefore, brings the facts of Petitioner's case within
the legal principle for which *Simmons* stands. Specifically, that principle that, "the State
may not mislead the jury by concealing accurate information about the defendant's parole
ineligibility. *Simmons*, 512 U.S. at 165 n. 5.

### *Ramdass v. Angelone* Analysis

In 2000, the Supreme Court revisited *Simmons* in deciding the case of *Ramdass v.
Angelone*, 530 U.S. 156, 120 S.Ct. 2113, 147 L.Ed. 2d 125 (2000). In *Ramdass*, almost
immediately upon the petitioner's release from a Virginia prison, he went on a four month
violent crime spree that included murder, several armed robberies, attempted murder in
the course of robbery, and the murder in the course of a robbery for which he was
sentenced to death. The Commonwealth of Virginia's sentencing scheme provided that a
person convicted of three separate felony offenses of murder, rape, or armed robbery,
which were not part of a common act, transaction or scheme, was ineligible for parole.
Virginia law also provided that after a jury returned a guilty verdict; the trial court then

could decide to either enter a judgment of conviction or set aside the verdict. A

conviction was not final for the purposes of Virginia's "three strikes" law until the trial

court entered the order of conviction. At the time of Ramdass' capital murder trial, he

had one final violent felony conviction. A jury had found him guilty of a second armed

robbery, but the trial court had not entered a final order of conviction in the second case.

Thus, according to the Virginia Supreme Court, Ramdass was not parole ineligible at the

time he was sentenced to death, and therefore, he was not entitled to a

*Simmons* instruction. *Ramdass*, 530 U.S. at 164.

In the Supreme Court, Ramdass argued that the facts of his case were

indistinguishable from *Simmons*, "even though the Virginia Supreme Court declared he

was not parole ineligible at the time of his sentencing trial because no judgment of

conviction had been entered in the Domino's crime." *Id*. at 166. A plurality of the Court,

consisting of the dissenting judges from the *Simmons* opinion, held:

> In this case, a *Simmons* instruction **would not have been accurate
> under the law**; for the authoritative determination of the Virginia Supreme
> Court is that petitioner was not ineligible for parole when the jury
> considered his sentence. In *Simmons* the defendant had 'conclusively
> established' his parole ineligibility at the time of sentencing. Ramdass had
> not. . . . Material differences exist between this case and *Simmons*, and the
> Virginia Supreme Court's decision is not contrary to the rule *Simmons*
> announced.

> *Ramdass*, 530 U.S. at 167 (internal citations omitted) (emphasis
> added).

Significantly, although the plurality did not grant habeas relief to Ramdass, the highlighted portion of its opinion once again demonstrates that the Court's analysis focused on the legal accuracy of the instructions provided to the jury by the trial court.

As a practical matter, "parole" and "good conduct time" both affect the actual duration of a defendant's sentence.  On direct appeal, the State conceded that Petitioner was ineligible to have the duration of his sentence reduced below forty years through the award of good conduct time, and the Court of Criminal Appeals also found that the trial court's instruction on the matter was erroneous.  *See Ross*, supra, 133 S.W.3d at 623, stating, "The State concedes that the parole charge should not have included the good conduct time language but argues that appellant was not harmed by the parole charge.  We agree that the parole charge was erroneous since it does not comply with Article 37.07, § 2(e)(2)(B)."  Hence, Petitioner conclusively established he was ineligible to have his sentence reduced through the award of good conduct time credit, and the trial court's instruction on the matter was legally inaccurate.  The threat to Petitioner's due process rights under the 14th Amendment were the same as in *Simmons* even though in this case the mechanism of early release was good conduct time and in *Simmons* it was parole.

That the accuracy of the trial court's jury instructions is the lynchpin of any *Simmons* analysis is provided by the dissenting opinion in *Ramdass*, written by Justice Stevens and joined by others who formed the *Simmons* plurality.  Justice Stevens argues that, "Even the most miserly reading of the opinions in *Simmons v. South Carolina*,

supports the conclusion that this petitioner was denied 'one of the hallmarks of due

process in our adversary system,' namely, the defendant's right 'to meet the State's case

against him.' *Ramdass*, 530 U.S. at 182 (Stevens, J., dissenting).  Using language that

made his point as clearly as possible, Justice Stevens prefaced his argument by stating,

"Before examining what *Simmons*' due process requirements entail, however, it is

important to understand the rationale behind *Simmons*: **the need for capital sentencing**

