IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| VAUGHN ROSS, | § | |
| Petitioner, | § | |
| | § | |
| V. | § | CIVIL CAUSE NO. 5:08-CV-0174-C |
| | § | DEATH PENALTY CASE |
| | § | ECF |
| NATHANIEL QUARTERMAN, | § | U.S. District Judge Sam Cummings |
| Director, Texas Department | § | |
| of Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

_____

RESPONDENT'S ANSWER

_____

GREG ABBOTT                                EDWARD L. MARSHALL
Attorney General of Texas      Chief, Postconviction Litigation Division

ANDREW WEBER
First Assistant Attorney General                *TOMEE M. HEINING
                                                Assistant Attorney General
                                        Postconviction Litigation Division
ERIC J.R. NICHOLS                        P.O. Box 12548, Capitol Station
Deputy Attorney General                          Austin, Texas 78711
Criminal Justice                                      (512) 936-1600

* Counsel of Record

ATTORNEYS FOR RESPONDENT

_____

RESPONDENT'S ANSWER
TABLE OF CONTENTS

Page

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT REGARDING THE RECORD. . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.      Facts of the Crime. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.     Punishment-Phase Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      Evidence by the State. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        B.      Evidence by the defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.      Ross Received the Effective Assistance of Counsel at Punishment.. . 14

II.     Trial Counsel's Punishment-Phase Mitigation Investigation was
        Neither Deficient Nor Prejudicial.. . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        A.      Ross does not demonstrate deficient performance. . . . . . . . . . 25

        B.      Ross does not demonstrate prejudice... . . . . . . . . . . . . . . . . . 29

III.    The State Court Did not Unreasonably Apply Controlling
        Federal Law in Concluding the Jury was not Mislead by the
        Punishment Phase Jury Charge, and Any Error in the
        Instruction Does Not Amount to a Constitutional Violation.. . . . . . . 34

TABLE OF CONTENTS, Continued

IV.   Counsel Was Not Ineffective and Ross Was Not Prejudiced By Counsel's Failure to Object to Alleged Hearsay Statements, or Request a Mistrial.......................................................... 43

      A.   A portion of this claim is unexhausted and procedurally barred.............................................................. 44

      B   Ross fails to demonstrate deficient performance or prejudice.............................................................. 47

V.   Ross's Brady Claim is Unexhausted and Meritless................ 54

      A.   This claim is unexhausted and procedurally barred.......... 54

      B.   This claim is meritless................................... 56

VI.   Trial Counsel was Not Ineffective for Failing to Object to Officer Knobbe's Testimony, and the Admission of this Testimony was Harmless and Not Prejudicial.................................. 59

CONCLUSION................................................ 63

## TABLE OF AUTHORITIES, Continued

Cases                                                                    Page

Amos v. Scott, 61 F.3d 333 (5th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Autry v. McKaskle, 727 F.2d 358 (5th Cir. 1984). . . . . . . . . . . . . . . . . . . . 23,27

Bagley v. Collins, 1 F.3d 378 (5th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . 39

Bartee v. Quarterman, 574  F.Supp.2d 624 (W.D.Tex. 2008). . . . . . . . . . 48,61

Beazley v. Johnson, 242 F.3d 248 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . 46,55

Bell v Cone, 535 U.S. 685 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Boyde v. California,  494 U.S. 370 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Brady v. Maryland, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Brecht v. Abrahamson, 507 U.S. 619 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . 38

Burruss v. State, 20 S.W.3d 179 (Tex.App. - Texarkana 2000, pet.ref'd). . . . 60

Brown v. Estelle, 701 F.2d 494 (5th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . 45

Coleman v. Thompson, 501 U.S. 722 (1991). . . . . . . . . . . . . . . . . . . . . . . . 46,55

Crawford v. Washington, 541 U.S. 36 (2004). . . . . . . . . . . . . . . . . . . . . . . . . 60

Cruz v. New York, 481 U.S. 186 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Cupp v. Naughten, 414 U.S. 141 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Delaware v. Van Arsdall, 475 U.S. 673 (1986). . . . . . . . . . . . . . . . . . . . . . 49,50

Dispensa v. Lynaugh, 847 F.2d 211 (5th Cir. 1988). . . . . . . . . . . . . . . . . . . . 45

Dowthitt v. Johnson, 230 F.3d 733 (5th Cir. 2000). . . . . . . . . . . . . . . . . passim

## TABLE OF AUTHORITIES, Continued

Cases                                                                      Page

Drew v. Collins, 964 F.2d 411 (5th Cir. 1992)............................ 59

Early v. Packer, 537 U.S. 3 (2002).................................... 13

Estelle v. McGuire, 502 U.S. 62 (1991). ......................... 35,36,37

Ex parte Akhtab, 901 S.W.2d 488 (Tex. Crim. App. 1995)............ 43,60

Foster v. Johnson, 293 F.3d 766 (5th Cir. 2002)........................ 11

Galvan v. Cockrell, 293 F.3d 760 (5th Cir. 2002). ................ 37,38,39

Gardner v. Florida, 430 U.S. 349 (1977)............................. 40

Givens v. Cockrell, 265 F.3d 306 (5th Cir. 2001). ................ 16,44,61

Gochicoa v. Johnson, 238 F.3d 278 (5th Cir. 2000)................... 48,62

Hafdahl v. Johnson, 251 F.3d 528 (5th Cir. 20001). .............. 50,53,62

Graham v. Johnson, 94 F.3d 958 (5th Cir. 1996). ..................... 45

Henderson v. Kibbe, 431 U.S. 145 (1977). ........................ 37,38

Hicks v. Johnson, 186 F.3d 634 (5th Cir. 1999). ................... 46,55

Idaho v. Wright, 497 U.S. 805 (1990)................................ 53

Johnson v. Cockrell, 306 F.3d 249 (5th Cir. 2002). ................... 27

Jones v. Johnson, 171 F.3d 270 (5th Cir. 1999). ..................... 46

Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992)....................... 46,55

Kinnamon v. Scott, 40 F.3d 731 (5th Cir. 1994). ................... 29,37

TABLE OF AUTHORITIES, Continued

Cases                                                                        Page

Kyles v. Whitley, 111 S. Ct. 333 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57,59

Lockyer v. Andade, 538 U.S. 63 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Luquis v. State, 72 S.W.3d 355 (Tex. Crim. App. 2002). . . . . . . . . . . . . . . . 35

Martin v. Cain, 246 F.3d 471 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . 13

Miller v. Dretke, 431 F.3d 241 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . 58

Miniel v. Cockrell, 339 F.3d 331 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . 32

Mitchell v. Esparza, 540 U.S. 12 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Montoya v. Johnson, 226 F.3d 399 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . 48,61

Muniz v. Johnson, 132 F.3d 214 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . . 46,55

Neal v. Puckett, 286 F.3d 230 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . 13

Nixon v. Epps, 405 F.3d 318 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . 27

Parker v. Randolph, 442 U.S. 62 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Penry v. Johnson, 532 U.S. 782 (2001) ("Penry II"). . . . . . . . . . . . . . . . . . 11,12

Ramdass v. Angelone, 530 U.S. 156 (2000). . . . . . . . . . . . . . . . . . . . . . . . . 41

Roberts v. Dretke, 356 F.3d 632 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . 23,27

Rodriguez v. McKaskle, 724 F.2d 463 (5th cCir. 1984). . . . . . . . . . . . . . passim

Rodriguez v. State, 974 S.W.2d 364
    (Tex. App. - Amarillo 1998, pet.ref'd). . . . . . . . . . . . . . . . . . . . . . . . 22,23

Rompilla v. Beard, 545 U.S. 374 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . passim

TABLE OF AUTHORITIES, Continued

Cases                                                                    Page

Santellan v. Cockrell, 271 F.3d 190 (th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . 13

Sawyer v. Whitley, 505 U.S. 333 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Sayre v. Anderson, 238 F.3d 631 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . 28,29

Schlup v. Delo, 513 U.S. 298 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Schriro v. Landrigan, 147 S. Ct. 1933 (2007). . . . . . . . . . . . . . . . . . . . . . . . . 28

Simmons v. South Carolina, 512 U.S. 154 (1994). . . . . . . . . . . . . . . . . . . passim

Strickland v. Washington, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . passim

Strickler v. Greene, 527 U.S. 263 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Styron v. Johnson, 262 F.3d 438 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . 16

Sullivan v. Blackburn, 804 F.2d 885 (5th Cir. 1986). . . . . . . . . . . . . . . . . . . 37

Tucker v. Johnson, 242 F.3d 617 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Agurs, 427 U.S. 97 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . 57

United States v. Cravero, 545 F.2d 406 (5th Cir. 1976). . . . . . . . . . . . . . . . . 57

United States v. Edwards, 303 F.3d 606 (5th Cir. 2002). . . . . . . . . . . 50,60,62

United States v. Masat, 896 F.2d 88 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . 28

Valdez v. Cockrell, 274 F.3d 941 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . 14

Vela v. Estelle, 708 F.2d 954 (5th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . 45,55

Whitehead v. Johnson, 157 F.3d 384 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . 45

## TABLE OF AUTHORITIES, Continued

Cases                                                                 Page

Wiggins v. Smith, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . passim

(Michael) Williams v. Taylor, 529 U.S. 420 (2000). . . . . . . . . . . . . . . . . . 12,13

(Terry) Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . passim

Woodford v. Visciotti, 537 U.S. 19 (2002). . . . . . . . . . . . . . . . . . . . . . . . 13,24

Woodson v. North Carolina, 428 U.S. 280 (1976). . . . . . . . . . . . . . . . . . . . . 41

Wright v. West, 505 U.S. 277 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Constitutions, Statutes and Rules

U. S. Const., amend. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

U. S. Const., amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U. S. Const., amend. VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41,42

U. S. Const., amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

28 U.S.C. § 2254. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Tex. Code Crim. Proc. Ann. art. 11.071. . . . . . . . . . . . . . . . . . . . . . . . . 46,55

Tex. Code Crim. Proc. Ann. art. 37.071. . . . . . . . . . . . . . . . . . . . . . . . . 35,36

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| VAUGHN ROSS, | § | |
|       Petitioner, | § | |
| | § | |
| V. | § | CIVIL CAUSE NO. 5:08-CV-0174-C |
| | § | DEATH PENALTY CASE |
| | § | ECF |
| NATHANIEL QUARTERMAN, | § | U.S. District Judge Sam Cummings |
| Director, Texas Department | § | |
| of Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
|       Respondent. | § | |

## RESPONDENT'S ANSWER

Texas death-row inmate Vaughn Ross challenges his presumptively valid capital murder conviction and sentence of death by filing a writ of habeas corpus petition pursuant to 28 U.S.C. § 2254, and brief in support. Docket Entry ("DE") #8 and #9. However, Petitioner fails demonstrate that the state court's adjudication of his claims was both incorrect and objectively unreasonable; he fails to allege either cause and prejudice or fundamental miscarriage of justice to enable the Court to consider the merits of his defaulted claims; and he fails to prove that his claims merit relief. Therefore, Respondent asks the Court to deny relief and deny a certificate of appealability ("COA").

