IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| VAUGHN ROSS, | § | |
| Petitioner, | § | |
| | § | |
| V. | § | CIVIL CAUSE NO. 5:08-CV-0174-C |
| | § | DEATH PENALTY CASE |
| | § | ECF |
| NATHANIEL QUARTERMAN, | § | U.S. District Judge Sam Cummings |
| Director, Texas Department | § | |
| of Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

RESPONDENT'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

The Court has considered the Petition for Writ of Habeas Corpus and Brief
in Support filed by Petitioner Vaughn Ross, the Answer filed by Respondent
Quarterman, and Petitioner's Response to the Answer. Docket Entries ("DE")8,
9, 19, & 23. After considering the state court record as well as the arguments of
counsel offered at the May 1, 2009 hearing, the Court issues the following
findings and conclusions:

## FINDINGS OF FACT RE: PROCEDURAL HISTORY

1. Respondent has custody of Petitioner pursuant to a judgment and
sentence from the 137th Judicial District Court of Lubbock County, Texas, in
Cause No. 453,653, styled The State of Texas vs. Vaughn Ross.

2. Petitioner was represented at trial by attorneys Floyd D. Holder and

Patrick S. Metze.  Clerk's Record ("CR") 98-101.

3.     Ross was convicted on September 23, 2002, for the capital murder of more than one person—Douglas Birdsall and Viola Ross—during the course of the same criminal transaction, committed on January 31, 2001.  1 CR 4, 278-82 .

4.     Following a separate punishment hearing, the jury answered affirmatively the special issue regarding future dangerousness and the special issue asking whether the jury believed Ross killed, intended to kill, or anticipated a life would be taken; and answered negatively the issue on mitigating evidence and, on September 27, 2002, Ross was sentenced to death. 1 CR 291-96.

5.     The evidence presented at the guilt-innocence stage of trial showed:

   a.     On January 31, 2001, the bodies of Douglas Birdsall and Viola Ross were found inside a car in a ravine, dead from multiple gunshot wounds to the head.  34 Reporter's Record ("RR") 33-34; 36 RR 252-54.

   b.     Inside of the car, the police found large amounts of blood, shell casings, glass shards, and the tip of a latex glove.  37 RR 29, 37.

   c.     The exterior of the glove tip was covered in Douglas Bridsall's blood.  37 RR 38, 168.  Skin cells found on the interior of the glove tip belonged to Ross.  37 RR 151, 168, 171.

   d.     Viola Ross's sister, Liza McVade, dated Ross.  34 RR 94, 159.

   e.     On January 30, 2001, Liza McVade was at Ross's apartment

when Viola telephoned her several times, and allowed Ronnie Martin and Clarence Garner to speak with McVade on the phone. 34 RR 139, 142, 167-59.

f.     Viola asked Martin for a ride to Ross's apartment due to concern for her sister, but was refused. 34 RR 145.

g.     Later, Birdsall arrived at Viola's home. 34 RR 172; 35 RR 227. Viola left with Birdsall and another person, who was dropped off shortly afterwards. 35 RR 228.

h.     Viola attempted to call McVade from Birdsall's home. 34 RR 173; 36 RR 80-81. Ross answered the phone, cursed Viola, told her not to call anymore, and threatened to hurt her. 34 RR 173; 35 RR 4.

i.     McVade attempted to leave Ross's apartment, but he refused to take her home or allow her to use the phone to call for a ride. 34 RR 175-76.

j.     McVade witnessed Ross putting on white latex gloves; Ross instructed McVade to leave "because if I do something, I don't want you around." 34 RR 176-77.

k.     McVade used a neighbor's phone in a futile attempt to get a ride, and then started walking home. 34 RR 177, 179. About fifteen to twenty minutes later, the neighbor heard gun shots, which he reported to the police. 35 RR 35.

l.     The police investigated the shots-fired report to see if there was any connection with the two bodies found. 35 RR 47-48. Behind Ross's apartment in an alleyway, officers found glass shards and two pools of blood. 35 RR 48, 175. The larger pool of blood matched Birdsall's DNA profile. 37 RR 163. A shell casing recovered from the scene matched the shell casings found inside the car. 35 RR 258-59; 36 RR 90. Police believed this was the scene where the murders took place. 36 RR 91.

m.     Ross admitted, in a police interview, that he was angry with Viola on the night of January 30th, and that he had

-3-

threatened her. 36 RR 94-95, 109. Ross also confirmed that he had worn latex gloves that night. 36 RR 110.

n.  After obtaining Ross's consent, the police searched his house where they found two latex gloves and a sweatshirt. 36 RR 107, 215-16, 234. The sweatshirt had bloodstains, which matched Birdsall's blood, and Ross's DNA was on the inside of the shirt. 36 RR 241-42; 37 RR 164-67.

o.  When a police officer expressed his concern that the murder weapon might be found by a child and cause injury, Ross advised the officer that the gun was in a safe place. 36 RR 143; 37 RR 193.

p.  When confronted with the physical evidence, Ross stated that he would not admit to the killing of Viola or Birdsall, but if the police had what they said they had, then they had the truth. 37 RR 194.

q.  When speaking with his mother on a jail phone call, his mother asked whether he had committed the crime, and Ross admitted that he "might have." 37 RR 200.

6.  The evidence presented by the State at the punishment-phase of trial demonstrated:

a.  Thomas Bostwick, a jailer with the Lubbock County Sheriff's Department, wrote an incident report regarding Ross's behavior on August 9, 2001. 40 RR 17. Bostwick was supervising the inmate roll call, where deputies visually inspect all inmates and their wristbands to ensure they are all present. 40 RR 11-12. Inmates are required to wear a wristband which contains their picture, book-in number, Sheriff's Office number, and a bar code. 40 RR 12. The wristband is secured by two metal brads and must be worn at all times, and inmates are instructed not to alter or remove the wristband. 40 RR 12-13. During the August 9th roll call, Ross did not have his wristband on and, when asked for it, Ross threw the band into the aisle where the officers walk. 40

-4-

RR 15-16.  The metal brads on the wristband had been altered and removed.  40 RR 16.  Bostwick informed Ross that he was going to confiscate the band, causing Ross to become very upset and begin using profanity towards Bostwick.  40 RR 16-17.  Bostwick wrote an incident report because Ross cursed a detention officer and "kind of went crazy."  40 RR 17.

b.   Ross was placed on probation in Missouri on October 7, 1997, when he pled guilty to a Class B felony assault and stealing a motor vehicle, a Class C felony.  40 RR 26-27.  The assault and theft occurred on July 13, 1997.

c.   Susie Caddell, a community supervision officer for the Lubbock County Adult Probation Office, testified that Ross told her that the victim of this assault and theft, Regina Carlisle, was Ross's girlfriend; they had problems in the past, and she was stalking him.  40 RR 29.  Ross stated that Carlisle had instigated the attack by attempting to stab Ross with a butcher knife while Ross was merely trying to talk to her; Ross grabbed the knife and stabbed her.  40 RR 29.  According to Caddell, Ross expressed no remorse, but said he would walk away if he had to do it over again.  40 RR 30.  Ross admitted that anger and outrage were contributing factors to the assault, and Caddell testified that Ross did not accept responsibility for the incident.  40 RR 30.  However, Ross successfully completed anger counseling and probation.  40 RR 30-31.

c.   Kevin Knobbe, a certified police officer in St. Louis, Missouri, responded to the assault involving Ross and girlfriend Regina Carlisle.  40 RR 33-35.  Knobbe found victim Regina Carlisle in a local park on July 13, 1997.  40 RR 35.  Carlisle was very shaken and was screaming, bleeding from stab wounds, and in need of medical attention.  40 RR 35.  According to Knobbe, Carlisle was in a very excitable state and said that her boyfriend had just stabbed her, cut her, and took off in her vehicle.  40 RR 36.  Carlisle identified Ross as her boyfriend.  40 RR 36-37.  Officer Knobbe overheard Carlisle say that Ross told her to give him her neck and that she was going to die.  40 RR 49.

      d.      The State admitted pictures of Carlisle's injuries, which included a laceration to her right arm, stab wounds to her left thigh, nine wounds where a knife cut her, three stab wounds, several stitches, and a laceration to the left side of her neck which could have potentially been life-threatening.  40 RR 39-43; State's Exhibit ("SX") 413-20.