**juries to have accurate information about the defendant in the particular area of**

**parole eligibility**." *Id*. at 193-94 (emphasis added).

Justice Stevens elaborated his point by quoting *Gregg v. Georgia*, 428 U.S. 153,

49 L.Ed. 2d 859, 96 S.Ct. 2909 (1976), "If an experienced trial judge, who daily faces the

difficult task of imposing sentences, has a vital need for accurate information about a

defendant and the crime he committed in order to able to impose a rational sentence in the

typical criminal case, then **accurate sentencing information is an indispensable**

**prerequisite to a reasoned determination of whether a defendant shall live or die by**

**a jury of people who may never before have made a sentencing decision**." *Ramdass*,

530 U.S. at 194 (emphasis added).  Justice Stevens continued his point about the need for

accurate sentencing information, stating:

This imperative is all the more critical when the jury must make a determination as

to future dangerousness.  "Any sentencing authority must predict a convicted person's

probable future conduct when it engages in the process of determining what sentence to

impose. . . . What is essential is that the jury have before it all possible relevant

information about the individual defendant whose fate it must determine." *Jurek v.*

*Texas*, 428 U.S. 262, 274-76, 49 L.Ed. 2d 929, 96 S.Ct. 2950 (1976) (joint opinion of

Stewart, Powell, and Stevens, JJ.).  When it comes to issues such as future dangerousness

and the possibility of parole, it is therefore vitally important that "the jury [have] accurate

information of which both the defendant and his counsel are aware," including "**an**

**accurate statement of a potential sentencing alternative.**" *California v. Ramos*, 463

U.S. 992, 1004, 1009, 77 L.Ed. 2d 1171, 103 S.Ct. 3446 (1983).

> *Ramdass*, 530 U.S. at 194 (emphasis added).

The importance of accurate sentencing information as it relates to due process of

law is not  only the guiding principle of *Simmons*, but is also based on other clearly

established United States Supreme Court precedent that predated *Simmons*.  *See*, supra,

*Gregg v. Georgia*, 428 U.S. 153, 49 L.Ed. 2d 859, 96 S.Ct. 2909 (1976); *Jurek v. Texas*,

428 U.S. 262, 274-76, 49 L.Ed. 2d 929, 96 S.Ct. 2950 (1976); *California v. Ramos*, 463

U.S. 992, 1004, 1009, 77 L.Ed. 2d 1171, 103 S.Ct. 3446 (1983).  Since *Simmons* stands

on the shoulders of *Gregg*, *Jurek*, and *Ramos*, its guiding principle on which Petitioner

now avails himself to cannot be contained within a narrow "miserly reading" of its literal

holding.

### *Luquis v. State* Analysis

In resolving Petitioner's federal constitutional points of error in favor of the State,

The Court of Criminal Appeals heavily relied on its own reasoning from *Luquis v. State*,

72 S.W.3d 355 (Tex. Crim. App. 2002), a non-capital case which also involved issues of

parole and good conduct time.  *Ross*, supra, 133 S.W.3d at 623-24.  In its Ross opinion,

the Court of Criminal Appeals wrote, "In *Luquis*, we decided that a charge like the one

here 'which informs the jury of the existence of good conduct time, briefly describes the

concept, and explicitly tells the jury not to apply that concept to the particular defendant'

does not violate federal due process even 'if the defendant's eligibility for parole . . . will

not be affected by good conduct time.'"  *Id*., quoting, *Luquis*, 72 S.W.3d at 365.  The

Court of Criminal Appeals then mentioned two important distinguishing factors of *Luquis*

without actually analyzing their significance, stating, "Though *Luquis* was a noncapital

case involving no jury charge error under state law, its reasoning applies here."  *Ross*, 133

S.W.3d at 624.  A closer look at *Luquis* and its reasoning reveal that this statement is also

inaccurate.

In *Luquis*, the appellant murdered a fellow inmate while incarcerated in a Texas

state penitentiary.  Luquis' trial counsel objected to the inclusion of a statutorily

mandated parole jury instruction in the trial court's charge to the jury on punishment.  *Id*.

at 358-59.  Also of note, is the fact that instruction was required by Texas Code of

Criminal Procedure Article 37.07, which is the Texas non-capital sentencing authority.