## PETITIONER'S ALLEGATIONS

1.     The Petitioner was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to investigate the nature and extent of Regina Carlisle's criminal history and, as a result, failed to develop evidence to contradict and impeach the State's punishment evidence.

2.     The Petitioner was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to investigate and present mitigating evidence that called for a sentence less than death.

3.     The Texas Court of Criminal Appeals's decision that there was no reasonable likelihood that the jury could have been mislead and that the jury was not mislead by the erroneous jury charge submitted at the punishment phase was contrary to, and involved an unreasonable application of, clearly established federal constitutional law as determined by the Supreme Court of the United States.

4.     The Petitioner was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to request an instruction to disregard or a mistrial after the State's continued questioning of Ronnie Martin subsequent to the Court's sustaining the defense counsel's hearsay objection and counsel's failure to object to hearsay or request a mistrial regarding testimony from Liza McVade about the Petitioner's alleged possession and use of a firearm.

5.     The actions of the prosecution in failing to provide defense counsel with the criminal history of Regina Carlisle and then "ambushing" the defense by introducing Ms. Carlisle's testimony through inadmissible hearsay, constitutes a violation of the Petitioner's right to due process of law under the Fifth and Fourteenth Amendments of the United State's Constitution, and Brady v. Maryland, 373 U.S. 83 (1963) and

Strickler v. Greene, 527 U.S. 263 (1999).

6.    The Petitioner was denied the effective assistance of counsel
guaranteed by the Sixth and Fourteenth Amendments to the
United States Constitution when his trial attorneys failed to
object to the State's questioning of Kevin Knobbe based on
violations of Petitioner's right under the Sixth Amendment to
the United States Constitution to confront and cross-examine
witnesses.

Petition for Habeas Corpus ("Petition") at 23-39.

## STATEMENT REGARDING THE RECORD

On September 10, 2008, Respondent filed an index to the state-court
records and then shipped three boxes containing eleven volumes of direct appeal
records and one volume of state habeas records.  DE 7.

## STATEMENT OF THE CASE

Ross was indicted by a grand jury in the 137th Judicial District Court of
Lubbock County, Texas, for the capital murder of more than one person during
the same criminal transaction, committed on January 31, 2001.  1 CR[1] 4.  Ross
was convicted on September 23, 2002, and sentenced to death on September 27,
2002, after a separate hearing on punishment.  1 CR 278-82, 291-96.  The Texas
Court of Criminal Appeals affirmed Ross's conviction and sentence on direct
appeal.  Ross v. State, 133 S.W.3d 618 (Tex. Crim. App. May 5, 2004).  Ross did

---

[1]    "CR" refers to the Court Reporter's Record, preceded by volume and
followed by page reference.

not seek certiorari review. While his direct appeal was pending, Ross filed a state habeas application. SHCr[2] 2-111. The Court of Criminal Appeals denied relief. Ex parte Ross, No. WR-60,294-01( Tex. Crim. App.) (unpublished order of Jan. 23, 2008).

Ross timely filed his federal habeas petition and brief in support on January 11, 2009. DE 8 & 9. This answer follows.

## STATEMENT OF FACTS

I.    Facts Of The Crime

On January 31, 2001, victims Douglas Birdsall and Viola Ross[3] were found dead inside a car located in a ravine. 34 RR[4] 33-34. Both died of multiple gunshot wounds to the head. 36 RR 252-54. Inside of the car, the police found large amounts of blood, shell casings, glass shards, and the tip of a latex glove. 37 RR 29, 37. The exterior of the glove tip was covered in blood, which was later determined to match Douglas Birdsall's DNA profile. 37 RR 38, 168. The inside of the glove tip was also tested; skin cells found on the interior of the glove tip belonged to Ross. 37 RR 151, 168, 171.

---

[2]    "SHCr" refers to the State Habeas Transcript compiled by the state court. Each citation is preceded by a volume number and followed by page reference.

[3]    Viola Ross and the Petitioner were not related.

[4]    "RR" is the Reporter's Record -- the volumes of pre-trial hearings, voir dire, trial testimony, and exhibits. Citations are preceded by volume number and followed by page reference.

Viola Ross's sister, Liza McVade, dated Ross.  34 RR 94, 159. On January 30, 2001, Liza McVade was at Ross's apartment when Viola telephoned her several times.  34 RR 167-69.  During one of these phone calls, Viola allowed both Ronnie Martin and McVade's former boyfriend, Clarence Garner, to speak with McVade on the phone.    34 RR 139, 142.  Viola then asked Martin, for a ride to Ross's apartment due to concern for her sister, but was refused.  34 RR 145.  Shortly afterwards, Birdsall arrived at Viola's home, looking for a young, black female prostitute. 34 RR 172; 35 RR 227.  Viola offered to take Birdsall to someone who would be interested.  34 RR 172.  Viola left with Birdsall and another person, who was dropped off shortly afterwards. 35 RR 228.

Viola attempted to call her sister from Birdsall's home.  34 RR 173; 36 RR 80-81.  Ross answered the phone, cursed Viola, told her not to call anymore, and threatened to hurt her. 34 RR 173; 35 RR 4.  McVade attempted to leave Ross's apartment, but he refused to take her home or allow her to use the phone to call for a ride.  34 RR 175-76.  Ross then began putting on white latex gloves and instructed McVade to leave "because if I do something, I don't want you around." 34 RR 176-77.  After using a neighbor's phone in a futile attempt to get a ride, McVade started walking home. 34 RR 177, 179. About fifteen to twenty minutes later, the neighbor heard gun shots, which he reported to the police.  35 RR 35.

After discovering the bodies the next day, the police investigated the shots-

fired report to see if there was any connection with the murders. 35 RR 47-48. Behind Ross's apartment in an alleyway, officers notices glass shards and two pools of blood. 35 RR 48, 175. The larger pool of blood matched Birdsall's DNA profile. 37 RR 163. A shell casing recovered from the scene matched the shell casings found inside the car. 35 RR 258-59; 36 RR 90. Police believed this was the scene where the murders took place. 36 RR 91.

When interviewed by the police, Ross admitted that he was angry with Viola on the night of January 30th, and that he had threatened her. 36 RR 94-95, 109. Ross also confirmed that he had worn latex gloves that night. 36 RR 110. After obtaining Ross's consent, the police searched his house where they found two latex gloves and a sweatshirt. 36 RR 107, 215-16, 234. The sweatshirt had bloodstains which matched Birdsall's blood, while Ross's DNA was on the inside of the shirt. 36 RR 241-42; 37 RR 164-67. When a police officer expressed his concern that the murder weapon might be found by a child and cause injury, Ross advised that the gun was in a safe place. 36 RR 143; 37 RR 193. When confronted with the physical evidence, Ross stated that he would not admit to the killing of Viola or Birdsall, but if the police had what they said they had, then they had the truth. 37 RR 194. Finally, when speaking with his mother on a jail phone call, his mother asked whether he had committed the crime, and Ross admitted that he "might have." 37 RR 200.

II.     Punishment-Phase Evidence

    A.     Evidence by the State

        Thomas Bostwick, a jailer with the Lubbock County Sheriff's Department,

was supervising roll call of the inmates in the Lubbock County jail on August 9,

2001.     During roll call, deputies visually inspect all inmates and their

wristbands to ensure they are all present.  40 RR 11-12.  Inmates are required

to wear, for identification purposes, a wristband which contains their picture,

book-in number, Sheriff's Office number, and a bar code.   40 RR 12.   The

wristband is secured by two metal brads, must be worn at all times, and inmates

are instructed not to alter or remover the wristband.  40 RR 12-13.  During the

August 9th roll call, Ross did not have his wristband on, and, when asked for it,

Ross threw the band into the aisle where the officers walk.  40 RR 15-16.  The

metal brads on the wristband had been altered and removed.   40 RR 16.

Bostwick informed Ross that he was going to confiscate the band, causing Ross

to become very upset and begin using profanity towards Bostwick.  40 RR 16-17.

Bostwick wrote an incident report because Ross cursed a detention officer and

"kind of went crazy."  40 RR 17.

        Evidence also showed that Ross was placed on probation in Missouri on

October 7, 1997, when he pled guilty to a Class B felony assault and stealing a

motor vehicle, a Class C felony.   40 RR 26-27.   Ross told Susie Caddell, a

community supervision officer for the Lubbock County Adult Probation Office, that the victim was his girlfriend; they had problems in the past, and she was stalking him. 40 RR 29. Ross stated that the assault victim pulled out a butcher knife and attempted to stab him, but he took the knife and stabbed her. 40 RR 29. According to Caddell, Ross expressed no remorse, but said he would walk away if he had to do it over again. 40 RR 30. Ross admitted that anger and outrage were contributing factors to the assault, and Caddell testified that Ross did not accept responsibility for the incident. 40 RR 30. However, Ross successfully completed anger counseling and probation. 40 RR 30-31.

Kevin Knobbe, certified police officer in St. Louis Missouri, responded to a call regarding a stabbing in a local park on July 13, 1997. 40 RR 33-35. Knobbe found victim Regina Carlisle at the scene. 40 RR 35. Carlisle was very shaken and was screaming, bleeding and in need of medical attention. 40 RR 35. Carlisle was in a very excitable state and said that her boyfriend had just stabbed her, cut her, and took off in her vehicle. 40 RR 36. Carlisle identified Ross as her boyfriend. 40 RR 36-37. The State admitted pictures of Carlisle's injuries, which included a laceration to her right arm, stab wounds to her left thigh, nine wounds where a knife cut her, three stab wounds, several stitches, and a laceration to the left side of her neck which could have potentially been life-threatening. 40 RR 39-43; SX 413-20. Officer Knobbe overheard Carlisle say

that Ross told her to give him her neck and that she was going to die.  40 RR 49.

B.     Evidence by the defense

Ross presented testimony from Felix Moore, a doctoral student at Texas Tech, who indicated that he and Ross were fraternity brothers and that Ross studied architecture.  41 RR 4, 6–7.  Additionally, Moore testified that Ross had paid for his own education by working while attending school.  41 RR 10-12. Moore testified that he had never seen Ross with a gun, weapon, or knife, and never saw Ross act violently or upset.  41 RR 13-14.  When asked about his demeanor, Moore said Ross was "always pretty calm."  41 RR 14.  Furthermore, Ross had girlfriends and drank some alcohol, but did not use drugs.  41 RR 14-16.

Tanya Robertson testified that she knew Ross through her sorority and eventually became roommates with Ross and Derald Powell.  41 RR 22-23. According to Robertson, Ross was a diligent student who was not involved in drugs and rarely drank.  41 RR 24-26.  Ross had one girlfriend during the time Robertson was his roommate.  41 RR 2 6.  Robertson described Ross as very calm, very polite, and very nice.  41 RR 26-27.