7.    The defense presented the following evidence at the punishment phase of trial:

      a.      Felix Moore, a doctoral student at Texas Tech, testified that he and Ross were fraternity brothers and that Ross studied architecture.  41 RR 4, 6–7.  Ross had paid for his own education by working while attending school. 41 RR 10-12.  Moore testified that he had never seen Ross with a gun, weapon, or knife, and never saw Ross act violently or upset.  41 RR 13-14.  When asked about his demeanor, Moore said Ross was "always pretty calm." 41 RR 14.  Furthermore, Ross had girlfriends and drank some alcohol but did not use drugs.  41 RR 14-16.

      b.      Tanya Robertson testified that she knew Ross through her sorority and eventually became roommates with Ross and Derald Powell.  41 RR 22-23.  According to Robertson, Ross was a diligent student who was not involved in drugs and rarely drank.  41 RR 24-26.  Ross had one girlfriend during the time Robertson was his roommate, with whom he had "a loving girlfriend/boyfriend relationship."  41 RR 22-27.  Robertson described Ross as very calm, very polite, and very nice.  41 RR 26-27.

      c.      Ross's mother, Johnnie Ross, testified that Ross had had no contact with his father since he was eight years old and that no men were living in the home during Ross's formative years.  41 RR 33-37, 44.  Also, Ross was born with pneumonia and was an asthmatic.  41 RR 37.

      d.      Johnnie's testimony also revealed that Ross attended public

school, where he ran track and played football, was involved
in the Boy Scouts and Cub Scouts, and attended inner city
schools until junior high, when the family moved to the
outskirts of St. Louis. 41 RR 37-38. There, the family owned
and lived in a single-family home in a community that was
predominantly white with racially mixed schools. 41 RR 39-
40.   Ross was involved in his church where his step-
grandfather was the preacher and attended three to four
times a week. 41 RR 40-41. Ross had a small, racially-mixed
group of friends from school, who his mother described as
"good kids." 41 RR 42. As a teenager, Ross had a job at the
Norwood County Club. 41 RR 45. His mother described him
as a quiet, calm, and laid-back person. 41 RR 46.

e.     After graduating high school, Ross attended Central Missouri
       State college for four years and received an Associate of
       Science degree and a Bachelor of Science degree. 41 RR 46-
       47. While in college, Ross did not use drugs and only drank
       socially. 41 RR 47. He was active in his fraternity, becoming
       president of his chapter his senior year. 41 RR 48. After
       college, Ross held jobs with several architectural firms. 41 RR
       49-50.

f.     Ross's mother testified there were no guns in their home, and
       Ross was not familiar with weapons and did not hunt. 41 RR
       40.

g.     According to his mother, Ross did not have trouble with the
       law as juvenile—apart from a curfew violation—and he did
       not get into trouble at school. 41 RR 42-43. His mother was
       not aware of any drug or alcohol use prior to his going away
       for college, and Ross was not involved in any gang activity. 41
       RR 45.

h.     According to his mother, Ross was never in trouble with the
       law until the incident with his girlfriend in 1997. 41 RR 51.
       After this incident, Ross made plans to continue his education
       by attending Texas Tech, where he paid for his own education
       and had no mental problems. 41 RR 51-54.

8.      The Texas Court of Criminal Appeals affirmed Ross's conviction and sentence on direct appeal, Ross v. State, 133 S.W.3d 618 (Tex. Crim. App. May 5, 2004), and Ross did not seek certiorari review.

9.      While his direct appeal was pending, Ross applied for state habeas corpus relief pursuant to Texas Code of Criminal Procedure Article 11.071. SHCr[1] 2-111.

10.     The convicting court adopted the State's proposed findings of fact and conclusions of law, 2 SHCr145, and the Court of Criminal Appeals denied relief.  Ex parte Ross, No. WR-60,294-01(Tex. Crim. App.) (unpublished order of Jan. 23, 2008).

11.     Ross timely filed in this Court his 28 U.S.C. § 2254 federal habeas petition and brief in support on January 11, 2009, DE 8 & 9, raising the following six claims:

> (1).    The Petitioner was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to investigate the nature and extent of Regina Carlisle's criminal history and, as a result, failed to develop evidence to contradict and impeach the State's punishment evidence.

> (2).    The Petitioner was denied the effective assistance

---

[1]      "SHCr" refers to the State Habeas Transcript compiled by the state court. Each citation is preceded by a volume number and followed by page reference.

of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to investigate and present mitigating evidence that called for a sentence less than death.

(3).    The Texas Court of Criminal Appeals's decision that there was no reasonable likelihood that the jury could have been mislead and that the jury was not mislead by the erroneous jury charge submitted at the punishment phase was contrary to, and involved an unreasonable application of, clearly established federal constitutional law as determined by the Supreme Court of the United States.

(4).    The Petitioner was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to request an instruction to disregard or a mistrial after the State's continued questioning of Ronnie Martin subsequent to the court's sustaining the defense counsel's hearsay objection and counsel's failure to object to hearsay or request a mistrial regarding testimony from Liza McVade about the Petitioner's alleged possession and use of a firearm.

(5).    The actions of the prosecution in failing to provide defense counsel with the criminal history of Regina Carlisle and then "ambushing" the defense by introducing Ms. Carlisle's testimony through inadmissible hearsay, constitutes a violation of the Petitioner's right to due process of law under the Fifth and Fourteenth Amendments of the United State's Constitution, and Brady v. Maryland, 373 U.S. 83 (1963), and Strickler v. Greene, 527 U.S. 263 (1999).

(6). The Petitioner was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to object to the State's questioning of Kevin Knobbe based on violations of Petitioner's right under the Sixth Amendment to the United States Constitution to confront and cross-examine witnesses.

Petition for Habeas Corpus ("Petition") at 23-39.

12.    The Director asserted procedural defenses against evidence proffered in support of claims 1, 2, and 4; and against a portion of claim 4 and all of claim 5. The Director also answered all the issues on the merits, and Ross responded. DE 19 & 23.

13.    The Court reviewed three boxes of state-court records received from Respondent consisting of eleven volumes of direct appeal records and one volume of state habeas records. Respondent also filed an index to the records. DE 7.

14.    Pursuant to the Court's August 27, 2008 scheduling order, a hearing will be held on May 1, 2009, at which time both parties will present oral argument.

## CONCLUSIONS RE: JURISDICTION & STANDARD OF REVIEW

1.    This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 2241 and 2254.

2.    Because Petitioner's federal writ petition was filed after the

-10-

enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the claims must be reviewed under the amended habeas provisions effected by the Act which call for a heightened standard of review. Penry v. Johnson, 532 U.S. 782, 792 (2001); see Foster v. Johnson, 293 F.3d 766, 776 (5th Cir. 2002) (citing Penry).

3.      Under the Act, a federal reviewing court cannot grant relief for claims which were adjudicated on the merits in state court unless the adjudication:

> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

4.      As to questions of law, a decision is contrary to clearly established Federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Penry, 532 U.S. at 792.

5.      Alternatively, when confronting a mixed question of law and fact, a

state court "unreasonably" applies clearly established Federal law "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Penry, 532 U.S. at 792.

6.     A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Williams, 529 U.S. at 409-11; Tucker v. Johnson, 242 F.3d 617, 620 (5th Cir. 2001). Rather, federal relief is only merited where the state court decision is both incorrect and objectively unreasonable, "[w]hether or not [this Court] would reach the same conclusion." Woodford v. Visciotti, 537 U.S. 19, 27 (2002); see also Martin v. Cain, 246 F.3d 471, 476 (5th Cir. 2001) (reiterating that relief is appropriate only where state court decision is both incorrect and objectively unreasonable). Relief is inappropriate when a state court, at a minimum, reaches a "satisfactory conclusion." Williams, 529 U.S. at 411 (citing Wright v. West, 505 U.S. 277, 287 (1992)).

7.     The reviewing court tests the state court's "ultimate decision" for reasonableness, "not every jot of its reasoning." Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001); see Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002)

(en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence").

8.     A state court's decision need not expressly cite any federal law or even be aware of applicable Supreme Court precedent in order to be entitled to deference. Mitchell v. Esparza, 540 U.S. 12, 16 (2003); see also Early v. Packer, 537 U.S. 3, 8 (2002) (state court decision must be upheld so long as the state result does not contradict Supreme Court precedent).

9.     Regarding questions of fact, federal courts must presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Dowthitt v. Johnson, 230 F.3d 733, 741 (5th Cir. 2000). This presumption applies to explicit and implicit findings which are necessary to the state court's conclusions of mixed law and fact and to the state court's credibility determinations. Valdez v. Cockrell, 274 F.3d 941, 948 n. 11 (5th Cir. 2001).

10.    Additionally, except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which an applicant would challenge a state court fact finding must have been presented to the state court. Because a federal habeas court is prohibited from granting relief unless a decision was based on

"an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.  28 U.S.C. § 2254(d)(2) (emphasis added).

## FINDINGS & CONCLUSIONS RE: PETITIONER'S CLAIMS FOR RELIEF

I.   Claim 1—Whether Ross was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to investigate the nature and extent of Regina Carlisle's criminal history and, as a result, failed to develop evidence to contradict and impeach the State's punishment evidence.

In his first claim, Ross argues that he was denied the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments, when his trial attorneys failed to investigate the nature and extent of Regina Carlisle's criminal history and, as a result, failed to develop evidence to contradict and impeach the State's punishment evidence.  Petition at 23-25; Brief at 4-9.  Ross alleges that, had trial counsel fully investigated the assault and Carlisle's background, counsel would have discovered evidence that Carlisle was once arrested for fraudulent use of a credit card and assault, stole several cars to make money, had shot another boyfriend who later died of his injuries, and that she had a 9mm handgun in her car on the night Ross attacked her; and such evidence could have been used to impeach Carlisle's credibility and undercut the

-14-

future dangerousness issue.  See Petition at 24; Petitioner's Exhibit A, at 4.

A.     Findings of Fact

1.     Ross raised this claim on state habeas review.  2 SHCr at 76, 79-81.

2.     The state habeas court denied relief, finding generally that Ross's trial attorneys "performed competently and provided constitutionally effective assistance of counsel."  2 SHCr 121, #10.