*See* Tex. Code Crim. Proc. Ann. art. 37.07, § 4(a) (Vernon 1999).  The trial court

followed the mandatory language of the statute and the Court of Criminal Appeals

correctly held that it did err in doing so, stating:

The Texas Legislature enacted legislation that *requires* the trial judge to instruct

the jury in the precise wording that the statute recites.  Article 37.07, section 4(a) sets out,

28

verbatim, the words that the trial judge is to use.  There are even quotation marks around the wording of the instruction.  That is at least some indication that the Legislature did not want any creative deviations from its chosen language.  The Legislature prefaced its instruction language with directions that 'the court *shall* charge the jury in writing as follows: . . .' The use of the word 'shall' generally indicates a mandatory duty.  There is no reason to think that the Legislature enacted merely a suggested parole law jury instruction, one that trial judges should cut and paste as they see fit. . . . Trial judges may occasionally doubt the wisdom of a particular law, but they are not free to ignore explicit legislative directions unless those directives are clearly unconstitutional.  Therefore, because the trial judge in the case instructed the jury according to the legislative dictate expressed in article 37.07, section 4(a), he did not commit error.

     *Id*. at 363 (emphasis supplied in original).

     The significance in the Court of Criminal Appeals' finding that the inclusion of the charge was not error comes to light later in the court's opinion when it reviews Luquis' due process claim and decides, "under Supreme Court precedent, we will not find federal constitutional error unless we conclude that a reasonable jury probably was actually confused by this charge."  *Id*. at 366-67.  Footnote 37 immediately follows that sentence, and cites *Boyd v. California*, 494 U.S. 370, 380, 108 L.Ed. 2d 316, 110 S.Ct. 1190 (1990), for the proposition that, "**jury instructions which are not themselves legally erroneous** but might be 'ambiguous and therefore subject to an erroneous interpretation' or application are reviewed to determine whether there is a reasonable likelihood that the

29

jury has applied the challenged instruction' in an erroneous way." *Luquis*, 72 S.W.3d at 367 n. 37 (emphasis added).  The standard applied by the Court of Criminal Appeals in deciding *Luquis* was predicated on first finding that the jury instruction was not erroneous, which was not the true in Petitioner's case.  Thus, the very foundation of the Court of Criminal Appeals's *Luquis* analysis was wholly inapplicable to Petitioner's federal due process claim.

The court's misapplication of *Luquis* to Petitioner's case is highlighted by the fact that it referred to *Estelle v. McGuire*, 502 U.S. 62, 72, 116 L.Ed. 2d 385, 112 S.Ct. 475 (1991) holding that "the [objected to jury] instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Luquis*, 72 S.W.3d at 366.  The Court of Criminal Appeals again emphasized the importance of evaluating the charge as a whole when it quoted *Boyde*, supra, 494 U.S. at 380, stating, "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might." *Luqis*, 72 S.W.3d at 367, n. 37.  However, despite the Court of Criminal Appeals' great care in explaining the importance of viewing the court's charge as a whole, and the Court's reliance on Supreme Court precedent in making this point, the court ultimately based its holding on the assertion that one sentence in the trial court's charge explicitly told the jurors what to do.  The court claimed:

Thus, a fair analysis of the parole instruction and the claim that it violates due process requires us to consider the instruction as a whole.  The first two paragraphs

mention good conduct time and parole in a general way.  The third makes it clear that appellant's eligibility for parole is one-half his actual sentence, or thirty years, whichever is less, 'without consideration of any good time he may earn,' This sentence contains the instruction's only indicative language, unlike the rest of the instruction which is written in conditional language, replete with 'may,' 'might,' 'possible,' 'does not guarantee,' and 'cannot be accurately predicted.'  This one factual sentence is the heart of the matter. *Luquis*, 72 S.W.3d at 366.

Thus, the *Luquis* court reversed itself mid-opinion and concluded that "one factual sentence" was all that due process required, even when that rest of the charge was "replete with" ambiguous language.  Such circuitous reasoning may pass due process scrutiny in a non-death penalty case in which the trial court properly followed the mandatory statutory instructions, but the Court of Criminal Appeals' reliance on *Luquis* to overrule Petitioner's due process claims in a death penalty case where the language was admittedly erroneous is nothing short of an unreasonable application of its own precedent, and practically no application to relevant U.S. Supreme Court precedent.