Ross's mother, Johnnie Ross, testified that Ross had had no contact with his father since he was eight years old and that no men were living in the home during Ross's formative years.  41 RR 33-37, 44.  Also, Ross was born with

pneumonia and was an asthmatic.  41 RR 37.

Johnnie's testimony also revealed that Ross attended public school, where he ran track and played football, was involved in the Boy Scouts and Cub Scouts, and attended inner city schools until junior high, when the family moved to the outskirts of St. Louis.  41 RR 37-38.  There, the family owned and lived in a single-family home in a community that was predominantly white with racially mixed schools.  41 RR 39-40.  Ross's mother testified there were no guns in their home, and Ross was not familiar with weapons and did not hunt.  41 RR 40. Ross was involved in his church where his step-grandfather was the preacher and attended three to four times a week.  41 RR 40-41.  Ross had a small, racially-mixed group of friends from school, who his mother described as "good kids."  41 RR 42.

According to his mother, Ross did not have trouble the law as juvenile — apart from a curfew violation — and he did not get into trouble at school.  41 RR 42-43.  His mother was not aware of any drug or alcohol use prior to his going away for college, and Ross was not involved in any gang activity.  41 RR 45.  As a teenager, Ross had a job at the Norwood County Club.  41 RR 45.  His mother described him as a quiet, calm, and laid-back person.  41 RR 46.

After graduating highschool, Ross attended Central Missouri State college for four years, and received an Associate of Science degree and a Bachelor of

Science degree.  41 RR 46-47.  While in college, Ross did not use drugs and only drank socially.  41 RR 47.  He was active in his fraternity, becoming president of his chapter his senior year.  41 RR 48.  After college, Ross held jobs with several architectural firms.  41 RR 49-50.

According to his mother, Ross was never in trouble with the law until the incident with his girlfriend in 1997.  41 RR 51.  After this incident, Ross made plans to continue his education by attending Texas Tech.  41 RR 51-52.  While at Texas Tech, Ross paid for his own education, and had no mental problems.  41 RR 53-54.

## STANDARD OF REVIEW

Because Petitioner's federal writ was filed after the effective date of the AEDPA, his claims are subject to a heightened standard of review.  Penry v. Johnson, 532 U.S. at 792; see also Foster v. Johnson, 293 F.3d 766, 776 (5th Cir. 2002) (citing Penry).  Under the Act, a federal reviewing court cannot grant relief for claims which were adjudicated on the merits in state court unless the adjudication:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

As to questions of law, a decision is contrary to clearly established Federal law[5] if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. Williams, 529 U.S. at 405-06; Penry, 532 U.S. at 792. Alternatively, when confronting a mixed question of law and fact, a state court "unreasonably" applies clearly established Federal law "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Penry, 532 U.S. at 792; see Williams, 529 U.S. at 407-09.

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Williams, 529 U.S. at 409-11; Tucker v. Johnson, 242 F.3d 617, 620 (5th Cir.

---

[5]     "Clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (citing (Terry) Williams v. Taylor, 529 U.S. 362, 412 (2000)). "In other words, 'clearly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. at 71-72 (citing Williams, 529 U.S. at 405, 413, and Bell v. Cone, 535 U.S. 685, 698 (2002)).

2001).  Rather, federal relief is only merited where the state court decision is both incorrect and objectively unreasonable, "[w]hether or not [this Court] would reach the same conclusion." Woodford v. Visciotti, 537 U.S. 19, 27 (2002);  see also Martin v. Cain, 246 F.3d 471, 476 (5th Cir. 2001) (reiterating that relief is appropriate only where state court decision is both incorrect and objectively unreasonable).  In other words, relief is inappropriate when a state court, at a minimum, reaches a "satisfactory conclusion." Williams, 529 U.S. at 411 (citing Wright v. West, 505 U.S. 277, 287 (1992)).

Further, it is the state court's "ultimate decision" that is to be tested for reasonableness, "not every jot of its reasoning." Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001);  see Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence").  And a state court's decision need not expressly cite any federal law or even be aware of applicable Supreme Court precedent in order to be entitled to deference.  Mitchell v. Esparza, 540 U.S. 12, 16 (2003);  see also Early v. Packer, 537 U.S. 3, 8 (2002) (state court decision must be upheld so long as the state result does not contradict Supreme Court precedent).

Regarding questions of fact, federal courts must presume correct the

factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Dowthitt v. Johnson, 230 F.3d 733, 741 (5th Cir. 2000).  This presumption of correctness applies to explicit and implicit findings which are necessary to the state court's conclusions of mixed law and fact and to the state court's credibility determinations.  Valdez v. Cockrell, 274 F.3d 941, 948 n. 11 (5th Cir. 2001).

Additionally, except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which an applicant would challenge a state court fact finding must have been presented to the state court.  Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.  28 U.S.C. § 2254(d)(2) (emphasis added).

## ARGUMENT

I.   Ross Received Effective Assistance of Counsel at Punishment.

In his first claim, Ross argues that he was denied the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments, when his trial attorneys failed to investigate the nature and extent of Regina Carlisle's

criminal history and, as a result, failed to develop evidence to contradict and impeach the State's punishment evidence.  Petition at 23-25; Brief at 4-9.

Ross raised this claim on state habeas review.  2 SHCr at 76, 79-81.  The reviewing court, adopting the State's proposed findings, see 2 SHCr145, denied relief.  The court found generally that Ross's trial attorneys "performed competently and provided constitutionally effective assistance of counsel."  2 SHCr 121, #10.  Regarding this specific claim, the court refused to find deficient performance because Ross did not set forth any facts demonstrating that the defense did not investigate Carlisle's history.  Nor did he set forth any facts to show how such evidence would have been elicited, or how such evidence would have been admissible.  2 SHCr 133.

The court also concluded that Ross had failed to set forth facts establishing prejudice.  2 SHCr 134.  The court reasoned that impeachment of Carlisle would have been fruitless given that Ross pled guilty to assault in the first degree for stabbing Carlisle and guilty to unlawfully appropriating her car.  2 SHCr 133.  Further, Ross's mitigating version of the events involving Carlisle was before the jury through the testimony of his community supervision officer, to whom he stated that the victim was his girlfriend; they had problems in the past, she was stalking him, and it was she who first pulled out the butcher knife and attempted to stab Ross before Ross took the knife and stabbed her.  2 SHCr 134.

These findings were not unreasonable and are entitled to deference.

Claims of ineffective assistance of counsel are to be reviewed under the two-prong standard of Strickland v. Washington, requiring a petitioner to show that counsel's performance was deficient and that the deficient performance prejudiced the defense.   466 U.S. 668, 684-86 (1984).   A claim of ineffective assistance may be disposed of for want of either deficient performance or actual prejudice.   Id. at 697; Givens v. Cockrell, 265 F.3d 306, 309-10 (5th Cir. 2001).

To demonstrate deficient performance the petitioner must show that counsel's conduct falls beyond the bounds of prevailing, objective professional standards. Strickland, 466 U.S. at 688.  However, "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effect of hindsight." Id. at 689.  There is a presumption that counsel has rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.   Id. at 690; Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).

A petitioner must also affirmatively prove prejudice by demonstrating that as a result of counsel's errors his trial was rendered fundamentally unfair or unreliable.   Ross must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Williams, 529 U.S. at 3911 (citing Strickland, 466 U.S. at 694).  A

"reasonable probability" is described as "probability sufficient to undermine confidence in the outcome."  Id.

During the punishment phase of trial, the State presented evidence that Ross assaulted Regina Carlisle and stole her car on July 13, 1997, and that Ross received probation for the offense.  40 RR 25-27.  The evidence also showed that Ross admitted the victim was his girlfriend; they had problems in the past, and she was stalking him.  The evidence also showed that she had instigated the attack by attempting to stab Ross with a butcher knife while Ross was merely trying to talk to her.  40 RR 29.  While expressing no remorse or responsibility, Ross admitted that he would walk away from Carlisle if he had to do it over again and that anger and outrage were contributing factors to the assault.  40 RR 30.  After the arrest, Ross successfully completed anger counseling and probation without any problems.  40 RR 30-31.  Ross's version of events, as given to his community supervision officer, was uncontested.

Nevertheless, Ross alleges that, had trial counsel fully investigated the assault and Carlisle's background, counsel would have discovered her criminal history which could have been used to impeach Carlisle's credibility and undercut the future dangerousness issue.  Specifically, counsel could have uncovered evidence that Carlisle was once arrested for fraudulent use of a credit card and assault, stole several cars to make money, had shot another boyfriend

-17-

who later died of his injuries, and that she had a 9mm handgun in her car on the night Ross attacked her.[6] See Petition at 24; Petitioner's Exhibit A, at 4.

The state court reasonably concluded that trial counsel was not deficient. First, Ross did not proffer any proof to the trial court that counsel failed to investigate either this offense specifically or Carlisle's background generally. See 2 SHCr 133. Ross now presents affidavits to this Court from trial counsel admitting they did not investigate such, however these were not presented to the state court, thus they are unexhausted and procedurally barred from federal consideration. See 28 U.S.C. § 2254(b)(1)(A); Dowthitt v. Johnson, 230 F.3d 733, 745 (5th Cir. 2000)(A habeas petitioner has failed to exhaust state remedies when he presents material additional evidentiary support to the federal court that was not presented to the state court.)  Regardless, while trial counsel Patrick Metze admits they did not investigate this offense, he also states that they "did not investigate Ross's criminal history because the strategy of the case was totally focused on an acquittal." Petitioner's Exhibit D at 1. The decision not to investigate Regina Carlisle's role in Ross's criminal background was not

---

[6]     Ross asserts that an investigation would have revealed that Carlisle spent nine months in jail for assaulting her boyfriend by hitting him with her car and that she was convicted of manslaughter and placed on probation for shooting and ultimately killing another abusive boyfriend.  Petition at 24. However, the cited source of this information — Exhibit A, Affidavit of Lisa Milstein — does not support this. Specifically, there is not mention of assaulting a boyfriend by striking him with a car, and no mention of the manslaughter conviction and probation.

unreasonable given that Ross plead guilty to this crime, and the jury heard the mitigating elements of the crime:  Ross was not the instigator; he recognized he should have acted differently; the crime was the product of anger and outrage but he had successfully completed anger counseling.  The jury also heard negative evidence about the victim:  that she had been stalking Ross, was carrying a butcher knife with her, and that she instigated the attack.  An additional attack on the victim's credibility with similar evidence would have likely carried little weight.

Even if trial counsel had investigated Regina Carlisle's credibility, it is unclear how counsel could have used this evidence.  Counsel could not have impeached the testifying police and community supervision officers with Carlisle's criminal record.  And neither witness attempted to establish that she was non-violent or particularly credible.  In fact, the community supervision officer presented Carlisle in a very negative light.  Even if trial counsel attempted to call Carlisle as a witness, Ross offers no proof that she would have testified in a manner favorable to Ross.  Ross proffers only the affidavit of an investigator to support his claim. See Petitioner's Exhibit A at 4. While Carlisle allegedly stated to the investigator that she would have spoken to defense, she does not indicate what she would have said about the offense.  The only reference to the assault is her apparent assertion that she had a 9mm handgun

in her car on the night of the offense.  Petitioner's Exhibit A at 4.  There is no
indication that she would have supported the version of events set forth by the
community supervision officer.  As the record stood, Ross's self-defense version
of the offense was uncontested.  Milstein's affidavit does not support Ross's claim
that favorable evidence was available if counsel had only investigated.