3.     The state habeas court refused to find deficient performance on this claim because Ross did not set forth any facts demonstrating that the defense did not investigate Carlisle's history.  Nor did he set forth any facts to show how such evidence would have been elicited, or how such evidence would have been admissible.  2 SHCr 133.

4.     The state habeas court also found that Ross failed to set forth facts establishing prejudice.  2 SHCr 134.

5.     The state habeas court reasoned that impeachment of Carlisle would have been fruitless given that Ross pled guilty to assault in the first degree for stabbing Carlisle and guilty to unlawfully appropriating her car.  2 SHCr 133. Further, Ross's mitigating version of the events involving Carlisle was before the jury through the testimony of his community supervision officer, to whom he stated that the victim was his girlfriend; they had problems in the past, she was stalking him, and it was she who first pulled out the butcher knife and

attempted to stab Ross before Ross took the knife and stabbed her.  2 SHCr 134.

B.       Conclusions of law

1.      This Court finds that the state habeas court's findings are reasonable and are entitled to deference.

2.      Claims of ineffective assistance of counsel are to be reviewed under the two-prong standard of Strickland v. Washington, requiring a petitioner to show that counsel's performance was deficient and that the deficient performance prejudiced the defense.  466 U.S. 668, 684-86 (1984).  A claim of ineffective assistance may be disposed of for want of either deficient performance or actual prejudice.  Id. at 697; Givens v. Cockrell, 265 F.3d 306, 309-10 (5th Cir. 2001).

3.      To demonstrate deficient performance, the petitioner must show that counsel's conduct falls beyond the bounds of prevailing, objective professional standards.  Strickland, 466 U.S. at 688.  However, "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effect of hindsight."  Id. at 689.  There is a presumption that counsel has rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  Id. at 690; Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).

4.      A   petitioner   must   also   affirmatively   prove   prejudice   by

demonstrating that as a result of counsel's errors, his trial was rendered fundamentally unfair or unreliable. Ross must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Williams, 529 U.S. at 3911 (citing Strickland, 466 U.S. at 694). A "reasonable probability" is described as "probability sufficient to undermine confidence in the outcome." Id.

5.    This Court finds that the state habeas court reasonably concluded that trial counsel was not deficient because Ross did not proffer any proof to the trial court that counsel failed to investigate either this offense specifically or Carlisle's background generally. See 2 SHCr 133.

6.    This Court finds that the affidavits of trial counsel Ross now presents to support this claim were not presented to the state court and are thus unexhausted and procedurally barred from consideration on federal habeas review. See 28 U.S.C. § 2254(b)(1)(A); Dowthitt, 230 F.3d at 745 (A habeas petitioner has failed to exhaust state remedies when he presents material additional evidentiary support to the federal court that was not presented to the state court.)

7.    Alternatively, the affidavits demonstrate that the failure to investigate this criminal offense was strategic: trial counsel "did not investigate Ross's criminal history because the strategy of the case was totally focused on

an acquittal." Petitioner's Exhibit D at 1.

8.     This Court finds that the strategic decision not to investigate Regina Carlisle's role in Ross's criminal background was not unreasonable given that Ross plead guilty to this crime, and the jury heard the uncontested mitigating facts of the crime:  Ross was not the instigator; he recognized he should have acted differently; the crime was the product of anger and outrage, but he had successfully completed anger counseling. The jury also heard negative evidence about the victim:  that she had been stalking Ross, was carrying a butcher knife with her, and that she instigated the attack.   An additional attack on the victim's credibility with similar evidence would have likely carried little weight.

9.     Even if trial counsel had investigated Regina Carlisle's credibility, the Court finds that Ross does not demonstrate how counsel could have used this evidence.   Counsel could not have impeached the testifying police and community supervision officers with Carlisle's criminal record.   Trial counsel could not have impeached their testimony as neither witness attempted to establish that Carlisle was non-violent or credible.   In fact, the community supervision officer presented Carlisle in a very negative light.

10.     The Court finds that Lisa Milstein's affidavit regarding what Carlisle allegedly said is hearsay.

11.     Lisa Milstein's affidavit does not support Ross's claim that favorable

-18-

evidence was available if counsel had only investigated and/or attempted to call Carlisle as a witness.  See Petitioner's Exhibit A at 4.  While Carlisle allegedly stated to the investigator that she would have spoken to defense, she does not provide her own affidavit and does not indicate to Milstein what she would have said about the offense.  The only reference to the assault by Carlisle in Milstein's affidavit is the apparent assertion that Carlisle had a 9mm handgun in her car on the night of the offense.  Petitioner's Exhibit A at 4.

12.  The Milstein affidavit does not support Ross's assertion that an investigation would have revealed that Carlisle spent nine months in jail for assaulting her boyfriend by hitting him with her car and that she was convicted of manslaughter and placed on probation for shooting and ultimately killing another abusive boyfriend.  See Petition at 24.  Specifically, there is no mention of assaulting a boyfriend by striking him with a car, and no mention of the manslaughter conviction and probation.

13.  Ross presents no credible evidence that Carlisle's potential testimony would have supported the version of events set forth by the community supervision officer. As the record stood, Ross's self-defense version of the offense was uncontested.

14.  The Court finds that this case is distinguishable from Rompilla v. Beard, 545 U.S. 374 (2005).  The evidence presently at issue was not the same

easily accessible, "sure bet" evidence at issue in Rompilla.  See id. at 389.
Indeed, trial counsel would have had to travel to St. Louis in order to talk to
Carlisle or investigate her history.  And there is no guarantee she would have
provided as favorable a version of the offense as that presented by Ross's
community supervision officer.  She would have likely painted Ross as an
abusive boyfriend—much like the other two boyfriends she allegedly assaulted,
according to Ross.  See Petition at 24.  At best, she would have provided
testimony cumulative of that presented by Ross's community supervision officer.
This Court concludes that such evidence would not "add up to a mitigation case
that bears no relation to the few naked pleas for mercy actually put before the
jury [.]" Rompilla, 545 U.S. at 393.

15.    This Court concludes that this evidence is not the sort of evidence
anticipated by the Supreme Court in Rompilla; thus, the state habeas court did
not unreasonably conclude that counsel's performance was neither deficient nor
prejudicial.

16.    The state habeas court's rejection of this claim is entitled to
deference in this Court.

II.    Claim 2—Whether Ross was denied the effective assistance of counsel
       guaranteed by the Sixth and Fourteenth Amendments to the United
       States Constitution when his trial attorneys failed to investigate and
       present mitigating evidence that called for a sentence less than death.

       In his second claim, Ross argues that he was denied effective assistance

of counsel under the Sixth and Fourteenth Amendments when his trial attorneys failed to investigate and present mitigating evidence that called for a sentence less than death.  Petition at 25; Brief at 9-14.  Ross alleges that, had counsel fully investigated his background, he could have presented the following evidence: (1) the victim's father, Chester Ross, did not want Ross to receive a death sentence; (2) Ross's grandmother, Lydia Davis, could have attested that Ross and his siblings raised themselves, Ross did not have a male role-model, and Ross's mother was unable to control her anger; (3) Ross's former girlfriend, Marsha Green, thought Ross was "mild-mannered and thoughtful;" and (4) his former girlfriend, Regina Carlisle, had a violent, criminal past.  Petition at 26; Petitioner's Exhibit A.

A.    Findings of fact

1.    Ross raised most of this claim on state habeas review.  2 SHCr 59-71.

2.    The state habeas court concluded generally that Ross's trial attorneys "performed competently and provided constitutionally effective assistance of counsel."  2 SHCr 121, #10.

3.    On this specific claim, the state habeas court declined to find deficient performance first because Ross failed to allege facts to show why trial counsel acted as they did; thus, he failed to establish deficient performance.  2

SHCr 123; see Rodriguez v. State, 974 S.W.2d 364, 370-71 (Tex.App. — Amarillo 1998, pet. ref'd) (holding defendant must first specify particular acts or omissions allegedly constituting deficient performance and then prove that they fell below professional norm of reasonableness by presenting evidence illustrating why counsel did what he did and how strategy was unsound).

4.    The state habeas court also declined to find deficient performance because Ross blocked his attorneys' attempts to present punishment phase evidence by insisting no punishment witnesses be called, and some of the witnesses counsel did call did not testify because they were complying with Ross's wishes. 2 SHCr 123. Thus, Ross cannot now complain that counsel was ineffective for failing to present such evidence. 2 SHCr 124 (citing Autry v. McKaskle, 727 F.2d 358, 361 (5th Cir. 1984); Roberts v. Dretke, 356 F.3d 632, 638 (5th Cir. 2004)).

5.    The state habeas court also found that Ross failed to establish how trial counsel's punishment investigation was deficient. Ross admits his family were not forthcoming when counsel attempted to talk to them, see 41 RR 2-3; Petition at 26-27; Ross told his family not to cooperate, see CR 266; and dissuaded available witnesses from testifying. 2 SHCr 124; see 40 RR 3; 41 RR 2-3. Thus counsel's decision to investigate other evidence was strategic. 2 SHCr 124.

6.     The state habeas court also found that Ross could not show prejudice from counsel's failure to uncover additional evidence since Ross did not demonstrate that these uncooperative witnesses could not have provided testimony similar to that now proffered by Ross.  2 SHCr 124-25.