In pursuing the death penalty against Petitioner, there is no question that the State, at least in part, based its argument on Petitioner's future dangerousness, thus triggering the trial court's duty to provide the jury with accurate information about the actual duration of a life sentence under Texas' sentencing structure.  In fact, the first special issue under Article 37.071 asks the jurors to determine whether there is a probability that Petitioner would commit criminal acts of violence which would constitute a continuing

threat to society. (CR 292). Furthermore, in its closing arguments on punishment, the State's attorneys repeatedly referenced a prior unrelated incident in which Petitioner "sliced and stabbed his girlfriend," (RR vol. 41, p. 70), argued that he would be a threat to "guards, nurses, [and] staff workers" within the penitentiary (RR vol. 41, p. 70), and the threat of Petitioner's escape from custody. (RR vol. 41, p. 70). The prosecution also argued, "Is there any doubt in anybody's mind this guy is a future danger? Good grief. That somebody could do this to another human being and you're concerned whether or not he's a future danger? And you have the audacity to get up here and say he's not? Come on." (RR vol. 41, p. 87).

There is also no question that the trial court's instructions were erroneous and inaccurate. The prosecution conceded the issue on direct appeal, and the Court of Criminal Appeals agreed that the trial court erred in its failure to follow the mandatory language of Article 37.071, § 2(e)(B)(2). *See Ross*, supra, 133 S.W.3d at 623.

The only remaining question, given that the first two prerequisites of *Simmons* were satisfied, is whether the Court of Criminal Appeals unreasonably misapplied the legal principle that due process demands accuracy in the instructions provided to a capital sentencing jury to the facts of Petitioner's case. As detailed above, the Court of Criminal Appeals did not resolve Petitioner's due process claims in accordance with *Simmons*, or any other applicable Supreme Court precedent. The Court of Criminal Appeals opinion never even cited *Simmons* in addressing Petitioner's due process argument. The Court of Criminal Appeals instead based its decision on its

32

reasoning in *Luquis v. State*, but that case's legal analysis is entirely inapplicable to Petitioner's case.

Under the Due Process Clause of the Fourteenth Amendment, Petitioner was entitled to have the trial court provide his sentencing jury with accurate information about the sentencing alternative to the death penalty. Article 37.071, § 2(e)(2)(B) uses mandatory language in instructing trial courts as to what should be contained in a capital sentencing charge. The text of the statute is the best indication of the legislature's intent, and the language of Article 37.071 is absolutely unambiguous. The fact that the Texas state legislature saw fit to inform juries in non-capital cases that they "may consider the existence of the parole law and good conduct time[,]" but choose not to do so in death penalty cases, indicates that the legislature saw at least some harm advising capital juries to even abstractly consider the general concepts of parole and good conduct time. The United States Supreme Court routinely defers to the State's choice of substantive factors relevant to the penalty determination. *See Ramos*, supra, 463 U.S. at 1001. However, in this case, the trial court usurped the legislature's authority to determine what relevant factors should, and should not, be brought to the jury's attention.

The *Simmons* Court stated that, "Because truthful information of parole ineligibility allows the defendant to 'deny or explain' the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court." 512 U.S. at 169 (internal citation omitted). In that case, the trial court refused to allow *any*

mention of parole throughout the trial and also refused to charge the jury on the subject.

Petitioner's case is factually distinguishable from *Simmons* for two reasons.  First, Texas

law did not provide for life without the possibility of parole as a sentencing alternative to

the death penalty.  Second, the trial court did allow defense counsel to provide the jury

with accurate information about a capital life sentence in his final arguments.

The existence of parole does not remove Petitioner's case from the purview of

*Simmons*.  As stated above, under Texas law, good conduct time is directly related to the

actual duration of a prisoner's term of incarceration.  Just as Simmons was ineligible to

have his sentence reduced through parole under South Carolina law, Petitioner was

ineligible to have his term of incarceration reduced through the award of good conduct

time.  Thus, the two concepts are substantially related, and *Simmons* still applies to the

instant case.

As for trial counsel's accurate description of the Texas capital life sentencing

scheme during his closing argument, the record indicates that this was a derivative

decision based on the trial court's erroneous charge.  The trial court had already

submitted its Charge on Punishment to the jurors, which placed counsel in the position of

either attempting to correct the charge on argument or remain silent.  Although

*Simmons* held that due process was satisfied by either an accurate jury instruction or

accurate argument from counsel, in Petitioner's case, the harm was complete the moment

the trial court read its erroneous charge to the jurors.  The legislature did not intend for

capital sentencing jurors to contemplate the existence of good conduct time, but the trial court's charge authorized the jury in Petitioner's case to do just that.