Ross claims his case is "virtually identical" to Rompilla v. Beard, 545 U.S.
374 (2005), Brief at 5, but can be easily distinguished.  In Rompilla, the Court
held that defense counsel were ineffective for failing to adequately review and
investigate the capital defendant's prior rape and assault conviction when (1)
counsel knew the State intended to introduce the prior rape conviction and trial
transcript of the rape victim; (2) the prior conviction file was easily available to
counsel; and (3) counsel reviewed only a portion of the prior conviction file
without examining other material in the file concerning evidence of Rompilla's
alcohol abuse, his poor background, test scores showing low cognitive level, and
test results pointing to the need for further mental evaluation, all of which
countered the assertions of Rompilla and his family that Rompilla's background
was unremarkable. See Rompilla, 545 U.S. at 381-90.  Moreover, the Court
specifically compared defense counsel's debatable obligation to pursue some
"potential lines of enquiry" and the "sure bet" obligation of Rompilla's counsel to
thoroughly review the prior conviction file for the previously noted reasons. Id.

at 382-83, 389. The Court specifically noted that if defense had examined available evidence, it was "uncontested they would have found a range of mitigation leads that no other source had opened up." Id. at 390. This missing mitigating evidence "add[ed] up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury [.]" Id. at 393.

The evidence presently at issue was not the same easily accessible, "sure bet" evidence at issue in Rompilla. See id. at 389. Indeed, trial counsel would have had to travel to St. Louis in order to talk to Carlisle or investigate her history. See Petition at 24. And there is no guarantee she would have provided as favorable a version of the offense as that presented by Ross's community supervision officer. She would have likely painted Ross as an abusive boyfriend — much like the other two boyfriends she allegedly assaulted, according to Ross. See Petition at 24. At best, she would have provided testimony cumulative of that presented by Ross's community supervision officer. Such evidence would not "add up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury [.]" Rompilla, 545 U.S. at 393.

Because this is not the sort of evidence anticipated by the Supreme Court in Rompilla, the state court did not unreasonably conclude that counsel's performance was neither deficient nor prejudicial. Thus, the rejection of this claim is entitled to deference in this Court.

II.   Trial Counsel's Punishment-Phase Mitigation Investigation was Neither Deficient Nor Prejudicial.

In his second claim, Ross argues that he was denied effective assistance of counsel under the Sixth and Fourteenth Amendments when his trial attorneys failed to investigate and present mitigating evidence that called for a sentence less than death.  Petition at 25; Brief at 9-14.  Ross alleges that, had counsel fully investigated his background, he could have presented the following evidence: (1) the victim's father, Chester Ross, did not want Ross to receive a death sentence; (2) Ross's grandmother, Lydia Davis, could have attested that Ross and his siblings raised themselves, Ross did not have a male role-model, and Ross's mother was unable to control her anger; (3) Ross's former girlfriend, Marsha Green, thought Ross was "mild-mannered and thoughtful;" and (4) his former girlfriend, Regina Carlisle, had a violent, criminal past.  Petition at 26; Petitioner's Exhibit A.

On state habeas review, the court concluded generally that Ross's trial attorneys "performed competently and provided constitutionally effective assistance of counsel."  2 SHCr 121, #10.  On this specific claim, the court declined to find deficient performance first because Ross failed to allege facts to show why trial counsel acted as they did; thus, he failed to establish deficient performance.  2 SHCr 123; see Rodriguez v. State, 974 S.W.2d 364, 370-71 (Tex.App. — Amarillo 1998, pet. ref'd) (holding defendant must first specify

particular acts or omissions allegedly constituting deficient performance and then prove that they fell below professional norm of reasonableness by presenting evidence illustrating why counsel did what he did and how strategy was unsound).

Second, the court found that Ross blocked his attorneys' attempts to present punishment phase evidence by insisting no punishment witnesses be called, and some of the witnesses counsel did call did not testify because they were complying with Ross's wishes.  2 SHCr 123.  Thus, Ross cannot now complain that counsel was ineffective for failing to present such evidence.  2 SHCr 124 (citing Autry v. McKaskle, 727 F.2d 358, 361 (5th Cir. 1984); Roberts v. Dretke, 356 F.3d 632, 638 (5th Cir. 2004)).

Third, the court found that Ross failed to establish how trial counsel's punishment investigation was deficient.  Ross admits his family were not forthcoming when counsel attempted to talk to them, see 41 RR 2-3; Petition at 26-27; thus counsel's decision to investigate other evidence was strategic.  2 SHCr 124.  Ross told his family not to cooperate, see CR 266, and dissuaded available witnesses from testifying.  2 SHCr 124; see 40 RR 3; 41 RR 2-3.  Since Ross does not demonstrate that these witnesses could not have provided testimony similar to that now proffered by Ross, he cannot show prejudice from counsel's failure to uncover additional evidence.  2 SHCr 124-25.

Regarding prejudice, after weighing the totality of the available mitigating evidence, the court concluded that Ross was "unable to show, if the newly proffered evidence had been presented and explained by counsel, there is a reasonable probability that the result of the sentencing proceeding would have been different." 2 SHCr 128. First, comparable evidence was presented at trial. 2 SHCr 125-26; see 41 RR 36-37 (testimony regarding family, lack of male role-model); 37 (Ross born with pneumonia and asthmatic); 41 RR 53, 54, 56 (testimony of mother indicates lack of close relationship). The court found that the proffered evidence was "not powerful and merely suggests that [Ross] came from a dysfunctional family with an emotionally detached mother" and that "the rationale of [Wiggins v. Smith, 539 U.S. 510 (2003)] does not apply in this case." 2 SHCr 126. The court concluded that the "mitigating effect of the potential evidence was greatly outweighed by the aggravating circumstances of [Ross's] prior criminal conduct and the premeditated nature of the murders." 2 SHCr 127; Woodford, 537 U.S. at 26-27. Furthermore, the evidence overwhelmingly indicated that Ross came from an advantaged background, and had no excuse for committing the murders. 2 SHCr 127-28.

The State court ultimately found:

[T]he complained of additional mitigation evidence as presented in the Application for Writ of Habeas Corpus and supporting affidavits is neither powerful nor compelling and is similar to evidence introduced at trial. After evaluating the totality of the available

mitigating evidence – both that adduced at trial and the evidence adduced in the habeas proceeding – this Court finds that Applicant is unable to show, if the newly proffered evidence had been presented and explained, that there is a reasonable probability that the result of the sentencing phase would have been different.

2 SHCr 121 #9. These findings are not unreasonable and are entitled to deference.

As with Claim 1, to be entitled to relief, Ross must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. Strickland, 466 U.S. at 684-86; Givens, 265 F.3d at 309-10. To prove prejudice, Ross must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Williams, 529 U.S. at 3911. A "reasonable probability" is described as a "probability sufficient to undermine confidence in the outcome." Id. Regarding counsel's failure to investigate and present mitigating evidence at the punishment phase of trial, the reviewing court must "reweigh the evidence in aggravation against the totality of available mitigating evidence[,]" including that adduced at trial, as well as the habeas proceeding. Wiggins, 539 U.S. at 534; Williams, 529 U.S. at 397-98.

A.    Ross does not demonstrate deficient performance

The state court reasonably concluded that Ross failed to demonstrate deficient performance. First, the state-court conclusion that trial counsel was

not deficient because Ross failed to allege facts to show why trial counsel acted as they did, 2 SHCr 123, was not unreasonable. As with the first claim, Ross did not proffer any proof to that court that trial counsel failed to investigate or why. Ross now presents affidavits from trial counsel; however, these were not presented to the state court. Therefore, they are unexhausted and procedurally barred from federal consideration. See 28 U.S.C. § 2254(b)(1)(A); Dowthitt, 230 F.3d at 745.

Second, the court reasonably concluded that Ross blocked his attorneys' attempts to present punishment phase evidence, see 2 SHCr 123, and that the investigation trial counsel did perform was not deficient, see 2 SHCr 124. If this Court chooses to consider the unexhausted affidavits, the Court must consider trial counsel's explanation that, while they did not hire mitigation experts to prepare this case, they did not do so because they were "instructed, by [Ross] and his family, that the focus of investigation in this case was on an acquittal." Petitioner's Exhibit C; see also Petitioner's Exhibit D. Since this was his client's wish, and because Ross and his family were not forthcoming when counsel attempted to talk to them, see 41 RR 2; see CR 266, and Ross dissuaded available witnesses from testifying, see 40 RR 3; 41 RR 2-3, trial counsel was not unreasonable in choosing to focus the investigation on other areas.

Furthermore, trial counsel attempted to investigate and present other

witnesses, but Ross and his family and friends were not cooperative.  See 40 RR
3; 41 RR 2-3; CR 266.  At least one witness, Derald Powell, backed out of
testifying at the last minute, at Ross's request.  41 RR 3.  Thus, as the state
court correctly noted, Ross cannot now complain that counsel was ineffective for
failing to present such evidence.  2 SHCr 124.  This Circuit has repeatedly and
explicitly stated that "[b]y no measure can [a defendant] block his lawyer's
efforts and later claim the resulting performance was constitutionally deficient."
Autry, 727 F.2d at 361; see also Nixon v. Epps, 405 F.3d 318, 325-26 (5th Cir.
2005) (defendant cannot block counsel from presenting line of defense, then
claim ineffective assistance); Roberts v. Dretke, 356 F.3d 632, 639 (5th Cir. 2004)
(where state court found petitioner competent to direct trial strategy, petitioner
cannot claim deficient performance where counsel did exactly as instructed);
Johnson v. Cockrell, 306 F.3d 249, 252-53 (5th Cir. 2002) (Fifth Circuit "has
consistently refused to hold attorneys responsible for introducing mitigation
evidence that their client and other witnesses fail to disclose."); Dowthitt, 230
F.3d at 748 (counsel not ineffective for following client's informed decision);
Amos v. Scott, 61 F.3d 333, 348-349  (5th Cir. 1995) (holding defendant not
prejudiced by counsel's failure to investigate and present mitigating evidence
where defendant had instructed counsel not to present punishment-phase
evidence); United States v. Masat, 896 F.2d 88, 91-93 (5th Cir. 1990) (defendant

cannot avoid conviction on the grounds that counsel did exactly what was asked). The Supreme Court has similarly ruled.  See Schriro v. Landrigan, 147 S. Ct. 1933, 1942 (2007) (where petitioner instructed attorney not to present any mitigation evidence in the punishment phase, petitioner could not demonstrate prejudice under Strickland).