7.     Regarding prejudice, after weighing the totality of the available mitigating evidence, the state habeas court concluded that Ross was "unable to show, if the newly proffered evidence had been presented and explained by counsel, there is a reasonable probability that the result of the sentencing proceeding would have been different."  2 SHCr 128.  The state habeas court reasoned that comparable evidence was presented at trial, 2 SHCr 125-26; see 41 RR 36-37 (testimony regarding family, lack of male role-model); 37 (Ross born with pneumonia and asthmatic); 41 RR 53, 54, 56 (testimony of mother indicates lack of close relationship); and the proffered evidence was "not powerful and merely suggests that [Ross] came from a dysfunctional family with an emotionally detached mother" and that "the rationale of [Wiggins v. Smith, 539 U.S. 510 (2003)] does not apply in this case."  2 SHCr 126.  The court concluded that the "mitigating effect of the potential evidence was greatly outweighed by the aggravating circumstances of [Ross's] prior criminal conduct and the premeditated nature of the murders."  2 SHCr 127; Woodford, 537 U.S. at 26-27. Furthermore, the evidence overwhelmingly indicated that Ross came from an

advantaged background and had no excuse for committing the murders.  2 SHCr

127-28.

8.      The state habeas court ultimately found:

> [T]he complained of additional mitigation evidence as presented in
> the Application for Writ of Habeas Corpus and supporting affidavits
> is neither powerful nor compelling and is similar to evidence
> introduced at trial.  After evaluating the totality of the available
> mitigating evidence—both that adduced at trial and the evidence
> adduced in the habeas proceeding—this Court finds that Applicant
> is unable to show, if the newly proffered evidence had been
> presented and explained, that there is a reasonable probability that
> the result of the sentencing phase would have been different.

2 SHCr 121 #9.

B.      Conclusions of law

1.      The Court concludes that these findings are not unreasonable and

are entitled to deference.

2.      To be entitled to relief, Ross must show both that counsel's

performance was deficient and that the deficient performance prejudiced the

defense.  Strickland, 466 U.S. at 684-86; Givens, 265 F.3d at 309-10.

3.      To prove prejudice, Ross must demonstrate "a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would

have been different."  Williams, 529 U.S. at 3911.  A "reasonable probability" is

described as a "probability sufficient to undermine confidence in the outcome."

Id.  Regarding counsel's failure to investigate and present mitigating evidence

at the punishment phase of trial, the reviewing court must "reweigh the evidence in aggravation against the totality of available mitigating evidence[,]" including that adduced at trial, as well as the habeas proceeding.  Wiggins, 539 U.S. at 534; Williams, 529 U.S. at 397-98.

4.      This Court finds that the state court reasonably concluded that Ross failed to demonstrate deficient performance.

5.      First, the state-court conclusion that trial counsel was not deficient because Ross failed to allege facts to show why trial counsel acted as they did, 2 SHCr 123, was not unreasonable.  As with the first claim, Ross did not proffer any proof to that court that trial counsel failed to investigate or why.

6.      The affidavits  from trial counsel proffered in support of this claim were not presented to the state court.  Therefore, the Court finds that they are unexhausted and procedurally barred from consideration on federal habeas review.  See 28 U.S.C. § 2254(b)(1)(A); Dowthitt, 230 F.3d at 745.

7.      Second, this Court finds that the state habeas court reasonably concluded that Ross blocked his attorneys' attempts to present punishment phase evidence, see 2 SHCr 123, and that the investigation trial counsel did perform was not deficient, see 2 SHCr 124.  While this Court finds that the trial counsels' affidavits are unexhausted, the affidavits nevertheless support the state habeas court's findings because trial counsel explain that, while they did

not hire mitigation experts to prepare this case, they did not do so because they were "instructed, by [Ross] and his family, that the focus of investigation in this case was on an acquittal." Petitioner's Exhibit C; see also Petitioner's Exhibit D. Since this was his client's wish, and because Ross and his family were not forthcoming when counsel attempted to talk to them, see 41 RR 2; see CR 266, and Ross dissuaded available witnesses from testifying, see 40 RR 3; 41 RR 2-3, trial counsel was not unreasonable in choosing to focus the investigation on other areas.

8.     This Court concludes that trial counsel attempted to investigate and present other witnesses, but Ross and his family and friends were not cooperative. See 40 RR 3; 41 RR 2-3; CR 266. At least one witness, Derald Powell, backed out of testifying at the last minute, at Ross's request. 41 RR 3. Thus, the state habeas court correctly found that Ross cannot now complain that counsel was ineffective for failing to present such evidence. 2 SHCr 124. "By no measure can [a defendant] block his lawyer's efforts and later claim the resulting performance was constitutionally deficient." Autry, 727 F.2d at 361; see also Nixon v. Epps, 405 F.3d 318, 325-26 (5th Cir. 2005); Roberts v. Dretke, 356 F.3d 632, 639 (5th Cir. 2004); Johnson v. Cockrell, 306 F.3d 249, 252-53 (5th Cir. 2002); Dowthitt, 230 F.3d at 748; Amos v. Scott, 61 F.3d 333, 348-349 (5th Cir. 1995); United States v. Masat, 896 F.2d 88, 91-93 (5th Cir. 1990). The Supreme

Court has similarly ruled.  See Schriro v. Landrigan, 127 S. Ct. 1933, 1942 (2007) (where petitioner instructed attorney not to present any mitigation evidence in the punishment phase, petitioner could not demonstrate prejudice under Strickland).

9.    This Court finds that Ross fails to demonstrate that additional evidence was even available had counsel investigated further.

10.    Ross does not present affidavits from the all potential witnesses, only the affidavit of investigator Lisa Milstein, who conveys conversations she had with these parties.  See Petitioner Exhibit A.  The Court finds that this hearsay representation is not sufficient to demonstrate what these witnesses would have testified to if called at trial.

11.    Furthermore, Chester Ross—the victim's father—refused to talk to Milstein.  Thus, the Court finds that there is no credible evidence that Chester Ross did not want Ross to receive the death penalty or that he would have testified to such at trial.

12.    This Court concludes that Ross fails to demonstrate that additional evidence was available, or that trial counsel would have had any success in convincing these witnesses to testify at trial had they interviewed them. "Complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified to are

largely speculative." Sayre v. Anderson, 238 F.3d 631, 635-36 (5th Cir.2001).

13.    This Court concludes that this claim of ineffective assistance amounts to nothing more than rank speculation and cannot form the basis of federal habeas relief.  Kinnamon v. Scott, 40 F.3d 731, 735 (5th Cir. 1994).

14.    Finally, this Court finds that trial counsel presented an impressive mitigation defense, in spite of Ross's and his family's refusal to cooperate.  The defense's case included testimony from Ross's college fraternity brother that Ross had paid for his own college education by working and attending school, that he had never known Ross to act violently or possess a weapon; Ross was "calm"and a peacemaker, and Ross did not use drugs.  41 RR 4-16.  A former female roommate, Tanya Robertson, testified that Ross was a diligent student, did not use drugs, that he had a girlfriend with whom he had "a loving girlfriend/boyfriend relationship," and he was calm, polite and nice.  41 RR 22-27.  Robertson could not recall ever being upset with Ross and remembered him as "meek and humble."  41 RR 27.  Ross's mother provided testimony about his lack of a male role-model, and that Ross was a sickly baby.  41 RR 33-37, 44. Ross's mother also provided a wealth of positive evidence about his background, his good character, and that he had not been in trouble as a youth.  See 41 RR 37-50. According to his mother, Ross was never in trouble with the law until the incident with Regina Carlisle in 1997 but, after this incident, Ross made plans

to continue his education by attending Texas Tech.  41 RR 51-52.

15.    For all these reasons, this Court finds that the state habeas court did not unreasonably conclude that Ross failed to demonstrate deficient performance, and relief on this claim is denied.

16.    This Court finds that the state habeas court reweighed the available aggravating and mitigating evidence and concluded that Ross did not establish prejudice.  See 2 SHCr 121 #9, 128; see also Wiggins, 539 U.S. at 534; Williams, 529 U.S. at 397-98.  This finding was not unreasonable and is entitled to deference.

17.    This Court finds that it is unlikely Regina Carlisle would have proved to be a helpful witness had she testified.  As the record stood, the evidence regarding the assault on Carlisle was presented in the most favorable light possible.  The uncontested evidence demonstrated that Carlisle had been stalking Ross; she instigated the assault, and Ross defended himself; Ross recognized he should have acted differently, and the crime was the product of anger and outrage, but he had successfully completed anger counseling.  At best, Carlisle's testimony would have been cumulative of that of Ross's community supervision officer.

18.    Marsha Green's testimony that Ross was "mild-mannered and thoughtful" would also have been cumulative of other witnesses, namely Felix

Moore—who testified Ross was calm and a peacemaker; and Tanya Robertson—a female roommate who thought he was calm, polite and nice, and testified that he had a loving relationship with his girlfriend.

19.    Ross's mother provided testimony that he did not have a male role-model in his life; thus, any additional testimony would have been cumulative on this point.

20.    This Court finds there is no credible proof Chester Ross would have testified that he did not want Ross to receive the death penalty.