Furthermore, the well-settled presumption is that juries follow the court's instructions absent evidence to the contrary.  However, there is no such presumption that juries follow and believe everything that defense attorneys say during closing arguments. In a situation where the court's charge and defense counsel's statements contain conflicting information; the situation results in confusion and possibly even juror mistrust of the defense counsel.  In any event, accuracy was lost when the trial court sandwiched the proper Article 37.071 jury instruction between paragraphs of erroneous non-capital instructions.  In the absence of accurate instructions regarding the sentencing alternative to the death penalty, the reliability of the jury's verdict must necessarily be called into question.  Simply put, without accuracy there cannot be reliability, and more specifically, without accuracy the Due Process Clause of the Fourteenth Amendment is violated.

In *Woodson v. North Carolina*, the question before the Court was whether the automatic imposition of the death penalty upon a finding of guilty in a capital murder case comported with the Eighth and Fourteenth Amendments to the United States Constitution.  428 U.S. 280, 285, 96 S.Ct. 2978, 49 L.Ed. 2d 944 (1976) (plurality opinion).  In finding the North Carolina automatic death penalty sentencing structure unconstitutional, the plurality initially noted that, "The Eighth Amendment stands to ensure that the State's power to punish is 'exercised within the limits of civilized standards[,]'" and that "[c]entral to the application of the Amendment is a determination

35

of contemporary standards regarding the infliction of punishment." *Woodson*, 428 U.S. at

288, quoting *Trop v. Dulles*, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed. 2d 630 (1958).  The

Court then held:

> This conclusion rests squarely on the predicate that the penalty of death is
> qualitatively different from a sentence of imprisonment, however long.  Death, in its
> finality, differs more from life imprisonment than a 100-year prison term differs from one
> of only a year or two.  **Because of that qualitative difference, there is a corresponding**
> **difference in the need for reliability in the determination that death is the**
> **appropriate punishment in a specific case.**
> *Woodson*, 428 U.S. at 305 (emphasis added).

*Woodson*, therefore, stands for the proposition that a jury's decision to impose the

death penalty must be based on accurate information about the offense and the defendant,

as well as accurate information regarding the sentencing alternative to death, in order to

have the constitutionally mandated reliability in the sentence.  The court went further,

stating, ". . . we believe that in capital cases the fundamental respect for humanity

underlying the Eighth Amendment . . . requires consideration of the character and record

of the individual offender and the circumstances of the particular offense as a

constitutionally indispensable part of the process of inflicting the penalty of death."

(internal citation omitted). *Woodson*, 428 U.S. at 304.

The Eighth Amendment claim made by Petitioner in his direct appeal relies on the

principal that a sentencing jury must be accurately instructed and that any sentence

carried based on inaccurate instructions constitutes cruel and unusual punishment.  The

trial court's failure to comply with the mandatory language of Texas Code of Criminal

Procedure Article 37.071, § 2(e)(2)(B), left the jury without accurate information about

the sentencing alternative to death.  As a result of the inaccurate instructions, it cannot be said that the jury's decision to impose the death sentence was, or appeared to be, based on reason instead of caprice or emotion.  *See Woodson*, supra, 439 U.S. at 358.  Instead, the jury's imposition of the death sentence was based on a false choice.

Therefore, even if this Court finds that the Court of Criminal Appeals did not engage in an unreasonable application of clearly established precedent when it denied Petitioner's Fourteenth Amendment claim, the Court did unreasonably apply clearly established United States Supreme Court Eighth Amendment precedent and Petitioner is entitled to relief.

## **Failure to Object or Request a Mistrial**

As was noted above, in order to satisfy the two prongs of the *Strickland* test, a Petitioner must show that not only was trial counsel's performance deficient, but that it also prejudiced the Petitioner to the point where the outcome of the trial might have been different.

In the instant case, on at least two occasions trial counsel failed to object allowed highly inflammatory and damaging testimony pertaining to the Petitioner threatening people with a gun to come into evidence. *See* 34 RR at 144, 165-166.

Further, at the one time Counsel did offer an objection which was sustained, he failed either to request a curative instruction or a mistrial. Clearly, this behavior on the part of trial counsel cannot in any way be considered part of any kind of trial strategy and

thus falls within the penumbra of the first prong of the *Strickland* test, *i.e,* that counsel's performance was deficient. *See Ward v. Dretke,* 420 F.3d 479, 490-491 (5th Cir. 2005).

With respect to the second prong of the *Strickland* test, that of prejudice, there can be no doubt that the Petitioner suffered extreme prejudice, as the only evidence that came before the jury pertaining to his use of a firearm came in through these inadmissible hearsay statements, and counsel made no attempt mitigate the harm by requesting the Court to give a curative instruction to the jury or to in fact declare a mistrial.