Ross also fails to demonstrate that additional evidence was even available had counsel investigated further.  Ross does not present affidavits from the all potential witnesses, only the affidavit of investigator Lisa Milstein, who conveys conversations she had with these parties.  See Petitioner Exhibit A.  This hearsay representation is not sufficient to demonstrate what these witnesses would have testified to if called at trial.  Furthermore, Chester Ross — the victim's father — refused to talk to Milstein.  Thus there is no credible evidence that Chester Ross did not want Ross to receive the death penalty, or that he would have testified to such at trial.  Thus, Ross fails to demonstrate that additional evidence was even available, or that trial counsel would have had any success in convincing these witnesses to testify at trial had they interviewed them.  The Fifth Circuit has held that "[c]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified to are largely speculative." Sayre v. Anderson, 238 F.3d 631, 635-36 (5th Cir.2001).  This claim of ineffective assistance amounts to

nothing more than rank speculation, and cannot form the basis of federal habeas relief.  Kinnamon v. Scott, 40 F.3d 731, 735 (5th Cir. 1994).

And finally, as will be discussed in the next section, trial counsel presented an impressive mitigation defense, in spite of Ross's and his family's refusal to cooperate.  For all these reasons, the state court did not unreasonably conclude that Ross failed to demonstrate deficient performance, and relief on this claim should be denied.

B.    Ross does not demonstrate prejudice.

The trial court reweighed the available aggravating and mitigating evidence and concluded that Ross did not establish prejudice.  See 2 SHCr 121 #9, 128; see alsoWiggins, 539 U.S. at 534; Williams, 529 U.S. at 397-98.  This finding was not unreasonable and is entitled to deference.

Despite the refusal to cooperate by Ross and his family, trial counsel presented an admirable mitigation defense that consisted of testimony from Ross's college fraternity brother that Ross had paid for his own college education by working and attending school, that he had never known Ross to act violently or possess a weapon, Ross was "calm"and a peacemaker, and Ross did not use drugs.  41 RR 4-16.  A former female roommate, Tanya Robertson, testified that Ross was a diligent student, did not use drugs, that he had a girlfriend with whom he had "a loving girlfriend/boyfriend relationship," and he was calm, polite

-29-

and nice.  41 RR 22-27.  Robertson could not recall ever being upset with Ross, and remembered him as "meek and humble."  41 RR 27.  Ross's mother provided testimony about his lack of a male role-model, and that Ross was a sickly baby. 41 RR 33-37, 44.  Ross's mother also provided a wealth of positive evidence about his background, his good-character, and that he had not been in trouble as a youth.  See 41 RR 37-50.  According to his mother, Ross was never in trouble with the law until the incident with Regina Carlisle in 1997, but after this incident, Ross made plans to continue his education by attending Texas Tech. 41 RR 51-52.

As discussed in the previous section, it is unlikely Regina Carlisle would have proved to be a helpful witness had she testified — she likely would have called Ross an abusive boyfriend, solely responsible for the attack.  As the record stood, the evidence regarding the assault on Carlisle was presented in the most favorable light possible.  The uncontested evidence demonstrated that Carlisle has been stalking Ross; she instigated the assault and Ross defended himself; Ross recognized he should have acted differently, and the crime was the product of anger and outrage, but he had successfully completed anger counseling.  At best, Carlisle's testimony would have been cumulative of that of Ross's community supervision officer.

Marsha Green's testimony that Ross was "mild-mannered and thoughtful"

would also have been cumulative of other witnesses, namely Felix Moore — who testified Ross was calm and a peacemaker; and Tanya Robertson — a female roommate who thought he was calm, polite and nice, and testified that he had a loving relationship with his girlfriend. Ross's mother provided testimony that he did not have a male role-model in his life, thus any additional testimony would have been cumulative on these points.

The only evidence the jury did not hear was that of Chester Ross that he allegedly did not want Ross to receive the death penalty. However, there is no credible proof Chester would have testified to this. Also, the jury may not have heard the full-extent of Ross's strained relationship with his mother and that she had anger-management issues, but, as noted by the state court, Ross's mother's testimony at trial suggested that she did not have a close relationship with her son. 2 SHCr 126.

Regardless, when weighed against the aggravating evidence, including the facts of the crime, the assault on Regina Carlisle, and Ross's outburst in jail while awaiting trial for capital murder, there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" had trial counsel investigated and presented this additional evidence. Williams, 529 U.S. at 3911.

The Fifth Circuit decision Miniel v. Cockrell, 339 F.3d 331 (5th Cir. 2003)

is instructive. Miniel contended that his "deprived and abusive family history" would have provided a source of mitigating evidence had counsel interviewed his family members. Miniel, 339 F.3d at 345. The Fifth Circuit rejected this contention, finding that "the nature and extent of the abuse ... was far less severe than that described in Williams[,]" or Wiggins. Id. at 347 n.10. The court agreed that Miniel "paint[ed] a picture of a rough childhood" with evidence that he was abandoned by his mother; raised, along with six siblings, by an aunt and uncle who often fought over the uncle's "drinking and philandering;" the uncle frequently beat Miniel, sometimes severely; and the children suffered from neglect, which included being left alone — either at home or in a car during the winter — while the uncle drank in bars. Id. at 345. However, when these facts were compared with Miniel's violent history and the cruel manner in which the victim was killed, the court concluded that Miniel had failed to present a reasonable probability of a different verdict, had this evidence been presented. Id. at 346-47. In reaching this conclusion, the court found significant that Miniel could not present evidence of sexual abuse in his family or social history, starvation as a child, time in foster homes, or sufficient evidence of mental retardation. Id. at 347 n.10. Ross's case is even less compelling than Miniel.

Unlike the petitioners in Wiggins, Rompilla and Williams (which Ross cites in support), trial counsel did not forego a compelling case for mitigation. In

Wiggins, defense counsel offered no mitigating evidence at trial in spite of the compelling evidence of physical and sexual abuse that was available.  539 U.S. at 516-17.    Further, Wiggins's counsel only reviewed a Pre-Sentence Investigation report and records from the Department of Social Services, and the Court concluded that defense counsel were unreasonable to cease investigation after learning that Wiggins had an alcoholic mother and problems in foster care. Id. at 518, 522-23. In Williams, defense counsel failed to prepare for sentencing until a week before trial; and failed to present evidence of neglect and abuse as a child, borderline mental retardation, and compelling evidence of a lack of future dangerousness found in his prison records.  529 U.S. at 396.  In Rompilla, defense counsel failed to review a prior conviction file thus failing to discover evidence of Rompilla's alcohol abuse, his poor background, test scores showing low cognitive level, and test results pointing to the need for further mental evaluation, all of which countered the assertions of Rompilla and his family that Rompilla's background was unremarkable. Rompilla, 545 U.S. at 390-93. Moreover, the Court specifically compared defense counsel's debatable obligation to pursue some "potential lines of enquiry" and the "sure bet" obligation of Rompilla's counsel to thoroughly review the prior conviction file for the previously noted reasons. Id. at 383, 389. The Court specifically noted that if defense had examined available evidence, it was "uncontested they would have

found a range of mitigation leads that no other source had opened up." Id. at 390. This missing mitigating evidence "add[ed] up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury [.]" Id. at 393.

In contrast to the situations in Williams, Wiggins, and Rompilla, Ross's trial counsel investigated his case, attempted to develop a mitigation case, and ultimately presented a compelling defense, despite Ross's refusal to cooperate. And unlike Williams, Wiggins, and Rompilla, counsel was not on notice of more compelling evidence, nor was any available to defense counsel. Counsel pursued evidence from Ross's relatives but they were not forthcoming.  Ross is not similarly situated to those petitioners for whom the Supreme Court has granted relief.  In light of the foregoing, there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Williams, 529 U.S. at 3911.  Thus, habeas relief must be denied.

III.   The State Court Did not Unreasonably Apply Controlling Federal Law in Concluding the Jury was not Mislead by the Punishment Phase Jury Charge, and Any Error in the Instruction Does Not Amount to a Constitutional Violation.

Before the state court on direct appeal, Ross argued that the trial court committed reversible error by overruling his objection to a punishment-phase jury charge containing language about good-conduct time, in violation of his Eighth and Fourteenth Amendment rights.  Petition at 28-29.  Ross complains

he is entitled to relief because the jury charge was so confusing that there was a reasonable likelihood that the jury applied the instruction in a way that prevented the consideration of constitutionally relevant mitigating evidence regarding the length of time he would have to serve under a life sentence before becoming parole-eligible.  Petition at 30-32.  While the Court of Criminal Appeals found the jury charge was erroneous as it did not comply with Texas Code of Criminal Procedure Article 37.071, Section 2(e)(2)(B), the court nevertheless denied relief, concluding that Ross was not harmed by the instruction, because there was no "reasonable likelihood that the good conduct time language in the parole charge misled the jury into believing that a life-sentenced appellant would be released from prison in less than forty years." Ross, 133 S.W.3d at 623, 624.

Ross now argues that this decision was contrary to, and involved an unreasonable application of clearly established federal law because that court relied on a non-capital state decision — Luquis v. State, 72 S.W.3d 355 (Tex. Crim. App. 2002) — rather than Simmons v. South Carolina, 512 U.S. 154 (1994), when reviewing the claim.  Petition at 30-32; Brief at 18-19, 27-33. However, Ross's arguments are unconvincing, and the state court's decision is entitled to deference because Simmons does not control this issue.  Further, there is no reasonable likelihood the jury was misled by the charge.  Estelle v.

-35-

McGuire, 502 U.S. 62, 72 (1991) (citing Boyde v. California, 494 U.S. 370, 380

(1990)).

The trial court submitted this parole charge at the punishment phase:

Under the law applicable in this case, the defendant, if sentenced to a term of life imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned on a life sentence might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, he will not become eligible for parole until the actual calendar time served without consideration of good conduct time, equals forty calendar years. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment for life, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

CR 289-90. Trial counsel objected to the charge on grounds that it was not in

accord with Article 37.071, and it was misleading because of the mention of good-

conduct time.  41 RR 63-67.

    As an initial matter, this issue involves an error of state law that is not cognizable on federal habeas review.  "The fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief."  Estelle, 502 U.S. at 71-72; Galvan v. Cockrell, 293 F.3d 760, 764 (5th Cir. 2002).  While it may have been improper under state law to inform the jury regarding good-time credit, there is no federal authority which forbids such an instruction.

    For a federal habeas court to grant relief on this claim, there must have been an error of constitutional magnitude.  Therefore, the relevant inquiry for this Court "is not whether there was prejudice [to the petitioner] or whether state law was violated, but whether there was prejudice of constitutional magnitude."  Galvan, 293 F.3d at 764(citing Sullivan v. Blackburn, 804 F.2d 885, 887 (5th Cir.1986)).  The question in a collateral proceeding "is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (citing Cupp v. Naughten, 414 U.S. 141, 146, 147 (1973)(internal citations omitted)); Estelle, 502 U.S. at 72; see also Galvan, 293 F.3d at 764-65; Kinnamon, 33 F.3d at 465.  "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral

attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson, 431 U.S. at 154; Kinnamon, 33 F.3d at 465. In the Fifth Circuit, there is a "strong presumption that errors in jury instruction are subject to harmless-error analysis." Galvan, 293 F.3d at 766. Thus, even if the instruction was erroneous, relief is not warranted unless it "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623-24 (1993) (internal quotation marks and citation omitted); Galvan, 293 F.3d at 765.