21.    As noted by the state habeas court, Ross's mother's testimony at trial suggested that she did not have a close relationship with her son.  2 SHCr 126.  Thus, the Court finds that the failure to present evidence of the full extent of Ross's strained relationship with his mother and that she had anger-management issues was not prejudicial.

22.    This Court finds that, when all potential mitigating evidence is weighed against the aggravating evidence, including the facts of the crime, the assault on Regina Carlisle and Ross's outburst in jail while awaiting trial for capital murder, there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" had trial counsel investigated and presented this additional evidence.  Williams, 529 U.S. at 3911; see also Miniel v. Cockrell, 339 F.3d 331, 345-47 (5th Cir. 2003)

(While Miniel "paint[ed] a picture of a rough childhood," when those facts were compared with Miniel's violent history and the cruel manner in which the victim was killed, the Fifth Circuit concluded that Miniel failed to present a reasonable probability of a different verdict, had this evidence been presented.)

23.    Unlike the petitioners in Wiggins, 539 U.S. at 516-18, 522-23, Rompilla, 545 U.S. at 383, 389-93, and Williams, 529 U.S. at 396 (which Ross cites in support), trial counsel did not forego a compelling case for mitigation. Ross's trial counsel investigated his case, attempted to develop a mitigation case, and ultimately presented a compelling defense, despite Ross's refusal to cooperate. And unlike Williams, Wiggins, and Rompilla, counsel was not on notice of more compelling evidence, nor was any available to defense counsel. Counsel pursued evidence from Ross's relatives but they were not forthcoming. Ross is not similarly situated to those petitioners for whom the Supreme Court has granted relief.

24.    This Court finds that there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Williams, 529 U.S. at 3911.  Thus, habeas relief is denied.

III.    Claim 3—Whether the Texas Court of Criminal Appeals's decision that
        there was no reasonable likelihood that the jury could have been mislead
        and that the jury was not mislead by the erroneous jury charge
        submitted at the punishment phase was contrary to, and involved an
        unreasonable application of, clearly established federal constitutional
        law as determined by the Supreme Court of the United States.

On direct appeal, Ross unsuccessfully argued that the trial court

committed reversible error by overruling his objection to a punishment-phase

jury charge containing language about good-conduct time, in violation of his

Eighth and Fourteenth Amendment rights.   Petition at 28-29.   Ross now

complains that the state court's rejection of this claim was contrary to, and

involved an unreasonable application of, clearly established federal law because

that court relied on a non-capital state decision—Luquis v. State, 72 S.W.3d 355

(Tex. Crim. App. 2002)—rather than Simmons v. South Carolina, 512 U.S. 154

(1994), when reviewing the claim.   Petition at 30-32; Brief at 18-19, 27-33.   Ross

argues he is entitled to relief because the jury charge was so confusing that there

was a reasonable likelihood that the jury applied the instruction in a way that

prevented the consideration of constitutionally relevant mitigating evidence

regarding the length of time he would have to serve under a life sentence before

becoming parole-eligible.   Petition at 30-32.

    A.    Findings of fact

    1.    The trial court submitted the following parole charge at the

punishment phase:

Under the law applicable in this case, the defendant, if sentenced to a term of life imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned on a life sentence might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, he will not become eligible for parole until the actual calendar time served without consideration of good conduct time, equals forty calendar years. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment for life, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

CR 289-90.

2.    Trial counsel objected to the charge on grounds that it was not in accord with Texas Code of Criminal Procedure Article 37.071, and it was misleading because of the mention of good-conduct time.  41 RR 63-67.

3.    Ross raised this claim on direct appeal.  Brief for Appellant at 23-32.

4.     While the Court of Criminal Appeals found the jury charge was erroneous as it did not comply with Article 37.071, Section 2(e)(2)(B), the court nevertheless denied relief, concluding that Ross was not harmed by the instruction, because there was no "reasonable likelihood that the good conduct time language in the parole charge misled the jury into believing that a life-sentenced appellant would be released from prison in less than forty years." Ross, 133 S.W.3d at 623, 624.

B.     Conclusions of law

1.     This Court concludes that this issue involves an error of state law that is not cognizable on federal habeas review.  "The fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief."  Estelle, 502 U.S. at 71-72; Galvan v. Cockrell, 293 F.3d 760, 764 (5th Cir. 2002).  While it may have been improper under state law to inform the jury regarding good-time credit, there is no federal authority which forbids such an instruction.

2.     For a federal habeas court to grant relief on this claim, there must have been an error of constitutional magnitude.  Therefore, the relevant inquiry for this Court "is not whether there was prejudice [to the petitioner] or whether state law was violated, but whether there was prejudice of constitutional magnitude."  Galvan, 293 F.3d at 764 (citing Sullivan v. Blackburn, 804 F.2d 885, 887 (5th Cir.1986)).  The question in a collateral proceeding "is 'whether the

-34-

ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.' " Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (citing Cupp v. Naughten, 414 U.S. 141, 146, 147 (1973)(internal citations omitted)); Estelle, 502 U.S. at 72; see also Galvan, 293 F.3d at 764-65; Kinnamon, 33 F.3d at 465. Even if the instruction was erroneous, relief is not warranted unless it "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623-24 (1993) (internal quotation marks and citation omitted); Galvan, 293 F.3d at 765.

3.    This Court concludes that, even if erroneous, the jury instruction did not cause prejudice of a constitutional magnitude. Galvan, 293 F.3d at 764

4.    The state court correctly concluded that any error from the admission of an instruction on good-time credit to the jury during the punishment phase was harmless. The jury was clearly instructed that, under a life sentence, Ross would not be eligible for parole until he had served forty years, without consideration of good-conduct time, and the jury was told not to consider the possibility of parole or good-conduct time in its deliberations. See CR 289-90. Thus the jury was told only that Ross may get good-conduct time which may affect his term of parole after he has served the requisite forty years

-35-

of his sentence.   The jury is presumed to have followed the trial court's instruction. Parker v. Randolph, 442 U.S. 62, 73 (1979), overruled on other grounds by Cruz v. New York, 481 U.S. 186 (1987); see also Galvan, 293 F.3d at765-66; cf. Bagley v. Collins, 1 F.3d 378, 381 (5th Cir.1993) (finding an instruction by the court to the jury that it should not consider remarks made by the prosecutor was sufficient to limit the extent to which the jury considered the remarks).

5.      Further, neither party argued the concept of good-conduct time to the jury in closing arguments.  In fact, defense counsel reminded the jury no less than six times that Ross would spend at least forty years in prison before being paroled under a life-sentence.  41 RR 77 ("... locking him up for forty years"), 78 (" ... not going to have much chance around women for the next forty years"), 80 (".... in forty years he can do some good."), 82 ("... parole clock doesn't start ticking for forty years, calendar time, flat.") ("A lot can happen in forty years."), 83 ("A lot can happen in forty years.")

6.      Finally, there is nothing in the record to indicate that the jury considered good-conduct time when making its decision.

7.      This Court concludes that there was no error of constitutional magnitude from the admission of this jury instruction because the alleged error did not have a " substantial and injurious effect or influence in determining the

jury's verdict." Brecht, 507 U.S. at 623-24.

8.    This Court also finds that Simmons is not controlling in these circumstances and does not provide for relief.

9.    Simmons stands for the general proposition that it violates a capital defendant's due process rights to argue that he is a future danger to free society and then not allow him to rebut or explain this information with evidence that he is legally ineligible for parole.  512 U.S. at 171.

10.    Simmons is not implicated in this context because that decision has traditionally been irrelevant where life without parole was not a sentencing option in capital cases. Simmons, 512 U.S. at 168 n.8 (noting that, while Texas has traditionally prohibited informing jury about capital defendant's parole eligibility, life without parole is not sentencing alternative in Texas); Ramdass v. Angelone, 530 U.S. 156, 169 (2000) (reiterating that the rule of Simmons does not extend to states such as Texas).  "Simmons applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison."  Ramdass, 530 U.S. at 169.   In this instance, the State argued Ross would present a future danger—to both free and prison society—and the jury was informed about his parole ineligibility for forty years.  Thus, Simmons does not control this issue.

11.    Even if the fact-specific Simmons is broadened to a general rule

regarding the accuracy of jury instructions, this Court concludes that Simmons still does not provide for relief.

12. First, Simmons does not support an Eighth Amendment claim. 512 U.S. at 162 n.4 (The Court "express[ed] no opinion on the question whether the result we reach today is also compelled by the Eighth Amendment."). And because the error was harmless and the instruction thus reliable, Ross's brief Eighth Amendment argument, supported by Woodson v. North Carolina, 428 U.S. 280, 305 (1976), for the general proposition that a death-sentence determination should be reliable, see Brief at 35-37, is meritless.

13. Second, while the jury instruction on good-conduct time may have been incorrect, the instruction also clearly told the jury that he would not be eligible for parole until he had served forty years, without consideration of good conduct time, and the jury was not to consider good-conduct time in its deliberations. See CR 289-90.

14. Further, neither party argued the concept of good-conduct time to the jury in closing arguments, and the defense repeatedly reminded the jury of the forty-year requirement. 41 RR 77, 78, 80, 82, 83. The Court finds that, since Simmons provides that parole-ineligibility may be brought to the jury's attention by court-instruction or argument by defense counsel, 512 U.S. at 169; id. at 177 (O'Connor and Kennedy, JJ., concurring), defense counsel's admonitions about

the amount of time Ross must serve are sufficient to satisfy Simmons.