The same analysis applies to the matter of trial counsel's failure to object or renew his objections to the hearsay evidence introduced during the examination of Officer Knobbe or to request a curative instruction or mistrial. Once again, through the errors of counsel highly inflammatory and damaging evidence was allowed to come before the jury with no attempt by counsel to mitigate its effect by renewing his objection or requesting a curative instruction or a mistrial.

Similarly, the prejudice suffered by the Petitioner as a result of counsel's errors was substantial. The incident regarding the alleged assault of Regine Carlisle was the only incident of allegedly violent conduct by Ross that came before the jury, and it came in entirely through hearsay as a result of counsel's deficient performance.

It is respectfully submitted that the prejudice caused by counsel's failure to object, request a curative instruction or request a mistrial regarding the introduction of inflammatory and damaging hearsay evidence during both the guilt and punishment phases of his trial warrants relief in the form of a new trial.

## Law governing *Brady* claims

In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The Court further held that the withheld evidence must be material to the outcome of the trial or hearing in order to establish a constitutional violation. *Id.* at 88, 83 S.Ct. 1197.

In *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555 (1995), the Supreme Court elaborated on the prejudice standard set forth in *Brady:*

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id.* at 434, 115 S.Ct. at 1566 (citation omitted).

In *Strickler v. Greene*, 527 U.S. 263, 281 119 S.Ct. 1936, 1948 (1999) the Supreme Court extended the prosecution's duty to learn of potential exculpatory evidence under *Brady* to law enforcement agencies.

The Fifth Circuit Court of Appeals has also held that:

> The United States Constitution forbids the Government from withholding evidence favorable to the accused **or useful for**

> **impeachment of a witness who testified against the accused**. *[citation omitted].*   Suppression of evidence favorable to the accused requires reversal if there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different.   *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). A "reasonable probability" for the purposes of this analysis is a probability sufficient to undermine the confidence in the outcome. *Id.*

*U.S. v. Sotelo,* 97 F.3d 782, 792 (5th Cir. 1996) (emphasis supplied). *See also, Miller v. Dretke*, 431 F.3d 241, 255 (5th Cir. 2005) (Garza, J. dissenting).

In the instant case defense counsel filed two discovery motions specifically requesting criminal history information on the State's witnesses, which could only have been provided by the State. *See* CR at 9, 16.

Prior to the commencement of the punishment phase of the Petitioner's trial, the State  filed a Notice of Extraneous Offenses, Bad Acts and Prior Convictions. CR at 147. Included in the notice were a series of acts pertaining to  a conviction for Aggravated Assault causing serious bodily injury, committed on or about the 13th day of July, 1997 in St. Louis County, Missouri. *Id.* at ¶¶ 4-8. The victim of these acts and offenses was Regina Carlisle, who had been listed as a witness by the State as early as July 24, 2002 and again in the State's 1st Supplemental Witness List. CR at 142, 225.

Because the incident involving Ms. Carlisle was the sole piece of evidence presented by the prosecution pertaining to Mr. Ross's propensity for violent behavior, the impeachment of Ms. Carlisle, either through subpoenaing her to trial or questioning Officer Knobbe about her criminal history and background was essential to the

40

Petitioner's case against future dangerousness, and the State's failure to supply this evidence clearly undermined the outcome of the punishment phase of the Petitioner's trial with respect to the issue of future dangerousness.

It is therefore respectfully submitted that the cumulative effect of the errors of counsel and the conduct of the State in failing to supply critical impeachment evidence to the defense so infected the Petitioner's trial with prejudice that a new trial should be granted.

For the foregoing reasons, Petitioner respectfully submits that relief should be granted and that he should be granted a new trial.

**RICHARD L. WARDROUP**
Attorney at Law
1001 Main Street, Suite 707
Lubbock, Texas 79401
(806)744-1911
Fax (806)762-1699

By:/s/_____
    Richard L. Wardroup
    State Bar No. 20861200
    Counsel for Mr. Ross

**DON VERNAY**
Attorney at Law
1604 Golf Course Road SE
Rio Rancho, NM 87124
(505) 892-2766
(505) 892-8119 (facsimile)

By: /s/_____
    Don Vernay
    State Bar No. 24035581
    Co-Counsel for Mr. Ross

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing Petition for Habeas Corpus by a

Person in State Custody was mailed to the Texas State Attorney General's Office, Capital

Litigation Unit,  P.O. Box 12548, Capital Station, Austin, Texas 78711-2548 on January

12, 2008.


_____

Richard L. Wardroup