The state court correctly concluded that any error from the admission of an instruction on good-time credit to the jury during the punishment phase was harmless. The jury was clearly instructed that, under a life sentence, Ross would not be eligible for parole until he had served forty years, without consideration of good-conduct time, and the jury was told not to consider the possibility of parole or good-conduct time in its deliberations. See CR 289-90. Thus the jury was told only that Ross may get good -conduct time which may affect his term of parole after he has served the requisite forty years of his sentence. The jury is presumed to have followed the trial court's instruction. Parker v. Randolph, 442 U.S. 62, 73 (1979) ("A crucial assumption underlying that system is that juries will follow the instructions given them by the trial

judge."), overruled on other grounds by Cruz v. New York, 481 U.S. 186 (1987); see also Galvan, 293 F.3d at765-66 (jury presumed to have followed trial court's instruction prohibiting consideration of how good conduct time might be awarded); cf., Bagley v. Collins, 1 F.3d 378, 381 (5th Cir.1993) (finding an instruction by the court to the jury that it should not consider remarks made by the prosecutor was sufficient to limit the extent to which the jury considered the remarks).

Further, neither party argued the concept of good-conduct time to the jury in closing arguments. In fact, defense counsel reminded the jury no less than six times that Ross would spend at least forty years in prison before being paroled under a life-sentence. 41 RR 77 ("... locking him up for forty years"), 78 (" ... not going to have much chance around women for the next forty years"), 80 (".... in forty years he can do some good."), 82 ("... parole clock doesn't start ticking for forty years, calendar time, flat.") ("A lot can happen in forty years."), 83 ("A lot can happen in forty years.") Finally, there is nothing in the record to indicate that the jury considered good-conduct time when making its decision.

Contrary to Ross's arguments, Simmons is not controlling in these circumstances and does not provide for relief. In Simmons the Supreme Court reaffirmed the principle that states are generally free to decide whether to inform a capital sentencing jury of the possibility of the defendant's early release

on parole if the jury chooses a sentence of life imprisonment.  512 U.S. at167-68 (plurality opinion); id. at 175 (O'Connor and Kennedy, JJ., concurring in judgment).   As an exception to this rule, however, the Court held that a defendant has a due process right to bring parole ineligibility to the jury's attention in cases in which the only available alternative sentence to death is life imprisonment without the possibility of parole, and the prosecution argues that the defendant will pose a threat to society in the future.  Id. at 177 (O'Connor, J., concurring); 512 U.S. at 165 (plurality opinion).   A defendant has a due process right not to be executed on the basis of information presented at trial that he had no opportunity to deny or explain.  Simmons, 512 U.S. at 161 (citing Gardner v. Florida, 430 U.S. 349, 362 (1977) (plurality)).  The Court concluded that Simmons's due process rights were violated because he was prevented from rebutting misleading information on which the jury may have relied in sentencing him to death.  Simmons stands for the general proposition, then, that it violates a capital defendant's due process rights to argue that he is a future danger to free society and then not allow him to rebut or explain this information with evidence that he is legally ineligible for parole.  Id. at 171.

Ross presents a situation different than that presented in Simmons.  The State argued Ross would present a future danger — to both free and prison society — and the jury was informed about his parole ineligibility for forty years.

-40-

Thus, Simmons is not implicated in this context because that decision has traditionally been irrelevant where life without parole was not a sentencing option in capital cases. Simmons, 512 U.S. at 168 n.8 (noting that, while Texas has traditionally prohibited informing jury about capital defendant's parole eligibility, life without parole is not sentencing alternative in Texas); Ramdass v. Angelone, 530 U.S. 156, 169 (2000) (the Supreme Court reiterated that the rule of Simmons does not extend to states such as Texas).[7] "Simmons applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." Ramdass, 530 U.S. at 169.

Even if this Court believes as Ross does, that the fact-specific Simmons should be broadened to a general rule regarding the accuracy of jury instructions, Simmons still does not provide for relief.[8]  While the jury instruction on good-conduct time may have been incorrect, the instruction also clearly told the jury that he will not be eligible for parole until he has served

---

[7]     While Texas now has a life-without-parole option, it did not at the time of Ross's trial.

[8]     Simmons provides no support for Ross's Eighth Amendment claim.  512 U.S. at 162 n.4 (the Court "express[ed] no opinion on the question whether the result we reach today is also compelled by the Eighth Amendment.").  And because the error was harmless and the instruction thus reliable, Ross's brief Eighth Amendment argument, supported by Woodson v. North Carolina, 428 U.S. 280, 305 (1976), for the general proposition that a death-sentence determination should be reliable, see Brief at 35-37, is meritless.

forty years, without consideration of good conduct time, and the jury was not to consider good-conduct time in its deliberations.  See CR 289-90.  Further, neither party argued the concept of good-conduct time to the jury in closing arguments, and the defense repeatedly reminded the jury of the forty-year requirement.  41 RR 77, 78, 80, 82, 83.  And, since Simmons provides that parole-ineligibility may be brought to the jury's attention by court-instruction or argument by defense counsel, 512 U.S. at 169; id. at 177 (O'Connor and Kennedy, JJ., concurring), defense counsel's admonitions about the amount of time Ross must serve are sufficient to satisfy Simmons.  Finally, unlike the situation in Simmons, 512 U.S. at 160, where the jury asked questions about parole-eligibility, there is nothing in the record to indicate that the jury considered good-conduct time in its deliberations.

The charge instructed the jury in general terms about the existence of the possibility of parole.  The judge specifically instructed the jury not to consider the extent to which good conduct time and parole would apply to Ross, neither party argued about good-conduct time during closing arguments, and nothing in the record indicates the jury applied or discussed this concept or showed confusion.  When read as a whole, there is no reasonable likelihood the jury instruction was so misleading as to render his trial fundamentally unfair and thus violate Ross's Eighth and Fourteenth Amendment rights.  Therefore,

-42-

deference is owed to the state court's decision, and relief on this claim should be denied.

IV.   Counsel Was Not Ineffective and Ross Was Not Prejudiced By Counsel's
       Failure to Object to Alleged Hearsay Statements or Request a Mistrial.

Ross argues that he was denied the effective assistance of counsel under the Sixth and Fourteenth Amendments when his trial attorneys failed to request an instruction to disregard or a mistrial after the State's continued questioning of Ronnie Martin about Ross's possession and use of a firearm, subsequent to the Court's sustaining counsel's first hearsay objection.  Also, for the first time in any court, Ross cites trial counsel's failure to object to hearsay or request a mistrial regarding testimony from Liza McVade about Ross's possession and use of a firearm.  See Petition at 33-35; Brief at 37-38.[9]

Regarding the Ronnie Martin allegation, the state court found generally that Ross's trial attorneys "performed competently and provided constitutionally effective assistance of counsel."  2 SHCr 121, #10.  Regarding this specific claim, the court found that Ross failed to establish deficient performance because he

---

[9]      Although Ross has never made this argument on this claim in any court, it bears noting that Crawford v. Washington, 541 U.S. 36 (2004) does not apply. Regarding claim VI, infra, the state court ruled that Crawford was inapplicable since it was decided after this trial, and trial counsel's performance must be judged under the law as it existed at the time of trial.  2 SHCR 131 (citing Ex parte Akhtab, 901 S.W.2d 488, 490 (Tex. Crim. App. 1995)).  The same applies to this claim.  And, as with claim VI, Crawford would not exclude this evidence since it was non-testimonial in nature.  See 2 SHCr 129-30.

did not allege facts showing what trial counsel's motivations were in failing to object.  2 SHCr 135. Regardless, the court concluded that Ross had failed to prove prejudice: "Based upon the relative unimportance of the hearsay statement, the cumulative nature of the testimony, and the overwhelming evidence of [Ross's] guilt, the alleged error is harmless." 2 SHCr 138.  These findings are not unreasonable and are entitled to deference.  Ross's arguments concerning Liza McVade are unexhausted and procedurally barred.

As with Claims 1 and 2, to be entitled to relief, Ross must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. Strickland, 466 U.S. at 684-86; Givens, 265 F.3d at 309-10.  To prove prejudice, Ross must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Williams, 529 U.S. at 391.  A "reasonable probability" is described as "probability sufficient to undermine confidence in the outcome." Id.

A.     A portion of this claim is unexhausted and procedurally barred.

Regarding Liza McVade's testimony, Ross did not argue that trial counsel was ineffective for failing to object to this testimony in the state courts. Therefore, this portion of the argument is unexhausted.

"To have exhausted his state remedies, a habeas petitioner must have fairly presented the substance of his claims to the state courts."  Rodriguez v.

McKaskle, 724 F.2d 463, 466 (5th Cir. 1984) (citing Vela v. Estelle, 708 F.2d 954, 958 (5th Cir. 1983)).  Normally, the exhaustion requirement is not satisfied if the claim is based on a new legal theory or a new factual claim.  Id.  "The state courts must have had an opportunity to pass on the claim in light of a full record and where the factual basis for a claim was not presented to the state courts the claim is unexhausted."  Brown v. Estelle, 701 F.2d 494, 495 (5th Cir. 1983); see also Graham v. Johnson, 94 F.3d 958, 968-69 (5th Cir. 1996).  "[The Fifth Circuit] has consistently held that a federal habeas petitioner has failed to exhaust his state remedies when he relies on a different legal theory than he did in state court or when he makes the same legal claim to a federal court but supports the claim with factual allegations that he did not make to the state courts."  Dispensa v. Lynaugh, 847 F.2d 211, 217 (5th Cir. 1988) (internal citations omitted); Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir. 1998).  Ross does not set forth a claim in this petition which is the "substantial equivalent" of the claim presented in state court.  See Whitehead, 157 F.3d at 387.  Therefore, the portion of the argument pertaining to Liza McVade is procedurally defaulted.

The Fifth Circuit has held that where a petitioner raises claims in federal court that have not previously been presented to the state courts, and Article

11.071, Section 5(a)[10] of the Texas Code of Criminal Procedure would apply to foreclose review of the claims if presented in a successive state habeas application, such is an adequate state procedural bar foreclosing federal habeas review of the claims.  Beazley v. Johnson, 242 F.3d 248, 264 (5th Cir. 2001); Hicks v. Johnson, 186 F.3d 634, 637-38 (5th Cir. 1999); Muniz v. Johnson, 132 F.3d 214, 221 (5th Cir. 1998).  The state courts have not had the opportunity to pass on part of his claim.  Furthermore, if Ross were to attempt to raise this claim now in a successive state habeas application, he would be barred by Article 11.071, Section 5.  Therefore, Ross is procedurally barred from raising this claim for the first time in federal proceedings.