15.     Finally, unlike the situation in Simmons, 512 U.S. at 160, where the jury asked questions about parole-eligibility, there is nothing in the record to indicate that the jury considered good-conduct time in its deliberations.

16.     The charge instructed the jury in general terms about the existence of the possibility of parole.  The judge specifically instructed the jury not to consider the extent to which good conduct time and parole would apply to Ross, neither party argued about good-conduct time during closing arguments, and nothing in the record indicates the jury applied or discussed this concept or showed confusion.  The Court finds that, when read as a whole, there is no reasonable likelihood the jury instruction was so misleading as to render his trial fundamentally unfair and thus violate Ross's Eighth and Fourteenth Amendment rights.  Therefore, deference is owed to the state court's decision, and relief on this claim is denied.

IV.     Claim 4—Whether Ross was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to request an instruction to disregard or a mistrial after the State's continued questioning of Ronnie Martin subsequent to the Court's sustaining the defense counsel's hearsay objection and counsel's failure to object to hearsay or request a mistrial regarding testimony from Liza McVade about Ross's alleged possession and use of a firearm.

Ross argues that he was denied the effective assistance of counsel under the Sixth and Fourteenth Amendments when his trial attorneys failed to request

either an instruction to disregard or a mistrial after the State's continued questioning of Ronnie Martin about Ross's possession and use of a firearm, subsequent to the Court's sustaining counsel's first hearsay objection. Before the state court, Ross argued that counsel's failure to object to the second reference to a gun violated his right to confront and cross-examine the declarant of the hearsay testimony, Clarence Garner. 2 SHCr 81-89. Also, for the first time in any court, Ross cites trial counsel's failure to object to hearsay or request a mistrial regarding testimony from Liza McVade about Ross's possession and use of a firearm. See Petition at 33-35; Brief at 37-38.

A.     Findings of fact

1.     Ross raised the Ronnie Martin allegation on state habeas review. 2 SHCR 81-89.

2.     Regarding the Ronnie Martin allegation, the state habeas court found generally that Ross's trial attorneys "performed competently and provided constitutionally effective assistance of counsel." 2 SHCr 121, #10.

3.     The state habeas court also found that Ross failed to establish deficient performance because he did not allege facts showing what trial counsel's motivations were in failing to object. 2 SHCr 135.

4.     The state habeas court also concluded that Ross had failed to prove prejudice: "Based upon the relative unimportance of the hearsay statement, the

cumulative nature of the testimony, and the overwhelming evidence of [Ross's]

guilt, the alleged error is harmless." 2 SHCr 138.

5.      Ross claims that trial counsel should have objected to the following

exchange between the State and witness Ronnie Martin:

> Q.      Okay.  And when Mr. Garner got on the phone to talk to Liza, what happened?
>
> A.      Well, during the conversation he spoke and asked Liza what was—what was the problem, and she was saying that [Ross] was tripping in the background for us calling his house.
>
> Q.      Okay.
>
> A.      And at the time, he told Liza he really didn't care for [Ross] anyway because he felt as though he was a coward from a recent incident they had had where he said [Ross] had pulled a gun—
>
>> [Trial counsel]:      Your Honor, I object to him talking about what someone else told him.
>>
>> The Court:      Sustained
>>
>>                            ***
>
> Q.      Okay.  And, Mr. Martin, was it your understanding that the comment regarding "coward" was because of some incident where there had been a threat with a gun that [Ross] had used?
>
> A.      Yes.

34 RR 142-144 (emphasis added).

6.      The Court finds that this conversation occurred a day before the

murders and was part of the testimony proffered to demonstrate that Ross was angry with the victim, Viola Ross, and that Viola wanted to pick up her sister from Ross's home that night.

7.     Regarding trial counsel's alleged failure to object to Liza McVade's testimony, Ross asserts trial counsel should have objected during the following exchange regarding an incident a few months prior to the murder where Viola was helping McVade leave Ross's home:

Q.     All right.  As you were leaving, did Viola say anything about what [Ross] had?

A.     She said he probably had—

| | |
|---|---|
| [Trial Counsel]: | Your Honor, I'm going to object to her putting any words in Viola's mouth. |
| [Prosecutor]: | Your Honor, it's a present sense exception at this time.  It's also an excited utterance, which is an exception to hearsay. |
| The Court: | Allow the question. |

Q.     Now, at the time that you're moving your stuff out, you said [Ross] was angry; is that right?

A.     Right.

Q.     Was—did Viola want you to get your stuff and go right then?

A.     Yes.

Q.     Okay.  Was Viola pretty excited about you getting out of there right then?

A.    Yes.

Q.    Okay.  Now, did Viola say anything about what [Ross] had as y'all were leaving?

A.    Yes.

Q.    What did she say?

A.    She say, "He probably got that gun.  He think [sic] everybody scared of him and that gun."

Q.    Okay.  Did Viola say she had seen a gun right then?

A.    No.  I asked her, "What did he have in his hand?"

Q.    And she said she had seen [Ross] with a gun?

A.    Right.

34 RR 165-66.

B.    Conclusions of law

1.    This Court finds that Ross's arguments concerning Liza McVade are unexhausted and procedurally barred.

2.    Ross did not argue that trial counsel was ineffective for failing to object to Liza McVade's testimony in the state courts.  Therefore, this portion of the argument is unexhausted.

3.    "To have exhausted his state remedies, a habeas petitioner must have fairly presented the substance of his claims to the state courts." Rodriguez v. McKaskle, 724 F.2d 463, 466 (5th Cir. 1984) (citing Vela v. Estelle, 708 F.2d

954, 958 (5th Cir. 1983)).  Normally, the exhaustion requirement is not satisfied

if the claim is based on a new legal theory or a new factual claim.  Id. "The state

courts must have had an opportunity to pass on the claim in light of a full record

and where the factual basis for a claim was not presented to the state courts the

claim is unexhausted."  Brown v. Estelle, 701 F.2d 494, 495 (5th Cir. 1983); see

also Graham v. Johnson, 94 F.3d 958, 968-69 (5th Cir. 1996).  "[The Fifth

Circuit] has consistently held that a federal habeas petitioner has failed to

exhaust his state remedies when he relies on a different legal theory than he did

in state court or when he makes the same legal claim to a federal court but

supports the claim with factual allegations that he did not make to the state

courts."  Dispensa v. Lynaugh, 847 F.2d 211, 217 (5th Cir. 1988) (internal

citations omitted); Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir. 1998).

4.    This Court finds that Ross does not set forth a claim in this petition

regarding Liza McVade that is the "substantial equivalent" of a claim presented

in state court.  See Whitehead, 157 F.3d at 387.  Therefore, the portion of the

argument pertaining to Liza McVade is procedurally defaulted.

5.    Where a petitioner raises claims in federal court that have not

previously been presented to the state courts, and Article 11.071, Section 5(a) of

the Texas Code of Criminal Procedure would apply to foreclose review of the

claims if presented in a successive state habeas application, such is an adequate

state procedural bar foreclosing federal habeas review of the claims.  Beazley v.

Johnson, 242 F.3d 248, 264 (5th Cir. 2001); Hicks v. Johnson, 186 F.3d 634, 637-

38 (5th Cir. 1999); Muniz v. Johnson, 132 F.3d 214, 221 (5th Cir. 1998).

6.    This Court finds that Ross is procedurally barred from raising this

claim for the first time in federal proceedings because the state courts have not

had the opportunity to pass on the Liza McVade part of this claim and, if Ross

were to attempt to raise this claim now in a successive state habeas application,

he would be barred by Article 11.071, Section 5.

7.    The Court finds that Ross cannot avoid the procedural bar because

he cannot assert cause for failing to bring the unexhausted claim in the first

state habeas application and prejudice, or assert that failure to consider the

claim will result in a "fundamental miscarriage of justice."  Jones v. Johnson,

171 F.3d 270, 277 (5th Cir. 1999) (citing Keeney v. Tamayo-Reyes, 504 U.S. 1

(1992)); Coleman v. Thompson, 501 U.S. 722, 749-50 (1991). To demonstrate a

"fundamental miscarriage of justice," Ross must demonstrate actual innocence.

Muniz, 132 F.3d at 221 n.12. Specifically, "the evidence must establish sufficient

doubt about his guilt[.]"  Schlup v. Delo, 513 U.S. 298, 316 (1995).

8.    Ross does not make the requisite showing of these factors, nor could

he. The Court finds that the record upon which Ross relies was known, or could

have been discovered, at the time he filed his first state habeas application.

Indeed, Ross referred to McVade's testimony in support of the Martin claim, as proof that Martin's testimony had little probative value because the State already had testimony that Ross possessed a gun.  2 SHCr 87-88.  This claim is also meritless; thus, there is no chance of prejudice if the Court refuses to consider the claim.  Finally, Ross does not allege that he is actually innocent of this crime.

9.      Therefore, the Court finds that Ross fails demonstrate an exception to the procedural bar, and this portion of the claim should be dismissed.

10.      The Court also concludes that any attempt to support this claim with affidavits from trial counsel that were not presented to the state court, see Exhibits C and D, is denied as these affidavits are unexhausted and procedurally barred from consideration on federal habeas review.   See 28 U.S.C. § 2254(b)(1)(A); Dowthitt, 230 F.3d at 745.