To avoid the procedural bar, Ross must assert cause for failing to bring the unexhausted claim in the first state habeas application and prejudice, or that failure to consider the claim will result in a "fundamental miscarriage of justice." Jones v. Johnson, 171 F.3d 270, 277 (5th Cir. 1999) (citing Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992)); Coleman v. Thompson, 501 U.S. 722, 749-50 (1991). To demonstrate a "fundamental miscarriage of justice," Ross must demonstrate actual innocence.  Muniz, 132 F.3d at 221 n.12.  Specifically, "the evidence must

---

[10]     Article 11.071, Section 5(a) provides that a state court may not consider the merits of or grant relief on claims presented in a successive state habeas application absent facts giving rise to a statutory exception.  Ross has made no showing that any exception applies.

establish sufficient doubt about his guilt[.]"  Schlup v. Delo, 513 U.S. 298, 316 (1995).

Ross makes no requisite showing of these factors, nor could he.  Clearly the record upon which Ross relies was known, or could have been discovered, at the time he filed his first state habeas application.  Indeed, Ross referred to McVade's testimony as proof that Martin's testimony had little probative value because the State already had testimony that Ross possessed a gun.  2 SHCr87-88.  And as discussed below, this claim is meritless; thus, there is no chance of prejudice if the Court refuses to consider the claim.  Finally, Ross does not allege that he is actually innocent of this crime.  Therefore, Ross fails demonstrate an exception to the procedural bar, and this portion of the claim should be dismissed.

Also, as with claim 1, any attempt to support this claim with affidavits from trial counsel that were not presented to the state court, see Exhibits C and D, should be denied as these affidavits are unexhausted and procedurally barred from federal consideration.  See 28 U.S.C. § 2254(b)(1)(A); Dowthitt, 230 F.3d at 745.

B.     Ross fails to demonstrate deficient performance or prejudice.

Ross fails to demonstrate that trial counsels' performance was deficient. As noted by the state court, Ross made no effort to demonstrate that trial

counsel's failure to object or move for a mistrial was not strategic.  Since he bears the burden of proving deficient performance, Montoya v. Johnson, 226 F.3d 399, 408 (5th Cir. 2000), and he failed to offer any proof that this was not a strategic decision, the trial court's decision was not unreasonable and is entitled to deference.  See Bartee v. Quarterman, 574 F.Supp.2d 624, 649 (W.D.Tex. 2008) (Absent some showing counsel's subjective decision-making was objectively unreasonable, it is almost impossible for a habeas petitioner to overcome presumption of reasonableness afforded counsel's strategic and tactical decisions).

Regardless, trial counsel's failure to object or request a mistrial was not prejudicial.  Even if trial counsel should have preserved error a second time with regard to Martin's testimony, or regarding McVade's testimony, the error is harmless.  See Gochicoa v. Johnson, 238 F.3d 278, 286 (5th Cir. 2000) (holding that Strickland prejudice prong is not met if failure to preserve error is harmless).

Ross claims that trial counsel should have objected to the following exchange between the State and witness Ronnie Martin:

Q.    Okay.  And when Mr. Garner got on the phone to talk to Liza, what happened?

A.    Well, during the conversation he spoke and asked Liza what was — what was the problem, and she was saying that [Ross]

-48-

was tripping in the background for us calling his house.

Q.    Okay.

A.    And at the time, he told Liza he really didn't care for [Ross] anyway because he felt as though he was a coward from a recent incident they had had where he said [Ross] had pulled a gun —

> [Trial counsel]:    Your Honor, I object to him talking about what someone else told him.
>
> The Court:    Sustained

***

Q.    Okay. And, Mr. Martin, was it your understanding that the comment regarding "coward" was because of some incident where there had been a threat with a gun that [Ross] had used?

A.    Yes.

34 RR 142-144 (emphasis added).  This conversation occurred a day before the murders, and was part of the testimony proffered to demonstrate that Ross was angry with the victim, Viola Ross, and that Viola wanted to pick up her sister from Ross's home that night.

Before the state court, Ross argued that counsel's failure to object to the second reference to a gun violated his right to confront and cross-examine the declarant of the hearsay testimony, Clarence Garner.  2 SHCr 81-89.  The Confrontation Clause guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him."  Delaware v. Van

-49-

Arsdall, 475 U.S. 673, 678 (1986).   However, "violations of the Confrontation

Clause are still subject to harmless error analysis."   Hafdahl v. Johnson, 251

F.3d 528, 539 (5th Cir. 2001); United State v. Edwards, 303 F.3d 606, 623 (5th

Cir. 2002).   To determine whether the error was harmless, the reviewing court

should consider "the importance of the witness' testimony in the prosecution's

case, whether the testimony was cumulative, the presence or absence of evidence

corroborating or contradicting the testimony of the witness on material points,

the extent of cross-examination otherwise permitted, and ... the overall strength

of the prosecution's case."   Hafdahl, 251 F.3d at 540.

Relying on this authority, the state court reasonably concluded that

Martin's testimony was "relatively unimportant."   2 SHCr 136-38.   First, this

small portion of Martin's testimony briefly referred to a previous altercation

between Clarence Garner and Ross, unrelated to the crime at hand.   This portion

was not the purpose of Martin's testimony, rather he described the day before

the murder in which he and Garner — an ex-boyfriend of Liza McVade — were

looking for her at her house; the victim called Liza at Ross's home and allowed

Garner and Martin to speak to Liza, angering Ross.   See 34 RR 136-46.   The

remainder of the testimony demonstrated that Ross was angry at the victim and

Garner, and that the victim feared for her sister's safety.

Further, this testimony was cumulative of other evidence indicating Ross

possessed a handgun, namely McVade's testimony that, on one occasion, Ross told her he had a handgun in his coat pocket and that he "carried it sometimes," 34 RR 162-63; testimony that McVade's sister told her that she had seen Ross with a gun in his hand on an occasion when he was angry, 34 RR 163-66; and incriminating statements Ross made to police that he had control over the murder weapon.  36 RR 143; 37 RR 193.  Finally, as found by both state courts, the evidence against Ross is overwhelming.  See Ross, 133 S.W.3d at 620; 2 SHCr 137-38.  Therefore, the introduction of this evidence was harmless, and trial counsel's failure to object a second time or request a mistrial was not prejudicial.

Regarding trial counsel's alleged failure to object to Liza McVade's testimony, apart from the procedural bar, trial counsel was not ineffective, and the admission of this testimony was also harmless.  Ross asserts trial counsel should have objected during the following exchange regarding an incident a few months prior to the murder where Viola was helping McVade leave Ross's home:

> Q.    All right.  As you were leaving, did Viola say anything about what [Ross] had?
>
> A.    She said he probably had —
>
> > [Trial Counsel]:    Your Honor, I'm going to object to her putting any words in Viola's mouth.
> >
> > [Prosecutor]:    Your Honor, it's a present sense

exception at this time.  It's also an excited utterance, which is an exception to hearsay.

The Court:       Allow the question.

Q.    Now, at the time that you're moving your stuff out, you said [Ross] was angry; is that right?

A.    Right.

Q.    Was — did Viola want you to get your stuff and go right then?

A.    Yes.

Q.    Okay.  Was Viola pretty excited about you getting out of there right then?

A.    Yes.

Q.    Okay.  Now, did Viola say anything about what [Ross] had as y'all were leaving?

A.    Yes.

Q.    What did she say?

A.    She say, "He probably got that gun.  He think everybody scared of him and that gun."

Q.    Okay.  Did Viola say she had seen a gun right then?

A.    No.  I asked her, "What did he have in his hand?"

Q.    And she said she had seen [Ross] with a gun?

A.    Right.

34 RR 165-66.

First, trial counsel did attempt to object to this line of questioning but it

-52-

was ruled admissible under the present-sense and excited-utterance exceptions. Therefore, a second objection — after the State had further demonstrated that this was in fact an excited utterance — was not likely to have been successful. Thus, trial counsel's performance was neither deficient nor prejudicial. Furthermore, Ross was not prejudiced because the admission of this testimony passes "constitutional scrutiny" under the Confrontation Clause because (1) the declarant was unavailable and (2) the statement was shown to be reliable – it falls within a "firmly rooted" hearsay exception. Hafdahl, 251 F.3d at 539 (citing Idaho v. Wright, 497 U.S. 805, 814-15 (1990)).   As with Ronnie Martin's testimony, McVade's testimony is also harmless because it was cumulative of other evidence indicating Ross possessed a handgun, namely McVade's own prior testimony that, on one occasion, Ross told her he had a handgun in his coat pocket and that he "carried it sometimes," 34 RR 162-63, and his own incriminating statements to the police that he had control over the murder weapon and it would not fall into anyone's hands.  36 RR 142-43; 37 RR 193. And finally, the evidence against Ross is overwhelming.  See Ross, 133 S.W.3d at 620; 2 SHCr 137-38.

Given the relative unimportance of Martin's testimony and the reliability of McVade's, the fact that both statements are cumulative in nature, and the strength of the other evidence against Ross, the state court reasonably concluded

that any error from trial counsel's failure to object was harmless.  Therefore, Ross fails to demonstrate either deficient performance or prejudice, and relief on this claim should be denied.

V.      Ross's Brady Claim is Unexhausted and Meritless.

In his fifth claim, Ross alleges that the actions of the prosecution in failing to provide defense counsel with the criminal history of Regina Carlisle and then "ambushing" the defense by introducing Ms. Carlisle's testimony through inadmissible hearsay, constitutes a violation of his right to due process of law under the Fifth and Fourteenth Amendments, and Brady v. Maryland, 373 U.S. 83 (1963) and Strickler v. Greene, 527 U.S. 263 (1999).  Petition at 35-37; Brief at 39-41.

This claim was not raised in the state court.  Therefore it is unexhausted and procedurally barred from federal habeas review.  In the alternative, this claim is meritless.

A.      This claim is unexhausted and procedurally barred.

Ross has not raised this claim in any state court. Therefore, it is unexhausted and he is procedurally barred from raising it for the first time in federal habeas proceedings.

"To have exhausted his state remedies, a habeas petitioner must have fairly presented the substance of his claims to the state courts."  Rodriguez, 724

F.2d at 466 (citing Vela, 708 F.2d at 958). Where a petitioner raises claims in federal court that have not previously been presented to the state courts, and Article 11.071, Section 5(a)[11] of the Texas Code of Criminal Procedure would apply to foreclose review of the claims if presented in a successive state habeas application, such is an adequate state procedural bar foreclosing federal habeas review of the claims. Beazley, 242 F.3d at 264; Hicks, 186 F.3d at 637-38; Muniz, 132 F.3d at 221. The state courts have not had the opportunity to pass on this claim. Furthermore, if Ross were to attempt to raise this claim now in a successive state habeas application, he would be barred by Article 11.071, Section 5. Therefore, Ross is procedurally barred from raising this claim for the first time in federal proceedings.