11.      This Court concludes that the state habeas court's findings regarding the Ronnie Martin allegation are not unreasonable and are entitled to deference.

12.      To be entitled to relief, Ross must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. Strickland, 466 U.S. at 684-86; Givens, 265 F.3d at 309-10.  To prove prejudice, Ross must demonstrate "a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." Williams, 529 U.S. at 391. A "reasonable probability" is described as "probability sufficient to undermine confidence in the outcome." Id.

13.    This Court concludes that Ross fails to demonstrate that trial counsels' performance was deficient.  Ross made no effort to demonstrate that trial counsels' failure to object or move for a mistrial was not strategic.  Since he bears the burden of proving deficient performance, Montoya v. Johnson, 226 F.3d 399, 408 (5th Cir. 2000), and he failed to offer any proof that this was not a strategic decision, the trial court's decision was not unreasonable and is entitled to deference.  See Bartee v. Quarterman, 574 F.Supp.2d 624, 649 (W.D. Tex. 2008) (Absent some showing counsel's subjective decision-making was objectively unreasonable, it is almost impossible for a habeas petitioner to overcome presumption of reasonableness afforded counsel's strategic and tactical decisions.)

14.    This Court concludes that the state habeas court's finding of lack of deficiency is entitled to deference.  See 2 SHCr 135.

15.    This Court also concludes that trial counsel's failure to object or request a mistrial was not prejudicial because, even if trial counsel should have preserved error a second time with regard to Martin's testimony, or regarding McVade's testimony, the failure to do so was harmless.  See Gochicoa v. Johnson,

238 F.3d 278, 286 (5th Cir. 2000) (holding that Strickland prejudice prong is not met if failure to preserve error is harmless).

16.    This Court concludes that deference is owed to the state habeas court's finding that Martin's testimony was "relatively unimportant."  2 SHCr 136-38.

17.    Violations of the Confrontation Clause are subject to harmless error analysis.  Hafdahl v. Johnson, 251 F.3d 528, 539 (5th Cir. 2001); United States v. Edwards, 303 F.3d 606, 623 (5th Cir. 2002).  To determine whether the error was harmless, the reviewing court should consider "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and ... the overall strength of the prosecution's case."  Hafdahl, 251 F.3d at 540.

18.    Any alleged violation of the Confrontation Clause was harmless. First, this small portion of Martin's testimony briefly referred to a previous altercation between Clarence Garner and Ross, unrelated to the crime at hand. This portion was not the purpose of Martin's testimony, rather he described the day before the murder in which he and Garner—an ex-boyfriend of Liza McVade—were looking for her at her house; the victim called Liza at Ross's

home and allowed Garner and Martin to speak to Liza, angering Ross.  See 34 RR 136-46.  The remainder of the testimony demonstrated that Ross was angry at the victim and Garner, and that the victim feared for her sister's safety.

19.     The alleged violation was also harmless because this testimony was cumulative of other evidence indicating Ross possessed a handgun, namely McVade's testimony that, on one occasion, Ross told her he had a handgun in his coat pocket and that he "carried it sometimes," 34 RR 162-63; testimony that McVade's sister told her that she had seen Ross with a gun in his hand on an occasion when he was angry, 34 RR 163-66; and incriminating statements Ross made to police that he had control over the murder weapon.  36 RR 143; 37 RR 193.

20.     Finally, any violation was harmless because, as found by both state courts, the evidence against Ross is overwhelming.  See Ross, 133 S.W.3d at 620; 2 SHCr 137-38.

21.     This Court concludes that the introduction of this evidence was harmless, and trial counsel's failure to object a second time or request a mistrial was not prejudicial.

22.     Regarding trial counsel's alleged failure to object to Liza McVade's testimony, apart from the procedural bar, this Court concludes that trial counsel was not ineffective, and the admission of this testimony was also harmless.

23.     First, trial counsel did attempt to object to this line of questioning but it was ruled admissible under the present-sense and excited-utterance exceptions.  Therefore, the Court finds that a second objection—after the State had further demonstrated that this was in fact an excited utterance—was not likely to have been successful.  Thus, trial counsel's performance was neither deficient nor prejudicial.

24.     The Court also finds that Ross was not prejudiced because the admission of this testimony passes "constitutional scrutiny" under the Confrontation Clause because (1) the declarant was unavailable and (2) the statement was shown to be reliable—it falls within a "firmly rooted" hearsay exception.  Hafdahl, 251 F.3d at 539 (citing Idaho v. Wright, 497 U.S. 805, 814-15 (1990)).  As with Ronnie Martin's testimony, McVade's testimony is also harmless because it was cumulative of other evidence indicating Ross possessed a handgun, namely McVade's own prior testimony that, on one occasion, Ross told her he had a handgun in his coat pocket and that he "carried it sometimes," 34 RR 162-63, and his own incriminating statements to the police that he had control over the murder weapon and it would not fall into anyone's hands.  36 RR 142-43; 37 RR 193.  And finally, the evidence against Ross is overwhelming.  See Ross, 133 S.W.3d at 620; 2 SHCr 137-38.

25.     The Court concludes that, given the relative unimportance of

Martin's testimony and the reliability of McVade's, the fact that both statements are cumulative in nature, and the strength of the other evidence against Ross, the state habeas court reasonably concluded that any error from trial counsel's failure to object was harmless.

26.    Therefore, this Court finds that Ross fails to demonstrate either deficient performance or prejudice, and relief on this claim is denied.

27.    This Court also concludes that Crawford v. Washington, 541 U.S. 36 (2004), does not apply to these claims since Crawford was decided after this trial, and trial counsel's performance must be judged under the law as it existed at the time of trial.  2 SHCR 131 (citing Ex parte Akhtab, 901 S.W.2d 488, 490 (Tex. Crim. App. 1995)).  And regardless, Crawford would not exclude this evidence since it was non-testimonial in nature.  See 2 SHCr 129-30.

V.    Claim 5—Whether the actions of the prosecution in failing to provide defense counsel with the criminal history of Regina Carlisle and then "ambushing" the defense by introducing Ms. Carlisle's testimony through inadmissible hearsay, constitutes a violation of Ross's right to due process of law under the Fifth and Fourteenth Amendments of the United State's Constitution, and Brady v. Maryland, supra, and Strickler v. Greene, supra.

In his fifth claim, Ross alleges that the actions of the prosecution in failing to provide defense counsel with the criminal history of Regina Carlisle and then "ambushing" the defense by introducing Ms. Carlisle's testimony through inadmissible hearsay, constitutes a violation of his right to due process of law

under the Fifth and Fourteenth Amendments, and Brady v. Maryland, 373 U.S. 83, and Strickler v. Greene, 527 U.S. 263.  Petition at 35-37; Brief at 39-41.

A.    Findings of fact

1.    This Court finds that this claim was not raised in any state court.

2.    The state courts have not had the opportunity to pass on this claim, although it could have been raised in any state court proceeding.

B.    Conclusions of law

1.    This Court thus concludes that this claim is unexhausted and procedurally barred from federal habeas review.

2.    "To have exhausted his state remedies, a habeas petitioner must have fairly presented the substance of his claims to the state courts." Rodriguez, 724 F.2d at 466.  Where a petitioner raises claims in federal court that have not previously been presented to the state courts, and Article 11.071, Section 5(a) of the Texas Code of Criminal Procedure would apply to foreclose review of the claims if presented in a successive state habeas application, such is an adequate state procedural bar foreclosing federal habeas review of the claims.  Beazley, 242 F.3d at 264; Hicks, 186 F.3d at 637-38; Muniz, 132 F.3d at 221.

3.    The state courts have not had the opportunity to pass on this claim. Furthermore, if Ross were to attempt to raise this claim now in a successive state habeas application, he would be barred by Article 11.071, Section 5.

Therefore, this Court finds that Ross is procedurally barred from raising this claim for the first time in federal proceedings.

4.    This Court finds that Ross does not even attempt to demonstrate cause and prejudice, or a fundamental miscarriage of justice, to overcome the procedural bar. Jones, 171 F.3d at 277; Coleman, 501 U.S. at 749-50. Nor could he, as the record upon which Ross now relies was known, or could have been discovered, at the time he filed his first state habeas application. In fact, Ross raised numerous claims involving the Regina Carlisle incident. See 2 SHCr 71-81. This claim is also meritless thus there is no chance of prejudice if the Court refuses to consider the claim. Finally, Ross does not allege that he is actually innocent of this crime—that he did not actually kill both victims—and presents no credible evidence that he would not be a future danger to society. See Sawyer v. Whitley, 505 U.S. 333, 336, 345, 350 (1992) (For purported punishment phase error, a miscarriage of justice occurs if clear and convincing evidence establishes that, "but for the constitutional error at [Ross's] sentencing hearing, no reasonable juror would have found him eligible for the death penalty" under state law. This exception requires evidence of "innocence of the capital crime itself," i.e., "a showing that there was no aggravating circumstance or that some other condition of eligibility had not been met.")

5.    This Court concludes that Ross thus fails to demonstrate an

exception to the procedural bar, and this claim should be dismissed.