To avoid the procedural bar, Ross must assert cause for failing to bring the unexhausted claim in the first state habeas application and prejudice, or that failure to consider the claim will result in a "fundamental miscarriage of justice." Jones, 171 F.3d at 277 (citing Keeney, supra); Coleman, 501 U.S. at 749-50. To demonstrate a "fundamental miscarriage of justice," Ross must demonstrate actual innocence. Muniz, 132 F.3d at 221 n.12. For purported punishment phase error, a miscarriage of justice occurs if clear and convincing evidence

---

[11]     Ross has made no showing that any exception to Article 11.071, Section 5(a) applies.

establishes that, "but for the constitutional error at [Ross's] sentencing hearing, no reasonable juror would have found him eligible for the death penalty" under state law.  Sawyer v. Whitley, 505 U.S. 333, 350 (1992).  This exception requires evidence of "innocence of the capital crime itself," i.e., "a showing that there was no aggravating circumstance or that some other condition of eligibility had not been met."  Id. at 336, 345.  Such a showing would require evidence that Ross did not kill two people in the course of the same criminal transaction, or reliable evidence proving a lack of future dangerousness.

Ross makes no requisite showing of these factors, nor could he. The record upon which Ross now relies was known, or could have been discovered, at the time he filed his first state habeas application.  In fact, Ross raised numerous claims involving the Regina Carlisle incident.  See 2 SHCr 71-81.  And as discussed below, this claim is meritless thus there is no chance of prejudice if the Court refuses to consider the claim.  Finally, Ross does not allege that he is actually innocent of this crime — that he did not actually kill both victims — and presents no credible evidence that he would be a future danger to society. Therefore, Ross fails demonstrate an exception to the procedural bar, and this portion of the claim should be dismissed.

B.    This claim is meritless.

To obtain federal habeas relief based on a violation of the Due Process

Clause, Ross bears the burden of demonstrating (1) the State suppressed evidence, (2) that is favorable to the defense, and (3) material as to issues of guilt or punishment.  Brady, 373 U.S. at 87.  Evidence is "material" if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed; a "reasonable probability" is one sufficient to undermine confidence in the outcome.  Kyles v. Whitley, 514 U.S. 419, 435 (1995).  The purpose of the Brady rule of disclosure is to ensure that the accused is not denied access to materially favorable evidence that is known to the government but unknown to him.  United States v. Agurs, 427 U.S. 97, 103 (1976); United States v. Cravero, 545 F.2d 406, 420 (5th Cir. 1976).

Ross fails to demonstrate a due-process violation from the State's failure to disclose Regina Carlisle's criminal history.  First, Ross does not demonstrate that the State suppressed this evidence.  Ross offers no proof that this evidence even exists — only the hearsay assertion of his investigator that there might be evidence of this nature.  See Petitioner's Exhibit A.  Thus, there is no evidence that the State ever had Regina Carlisle's criminal history.  And since the State did not call her as a witness, they were under no duty to disclose her criminal background, if it did exist.

Second, this evidence is not "favorable" to the defense.  Ross does not demonstrate how he could have actually used this evidence as impeachment.

The State never called Regina Carlisle so Ross had no opportunity to use her criminal record against her.  Ross does not suggest that he would have called her as a witness had he had this impeachment evidence.  However, to do so, the evidence first would have to satisfy Texas Rule Evidence 609 — specifically, there had to be a conviction of a felony or a crime of moral turpitude, and the evidence is more probative than prejudicial.  Once again, Ross offers no proof of an actual conviction which satisfies this standard.

Ross provides no authority which would have allowed him to impeach the two witnesses who testified about the Carlisle incident — community supervision officer Susie Caddell and police officer Kevin Knobbe — with Carlisle's criminal record.  Neither witness implied Carlisle was a particularly credible person.  In fact, Caddell provided testimony that Carlisle was stalking Ross and that she pulled the knife on Ross and tried to stab him first.  40 RR 29. Officer Knobbe testified generally about the incident as the responding officer. See 40 RR 33-49.  Ross fails to demonstrate how the testimony of these two witnesses could have been impeached with Carlisle's criminal record, or under what authority he could have done so.

Even if it was somehow admissible, this evidence is not material.  Regina Carlisle's prior criminal record is incremental impeachment at best.  See Miller v. Dretke, 431 F.3d 241, 251 (5th Cir. 2005) (holding that evidence providing

only incremental impeachment value, does not rise to the level of Brady materiality); Drew v. Collins, 964 F.2d 411, 419-20 (5th Cir. 1992). Her credibility was already damaged by Caddell's negative testimony. Additional testimony that she had a criminal record and was violent towards men would have provided little more. And it would have been more harmful than helpful for Ross to call Carlisle in an attempt to impeach her with her criminal record. As the record stood, Ross was able to get his uncontested version of the attack before the jury through Susie Caddell's testimony, without having to take the stand. Had counsel called Carlisle in hopes of being able to impeach her credibility, she would likely have placed the blame on Ross for the brutal attack and denied any responsibility. Better impeachment evidence was already on the record, and this additional bit of information was neither favorable nor material to Ross's defense. Thus, even if the allegedly suppressed evidence had been disclosed, it does not undermine confidence in the jury's sentence. Kyles, 514 U.S. at 435. Therefore, apart from the procedural bar, this claim is meritless and should be denied.

VI.   Trial Counsel was Not Ineffective for Failing to Object to Officer Knobbe's Testimony, and the Admission of this Testimony was Harmless and Not Prejudicial.

Ross alleges that he was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments when his trial attorneys

failed to object to the State's questioning of Kevin Knobbe based upon violations of his Sixth Amendment right to confront and cross-examine witnesses.  Petition at 37-39.

On state habeas review, the court found generally that Ross's trial attorneys "performed competently and provided constitutionally effective assistance of counsel." 2 SHCr 121, #10.  Regarding this specific claim, the state court found that trial counsel's failure to continue to object to testimony regarding Carlisle's excited utterances was not ineffective because such excited utterances were admissible.  2 SHCr 131; Burruss v. State, 20 S.W.3d 179, 188 (Tex.App. — Texarkana 2000, pet. ref'd) ("The failure to object to admissible evidence is not ineffective assistance."); see also 2 SHCr 129-30 (statements were not testimonial under the circumstances and were excited utterances).[12]

The court also found there was no prejudice because any alleged error from counsel's failure to object was harmless.  2 SHCr 131; see United States v. Edwards, 303 F.3d 606, 623 (5th Cir. 2002) (Confrontation Clause violations are subject to harmless-error analysis.)   First the declarant's statement was

---

[12]     The court also found that Crawford v. Washington, 541 U.S. 36 (2004) did not apply since it was decided after this trial, and trial counsel's performance must be judged under the law as it existed at the time of trial.  2 SHCR 131 (citing Ex parte Akhtab, 901 S.W.2d 488, 490 (Tex. Crim. App. 1995)).  Further, the court ruled that Crawford would not apply to this case because, due to the on-going nature of the emergency, Carlisle had not regained the capacity to make a testimonial statement. 2 SHCr 129-30.  Ross does not repeat his Crawford arguments to this Court.

substantiated by Ross when he pled guilty to the offenses; these guilty pleas were admitted at trial. 2 SHCr 132; see SX[13] 412. Second, the evidence against Ross was overwhelming. 2 SHCr 132; see also Ross v. State, 133 S.W.3d at 626. These findings are not unreasonable and are entitled to deference.

As with Claims 1, 2 and 4, to be entitled to relief, Ross must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. Strickland, 466 U.S. at 684-86; Givens, 265 F.3d at 309-10. To prove prejudice, Ross must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Williams, 529 U.S. at 391. A "reasonable probability" is described as "probability sufficient to undermine confidence in the outcome." Id.

Ross fails to demonstrate that trial counsels' performance was deficient. As with his previous Strickland claims, Ross makes no effort to demonstrate that trial counsel's failure to object or move for a mistrial was not strategic. Since he bears the burden of proving deficient performance, Montoya, 226 F.3d at 408, and he failed to offer any proof that this was not a strategic decision, the trial court's decision was not unreasonable and is entitled to deference. See Bartee, 574 F.Supp.2d at 649.

Regardless, the trial court correctly concluded that, because this evidence

---

[13]    "SX" refers to "State's Exhibit."

was admissible as an excited utterance, trial counsel was not ineffective for failing to object.  Trial counsel did object to early testimony about what Carlisle said to the officer, but the objection was overruled because the testimony was admissible under the excited-utterance exception.  See 40 RR 35-36  Therefore, a second objection was not likely to have been successful, and trial counsel's performance was not deficient.

Regardless, trial counsel's failure to object was not prejudicial because, even if trial counsel should have continued to object to the testimony, any error from the admission of the testimony is harmless.  See Gochicoa, 238 F.3d at 286 (holding that Strickland prejudice prong is not met if failure to preserve error is harmless); see also Hafdahl, 251 F.3d at 539 ("violations of the Confrontation Clause are still subject to harmless error analysis."); Edwards, 303 F.3d at 623 (same).  Ross pled guilty to charges that he assaulted Regina Carlisle and stole her car. 58 RR SX 412.  Therefore, even if trial counsel had successfully objected and kept out Regina Carlisle's "excited utterances," evidence of the attack and theft, and Ross's guilt of these crimes, was still before the jury.  And the jury would still have heard the officer's testimony on what Carlisle looked like and how she was acting when he responded to the scene, 40 RR 35-36 (she was very shaken, screaming, bleeding, in need of medical attention, looked like she was in a lot of pain); and the jury would have seen the photographs of the victim's

injuries taken by Officer Knobbe, and heard his description of her injuries. 40 RR 39-43. Therefore, the brutality of the attack and Ross's role in that attack would have come before the jury regardless of trial counsel's objection. Therefore, the admission of the additional testimony without objection was harmless and not prejudicial, and relief on this claim should be denied.

## CONCLUSION

The Director requests the Court deny habeas relief and deny a COA on all claims.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

ANDREW WEBER
First Assistant Attorney General

ERIC J.R. NICHOLS
Deputy Attorney General for
Criminal Justice

EDWARD MARSHALL
Assistant Attorney General
Chief, Postconviction Litigation Division

\*Attorney in Charge

s/ Tomee M. Heining
TOMEE M. HEINING\*
Assistant Attorney General
State Bar No. 24007052

P.O. Box 12548, Capitol Station
Austin, Texas   78711

-63-

(512) 936-1400
Facsimile No. (512) 936-1280
tomee.heining@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2009, I electronically filed the foregoing pleading using the electronic case filing system of this Court.  In turn, a "Notice of Electronic Filing" was generated and sent to the following attorney of record who has consented in writing to accept the Notice as service of this document by electronic means:

Richard L. Wardroup
rickwardroup@msn.com

Don Vernay
minimal243@yahoo.com

 s/ Tomee M. Heining
TOMEE M. HEINING
Assistant Attorney General

-64-