6.    This Court also concludes that this claim is meritless.

7.    To obtain federal habeas relief based on a violation of the Due Process Clause, Ross bears the burden of demonstrating (1) the State suppressed evidence, (2) that is favorable to the defense, and (3) material as to issues of guilt or punishment.  Brady, 373 U.S. at 87.  Evidence is "material" if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed; a "reasonable probability" is one sufficient to undermine confidence in the outcome.  Kyles v. Whitley, 514 U.S. 419, 435 (1995).  The purpose of the Brady rule of disclosure is to ensure that the accused is not denied access to materially favorable evidence that is known to the government but unknown to him.  United States v. Agurs, 427 U.S. 97, 103 (1976); United States v. Cravero, 545 F.2d 406, 420 (5th Cir. 1976).

8.    Ross fails to demonstrate a due-process violation from the State's failure to disclose Regina Carlisle's criminal history.

9.    First, this Courts holds that Ross does not demonstrate that the State suppressed this evidence.   Ross offers no proof that this evidence even exists—only the hearsay assertion of his investigator that there might be evidence of this nature.  See Petitioner's Exhibit A.  Thus, there is no evidence that the State ever had Regina Carlisle's criminal history.  And since the State

did not call her as a witness, they were under no duty to disclose her criminal background, if it did exist.

10.     This Court next finds that this evidence is not "favorable" to the defense.  Ross does not demonstrate how he could have actually used this evidence as impeachment.  The State never called Regina Carlisle so Ross had no opportunity to use her criminal record against her.  Ross does not suggest that he would have called her as a witness had he had this impeachment evidence.  However, to do so, the evidence first would have to satisfy Texas Rule Evidence 609—specifically, there had to be a conviction of a felony or a crime of moral turpitude, and the evidence is more probative than prejudicial.  Once again, Ross offers no proof of an actual conviction which satisfies this standard.

11.     Ross provides no authority which would have allowed him to impeach the two witnesses who testified about the Carlisle incident—community supervision officer Susie Caddell and police officer Kevin Knobbe—with Carlisle's criminal record.  Neither witness implied Carlisle was a credible person.  Ross fails to demonstrate how the testimony of these two witnesses could have been impeached with Carlisle's criminal record, or under what authority he could have done so.

12.     Finally, this Court holds that this evidence is not material.  Regina Carlisle's prior criminal record is incremental impeachment at best.  See Miller

v. Dretke, 431 F.3d 241, 251 (5th Cir. 2005) (holding that evidence providing only incremental impeachment value, does not rise to the level of Brady materiality); Drew v. Collins, 964 F.2d 411, 419-20 (5th Cir. 1992). Her credibility was already damaged by Caddell's negative testimony. Additional testimony that she had a criminal record and was violent towards men would have provided little more.

13.   It would have been more harmful than helpful for Ross to call Carlisle in an attempt to impeach her with her criminal record. As the record stood, Ross was able to get his uncontested version of the attack before the jury through Susie Caddell's testimony, without having to take the stand. Had counsel called Carlisle in hopes of being able to impeach her credibility, she would likely have placed the blame on Ross for the brutal attack and denied any responsibility.

14.   The Court finds that better impeachment evidence was already on the record, and this additional bit of information was neither favorable nor material to Ross's defense.

15.   The Court thus concludes that, even if the allegedly suppressed evidence had been disclosed, it does not undermine confidence in the jury's sentence. Kyles, 514 U.S. at 435. Therefore, apart from the procedural bar, this claim is meritless and is denied.

VI.   Claim 6—Whether Ross was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to object to the State's questioning of Kevin Knobbe based on violations of Ross's right under the Sixth Amendment to the United States Constitution to confront and cross-examine witnesses.

Ross alleges that he was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments when his trial attorneys failed to object to the State's questioning of Kevin Knobbe based upon violations of his Sixth Amendment right to confront and cross-examine witnesses. Petition at 37-39.

A.   Findings of fact

1.   Ross raised this claim on state habeas review. 2 SHCr 76-81.

2.   The state habeas court found generally that Ross's trial attorneys "performed competently and provided constitutionally effective assistance of counsel." 2 SHCr 121, #10.

3.   The state habeas court also found that trial counsel's failure to continue to object to testimony regarding Carlisle's excited utterances was not ineffective because such excited utterances were admissible. 2 SHCr 131; Burruss v. State, 20 S.W.3d 179, 188 (Tex.App.—Texarkana 2000, pet. ref'd) ("The failure to object to admissible evidence is not ineffective assistance."); see also 2 SHCr 129-30 (statements were not testimonial under the circumstances and were excited utterances).

-57-

4.     The state habeas court found there was no prejudice from counsel's actions because any alleged error from counsel's failure to object was harmless. 2 SHCr 131; see United States v. Edwards, 303 F.3d at 623 (Confrontation Clause violations are subject to harmless-error analysis.)

5.     The state habeas court found the error harmless because the declarant's statement was substantiated by Ross when he pled guilty to the offenses; these guilty pleas were admitted at trial, 2 SHCr 132; see SX 412; and the evidence against Ross was overwhelming.  2 SHCr 132; see also Ross, 133 S.W.3d at 626.

6.     The state habeas court also found that Crawford, 541 U.S. 36 did not apply since it was decided after this trial, and trial counsel's performance must be judged under the law as it existed at the time of trial.  2 SHCR 131 (citing Ex parte Akhtab, 901 S.W.2d at 490).  Further, the court ruled that Crawford would not apply to this case because, due to the on-going nature of the emergency, Carlisle had not regained the capacity to make a testimonial statement. 2 SHCr 129-30.  Ross does not repeat his Crawford arguments to this Court.

B.     Conclusions of law

1.     This Court concludes that the state habeas court's findings are reasonable and are entitled to deference.

2.     To be entitled to relief, Ross must show that counsel's performance

was deficient and that the deficient performance prejudiced the defense. Strickland, 466 U.S. at 684-86; Givens, 265 F.3d at 309-10.  To prove prejudice, Ross must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Williams, 529 U.S. at 391. A "reasonable probability" is described as "probability sufficient to undermine confidence in the outcome." Id.

3.      This Court concludes that Ross fails to demonstrate that trial counsels' performance was deficient.

4.      As with his previous Strickland claims, Ross makes no effort to demonstrate that trial counsel's failure to object or move for a mistrial was not strategic.  Since he bears the burden of proving deficient performance, Montoya, 226 F.3d at 408, and he failed to offer any proof that this was not a strategic decision, this Court concludes that the trial court's decision was not unreasonable and is entitled to deference.  See Bartee, 574 F.Supp.2d at 649.

5.      This Court concludes that deference is owed to the state habeas court's conclusion that, because this evidence was admissible as an excited utterance, trial counsel was not ineffective for failing to object.  See 2 SHCr 131.

6.      Because trial counsel did object to early testimony about what Carlisle said to the officer, but the objection was overruled because the testimony was admissible under the excited-utterance exception, see 40 RR 35-36, a second

objection was not likely to have been successful, and trial counsel's performance was not deficient.

7.     This Court also finds that trial counsel's failure to object was not prejudicial because, even if trial counsel should have continued to object to the testimony, any error from the admission of the testimony is harmless.  See Gochicoa, 238 F.3d at 286 (holding that Strickland prejudice prong is not met if failure to preserve error is harmless); see also Hafdahl, 251 F.3d at 539 ("violations of the Confrontation Clause are still subject to harmless error analysis."); Edwards, 303 F.3d at 623 (same).  Ross pled guilty to charges that he assaulted Regina Carlisle and stole her car.  58 RR SX 412.  Therefore, even if trial counsel had successfully objected and kept out Regina Carlisle's "excited utterances," evidence of the attack and theft, and Ross's guilt of these crimes, was still before the jury.  And the jury would still have heard the officer's testimony on what Carlisle looked like and how she was acting when he responded to the scene, 40 RR 35-36 (she was very shaken, screaming, bleeding, in need of medical attention, looked like she was in a lot of pain); and the jury would have seen the photographs of the victim's injuries taken by Officer Knobbe, and heard his description of her injuries.  40 RR 39-43.  Therefore, the brutality of the attack and Ross's role in that attack would have come before the jury regardless of trial counsel's objection.

8.     This Court concludes that the admission of the additional testimony without objection was harmless and not prejudicial, and relief on this claim is denied.

CONCLUSION

Based on the above findings and conclusions, the Court is of the opinion that Petitioner's claims do not warrant federal habeas relief.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

ANDREW WEBER
First Assistant Attorney General

ERIC J.R. NICHOLS
Deputy Attorney General for
Criminal Justice

EDWARD MARSHALL
Assistant Attorney General
Chief, Postconviction Litigation Division

s/ Tomee M. Heining

*Attorney in Charge     TOMEE M. HEINING*
Assistant Attorney General
State Bar No. 24007052

P.O. Box 12548, Capitol Station
Austin, Texas   78711
(512) 936-1400
Facsimile No. (512) 936-1280
tomee.heining@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2009, I electronically filed the foregoing pleading using the electronic case filing system of this Court.  In turn, a "Notice of Electronic Filing" was generated and sent to the following attorney of record who has consented in writing to accept the Notice as service of this document by electronic means:

Richard L. Wardroup
rickwardroup@msn.com

Don Vernay
minimal243@yahoo.com

           s/ Tomee M. Heining
          TOMEE M. HEINING
          Assistant Attorney General