IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| VAUGHN ROSS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| v. | § | Civil Action No. |
| | § | 5:08-CV-00174-C |
| | § | |
| RICK THALER, Director, | § | DEATH PENALTY CASE |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division,[1] | § | |
| | § | |
| Respondent. | § | |

## ORDER

Came on for hearing the above-styled and -numbered cause. Both parties appeared and announced ready. Having considered the arguments, as well as the pleadings, the state court records, and the relevant law, the Court enters the following Order, which constitutes the Court's findings of fact and conclusions of law.

## I. BACKGROUND

### A.    Procedural Background

Petitioner Vaughn Ross ("Ross"), identification number 999429, is incarcerated in the Texas Department of Criminal Justice, Correctional Institutions Division ("TDCJ-CID") pursuant to a judgment and sentence from the 137th Judicial District Court of Lubbock County, Texas, in cause no. 2001-435,653, styled *The State of Texas v. Vaughn Ross*. On February 14, 2001, Ross was

---

[1]Rick Thaler has been named the Director of the Institutional Division of the Texas Department of Criminal Justice, Correctional Institutions Division, and the caption is being changed pursuant to Federal Rule of Civil Procedure 25(d).

indicted in a one-count indictment for the capital murder of more than one person during the same criminal transaction, Douglas Birdsall and Viola Ross (no relation to Petitioner), alleged to have been committed on January 31, 2001.

On February 27, 2001, Jack Stoffregen was appointed to represent Ross, but Floyd Holder was substituted as counsel on June 4, 2001. Patrick Metze was subsequently appointed to assist Holder at trial. The trial court heard pretrial matters on July 11, July 29, and September 13, 2002. Individual voir dire commenced on August 7, 2002, and was completed on September 12, 2002. Jury trial commenced on September 16, 2002, and the jury found Ross guilty of the offense of capital murder as charged in the indictment on September 23, 2002. One day later, on September 24, 2002, following a separate punishment hearing, the jury answered affirmatively the special issue regarding future dangerousness and answered negatively the special issue regarding mitigating evidence. Tex. Code Crim. P. art. 37.071 § 2 (Vernon's Supp. 2001). The trial court sentenced Ross to death and entered Judgment on September 27, 2002.

Notice of appeal in a death penalty case is automatic in Texas. *See* Tex. R. App. P. 25.2(b) (Vernon's 2003) ("In a death-penalty case, . . . it is unnecessary to file a notice of appeal."). On October 2, 2002, the trial court appointed Richard Wardroup to represent Ross on appeal. Ross filed a Motion for New Trial in the trial court on October 21, 2002. There is no record, however, of a ruling on the Motion for New Trial.

On August 2, 2003, Ross filed his appellate brief in the Texas Court of Criminal Appeals and raised seventeen points of error, including eight challenges to language in the jury charge regarding good time and parole; three challenges to the legal and factual sufficiency of the evidence; a challenge to the denial of use of polygraph evidence; a challenge to the denial for a psychiatric

examination of Ross; and four challenges to the denials of Ross's motions for continuances. The State filed a reply brief on November 13, 2003. The Texas Court of Criminal Appeals affirmed Ross's conviction and sentence on May 5, 2004. *Ross v. State of Texas,* 133 S.W.3d 618 (Tex. Crim. App. 2004). Mandate issued on June 1, 2004. Ross did not file a petition for writ of certiorari in the Supreme Court of the United States.

While the direct appeal was pending, Gary Taylor[2] was appointed on February 27, 2003, to represent Ross in state habeas proceedings. The state habeas application was filed in the trial court on March 26, 2004, and raised the following fourteen grounds for review:

> (1)    Ross was denied effective assistance of counsel when his trial attorneys failed to investigate and present mitigating evidence that called for a sentence less than death.

> (2)    Ross was denied the right to confront and cross examine Regina Carlisle in violation of his Sixth Amendment right.

> (3)    Ross was denied effective assistance of counsel when his trial attorneys failed to object to the State's questioning of Kevin Knobbe based on violations of Ross's rights under the Sixth Amendment to confront and cross examine witnesses.

> (4)    Ross was denied effective assistance of counsel in violation of the Sixth Amendment when his trial attorneys failed to object or failed to renew their objections to the State's questioning of Kevin Knobbe based on hearsay in violation of the Texas rules of evidence.

> (5)    Ross was denied effective assistance of counsel in violation of the Sixth Amendment when his trial attorneys failed to investigate the nature and extent of Regina Carlisle's criminal history and, as a result, failed to develop evidence to contradict and impeach the State's punishment evidence.

> (6)    Ross was denied the right to confront and cross examine Clarence Garner in violation of the Sixth Amendment.

---

[2]Paul E. Mansur and Michael Charlton were subsequently appointed at different times to represent Ross in his state habeas proceedings, but it was Paul E. Mansur who signed and certified the state application.

(7)     Ross was denied effective assistance of counsel in violation of the Sixth Amendment when his trial attorneys failed to object to the State's questioning of Ronnie Martin based on violations of Ross's rights to confront and cross examine witnesses under the Sixth Amendment.

(8)     Ross was denied effective assistance of counsel in violation of the Sixth Amendment when his trial attorneys failed to request an instruction to disregard, or an instruction for a mistrial, after receiving a favorable ruling on their objection to the State's questioning of Ronnie Martin based on hearsay in violation of the Texas Rules of Evidence.

(9)     Ross was denied effective assistance of counsel in violation of the Sixth Amendment when his trial attorneys failed to object to the relevancy of the statements made by Ronnie Martin that Ross had previously pointed a gun in a threatening manner.

(10)    Ross was denied effective assistance of counsel in violation of the Fifth and Sixth Amendments when the State recorded a telephone conversation between Ross and his mother and then admitted the tape and a typed transcript of the tape into evidence.

(11)    Ross was denied effective assistance of counsel in violation of the Sixth Amendment when his trial attorneys failed to object based on his rights to counsel under the Fifth and Sixth Amendments when the State recorded and offered the taped and transcribed conversation between Ross and his mother.

(12)    Ross was denied due process of law and a fair trial when the State played portions of a taped telephone conversation between Ross and his mother in which Ross repeatedly asserted that he needed to speak with an attorney.

(13)    Ross was denied effective assistance of counsel in violation of the Sixth Amendment when his trial attorneys failed to object based on due process grounds to the playing of the taped telephone conversation between Ross and his mother in which he repeatedly asserted that he needed to speak with an attorney.

(14)    Ross was denied effective assistance of counsel in violation of the Sixth Amendment when his trial attorney improperly opened the door for the prosecutor to present additional evidence of prior criminal acts.

Ross attached two affidavits as exhibits to his state application: one from licensed private investigator Lisa Milstein and one from Valeria Martin, Ross's sister. The State filed an Answer on September 9, 2004, and did not attach any exhibits or affidavits.

The trial court (with the same judge conducting the habeas proceedings that conducted Ross's trial and sentencing) did not hold a hearing but signed an Order on May 25, 2007, requesting that the parties submit proposed findings of fact and conclusions of law within thirty days from the date of the order. The State submitted its findings and conclusions on July 3, 2007, and the trial court adopted them on the same date. On October 4, 2007, Ross filed a Motion for Remand to Trial Court for Reconsideration of [Ross's] Proposed Findings of Fact and Conclusions of Law (First Supplemental Motion) in which his attorneys stated that neither Ross nor the attorneys had received a copy of the trial court's May 25, 2007 order to file proposed findings and conclusions and therefore had no chance to file such. Ross also objected to the trial court's failure to hold a hearing and stated that his proposed findings and conclusions were being filed contemporaneously with the motion.

In an unpublished *per curiam* Order dated October 10, 2007, the Texas Court of Criminal Appeals remanded the application (WR-60-294-01) to the trial court to "submit new findings of fact or amend, supplement, or affirm, the findings of fact and conclusions of law previously entered" within fifteen days from the date of the order and after considering Ross's proposed findings of fact and conclusions of law, before returning the record to the Court of Criminal Appeals. On October 19, 2007, the trial court "affirm[ed] the findings of fact and conclusions of law previously entered" and "adopt[ed] the State's Proposed Findings of Fact and Conclusions of Law in its entirety." The Texas Court of Criminal Appeals "denied the application for writ of habeas corpus with written order" on January 23, 2008.

By Order dated August 27, 2008, Don Vernay and Richard L. Wardroup were appointed to represent Ross in federal habeas corpus proceedings. Ross timely filed his Petition for Writ of Habeas Corpus by a person in state custody pursuant to 28 U.S.C. 2254 and brief in support thereof on January 11, 2009. Respondent filed an Answer on February 26, 2009, but had previously filed the state court records on September 10, 2008. Ross filed a reply and objections on March 20, 2009.

This Court conducted a hearing on May 1, 2009. Both parties appeared and presented arguments in support of their respective positions.

## B.    The Offense

This Court shall adopt the statement of the offense as summarized by the Texas Court of Criminal Appeals on direct appeal and subsequently adopted by the state habeas court:

> [Ross's] victims (Viola Ross and Douglas Birdsall) were apparently murdered in Birdsall's car in an alley outside [Ross's] apartment complex. [Ross's] neighbor reported hearing gunshots in the alley at around 10:00 p.m. The victims' bodies were discovered in Birdsall's car, which was parked in a ravine approximately 4.2 miles from the alley where the victims were murdered. Inside the car were shell casings, glass shards, and fingertip piece of a latex glove. Shortly before the murders, [Ross's] girlfriend (Liza, who was also Viola's sister) saw Ross wearing latex gloves. [Ross] told Liza to leave the apartment so she would not be there "if anything happens." Liza left the apartment and walked to her father's house, arriving about 10:11 p.m.
>
> In the alley outside [Ross's] apartment complex, the police discovered blood stains, glass shards and a shell casing. Testing revealed that the glass shards were similar to the glass windows of Birdsall's car. Additionally, the shell casing from the alley was tested and determined to be consistent with the shell casings in Birdsall's car. The day after the murders, [Ross] accompanied Liza to the police station to describe events of the previous nights. Ross told police he had argued with Viola over the telephone. During a second interview with police, [Ross] told an investigator that he and Viola did not get along and that they had argued because Viola kept calling

and putting Liza's ex-boyfriend on the phone. [Ross] consented to a police search of his apartment, which resulted in the recovery of two latex gloves and a sweatshirt. DNA testing showed that a blood stain on the sweatshirt belonged to Birdsall. DNA testing also showed that Birdsall's blood was on the outside of the latex glove tip found in Birdsall's car and that [Ross's] DNA was on the inside of the glove tip. [Ross] incriminated himself when asked about the location of the murder weapon, and again in a conversation with his mother recorded at the Lubbock County Jail.

*Ross v. State of Texas,* 133 S.W.3d at 620.

## II.  STANDARD OF REVIEW

Jurisdiction is vested in this Court by virtue of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. §§2241 and 2254. *See Williams v. Taylor,* 529 U.S. 329, 402 (2000) (holding that a federal petition filed after April 24, 1996, by an inmate convicted of capital murder in state court is reviewed under the AEDPA). "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693 (2002).

A state prisoner seeking federal habeas relief must first exhaust the remedies available in the state courts, or show the absence or ineffectiveness of such remedies, before federal collateral relief can be granted. 28 U.S.C. § 2254(b)(1). A prisoner incarcerated in the State of Texas pursuant to a capital sentence satisfies the exhaustion requirement by filing either an appeal directly to the Texas Court of Criminal Appeals or a state application for writ of habeas corpus. *See* Tex. Code Crim. P. art. 37.071 § 2(h) (Vernon's Supp. 2001) ("The judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals."); art. 11.071 (establishing the procedures for an applicant seeking habeas relief from a judgment imposing the death penalty).

Although 28 U.S.C. § 2254(b)(3), as amended by AEDPA, also "authorizes a district court to deny relief on an unexhausted claim, . . . it does not authorize a district court to grant relief on an unexhausted claim." *Alexander v. Johnson,* 163 F.3d 906, 908 (5th Cir. 1998).

Under 28 U.S.C. §2254(d), as amended by the AEDPA, a state prisoner may not obtain federal habeas relief on any claims that were adjudicated on the merits in state-court proceedings unless the adjudication of the claims —

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d). This section creates a "highly deferential standard for evaluating state-court rulings, . . . which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Viscotti,* 537 U.S. 19, 24 (2002) (*per curiam*) (internal quotation and marks omitted). The petitioner carries the burden of proof. *Id.* at 25.

"In the context of federal habeas proceedings, adjudication 'on the merits' is a term of art that refers to whether a court's disposition of the case was substantive as opposed to procedural." *Neal v. Puckett,* 286 F.3d 230, 235 (5th Cir. 2002). When the Texas Court of Criminal Appeals explicitly adopts the trial court's findings of fact and conclusions of law and denies state habeas relief, with or without a written opinion, the decision qualifies as an "adjudication on the merits" for purposes of § 2254(d). *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). *See Barrientes v. Johnson,* 221 F.3d 741, 780 (5th Cir. 2000) (holding that a denial of relief by the Texas Court of Criminal Appeals is a denial of relief "on the merits").

When a claim has been adjudicated on the merits, "[s]ection 2254(d)(1) provides the standard of review for questions of law and mixed questions of law and fact." *Woods v. Cockrell,* 307 F.3d 353, 356 (5th Cir. 2002). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster,* ___ U.S. ___, 131 S. Ct. 1388, 1398 (2011).

"A state-court decision is 'contrary to' . . . clearly established [Supreme Court] precedents if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Early v. Packer,* 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor,* 529 U.S. 329, 362 and 405-06 (2000)). This standard does not require that the state court cite to Supreme Court cases "–indeed, it does not even require *awareness* of [the Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.* (emphasis in original).

A state court decision is an "unreasonable application" of clearly established Supreme Court law "if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of a particular case." *Bell v. Cone,* 535 U.S. at 694 (citing *Williams v. Taylor,* 529 U.S. at 407-08). "The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and [the Supreme Court] stressed in *Williams* that an unreasonable application is different from an incorrect one." *Id.* (citing *Williams v. Taylor,* 529 U.S. at 409-10). "Distinguishing between an unreasonable and an incorrect application of federal law, [the Supreme Court has] clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law

incorrectly, relief is appropriate only if that application is also objectively unreasonable." *Penry v. Johnson,* 532 U.S. 782, 793 (2001) (citing *Williams v. Taylor,* 529 U.S. at 410-11).

"[C]learly established federal law 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Valdez v. Cockrell,* 274 F.3d 941, 946 (5th Cir. 2001) (quoting *Williams v. Taylor,* 529 U.S. at 412).

Under § 2254(d)(2), "a decision adjudicated on the merits in a state court will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding . . . ." *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." *Id.* (citing 28 U.S.C. § 2254(e)(1)). *See Jackson v. Anderson,* 112 F.3d 823, 824 (5th Cir. 1997) (noting that the burden of rebutting the presumption was made more onerous by the AEDPA amendments to § 2254).

## III. DISCUSSION

### A.     Grounds for Review

The Court understands Ross to raise the following grounds for review in this federal petition for writ of habeas corpus:

(1)     Ross was denied effective assistance of counsel in violation of the Sixth Amendment when his trial attorneys failed to investigate the nature and extent of Regina Carlisle's criminal history and, as a result, failed to develop evidence to contradict and impeach the State's punishment evidence.

(2)     Ross was denied effective assistance of counsel in violation of the Sixth Amendment when his trial attorneys failed to investigate and present mitigating evidence at the punishment phase that called for a sentence less than death.

(3)     The decision by the Texas Court of Criminal Appeals that there was no reasonable likelihood that the jury could have been misled and that the jury was not

misled by an erroneous jury charge submitted at the punishment phase was contrary to, and involved an unreasonable application of, clearly established federal constitutional law as determined by the Supreme Court of the United States.

(4)   Ross was denied effective assistance of counsel in violation of the Sixth Amendment when his trial attorneys failed to request an instruction to disregard, or an instruction for a mistrial, after the State's continued questioning of Ronnie Martin subsequent to the Court's sustaining defense counsel's hearsay objection and counsel's failure to object to hearsay or request a mistrial regarding testimony from Liza McVade about Ross's alleged possession and use of a firearm.

(5)   The prosecution committed misconduct and violated Ross's right to due process of law in violation of the Fifth and Fourteenth Amendments by failing to provide defense counsel with the criminal history of Regina Carlisle and then "ambushing" the defense by introducing her testimony through inadmissible hearsay.

(6)   Ross was denied effective assistance of counsel in violation of the Sixth Amendment when his trial attorneys failed to object to the State's questioning of Kevin Knobbe based on violations of Ross's rights under the Sixth Amendment to confront and cross examine witnesses.

Ross has attached four sworn statements/affidavits to his federal petition: one from private investigator Lisa Milstein, which is dated March 26, 2004; one from his sister Valeria Martin, which is dated March 26, 2004; one from his trial attorney Floyd Holder, which is dated January 9, 2009; and one from his second trial attorney Pat Metze, which is dated January 9, 2009.

**B.   Findings of Fact and Conclusions of Law**

For clarity and efficiency, the Court has combined the discussion of claims which rely on the same facts and appurtenant legal analysis.

### 1.   Were trial counsel constitutionally ineffective?   (Grounds 1, 2, 4 and 6)

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel." *Yarbrough v. Gentry,* 540 U.S. 1, 5 (2003).   To establish ineffective assistance of counsel at trial, the Supreme Court requires a federal petitioner to demonstrate that (1) his counsel's performance

was objectively deficient and (2) the deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. at 687. *Accord Wiggins v. Smith,* 539 U.S. 520, 521 (2003). "Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687. The standard set out in *Strickland,* "although by no means insurmountable, is highly demanding." *Kimmelman v. Morrison,* 477 U.S. 365, 382 (1986).

"To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins v. Smith,* 539 U.S. at 521 (quoting *Strickland v. Washington,* 466 U.S. at 688). The Supreme Court has determined that

> [j]udicial scrutiny of counsel's performance must be highly deferential because [i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland v. Washington,* 466 U.S. at 689 (internal quotations and citations omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690-91. Thus, "[t]he Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarbrough v. Gentry,* 540 U.S. at 8.

To demonstrate "prejudice," a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. at 694. "The 'prejudice' component focuses on the question whether counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell,* 506 U.S. 364, 372 (1993) (quotation omitted). Simply alleging prejudice will not suffice; the petitioner must affirmatively prove prejudice. *Deville v. Whitley,* 21 F.3d 654, 659 (5th Cir. 1994).

When "a state court has already rejected an ineffective-assistance claim, a federal court may grant habeas relief [only] if the decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Yarbrough v. Gentry,* 540 U.S. at 5 (quoting 28 U.S.C. § 2254(d)(1)). "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington v. Richter,* ___ U.S. ___, 131 S. Ct. 770, 788 (2011) (internal quotations omitted). Thus, "[f]ederal courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Id.* "When § 2254(d) applies, the question is not whether counsel's actions were reasonable; [t]he question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

**Ground (1)   Did trial counsel fail to investigate Regina Carlisle's criminal history and thus fail to develop evidence to contradict and impeach an important State's punishment witness?**

The State's second witness at the punishment hearing, a community supervision officer from the Lubbock County Community Supervision (Adult Probation) Office, testified without objection to the following:

(a)     During her tenure as a community supervision officer, she served as an Interstate Compact Coordinator with the Lubbock County Adult Probation Office. She identified Ross as having previously been supervised by the Lubbock County office and stated that she was familiar with his official probation records.

(b)     Ross pleaded guilty in Cause No. 97CR-4071 in the Circuit Court of St. Louis County, Missouri, on October 7, 1997, to the felony offenses of assault and stealing a motor vehicle (alleged to have occurred on July 13, 1997). He was sentenced to a three-year suspended sentence and ordered to serve twelve days' shock time, complete one hundred hours of community service, attend a domestic violence/counseling program, and stay away from the victim of the assault. (The probation officer identified Ross in the courtroom.).

(c)     Ross's probation in Missouri was subsequently transferred to Lubbock County, Texas, and on February 20, 1998, he met with a supervision officer in Lubbock to discuss the terms of his probation. At Ross's initial interview, he identified the victim of the assault as his girlfriend[, Regina Carlisle,], stated they had had problems from the past, and said that she had been stalking him before the incident. Ross then admitted that he "saw her to talk, but when the victim pulled the knife out and attempted to stab [him], [he] took the knife and stabbed her." The interview notes reflected that although Ross seemed to have little remorse for the crime, he did state "that if he could do things over, he would have walked away."

(d)     Ross completed counseling as ordered on November 5, 1998.

(e)     Ross successfully completed his probation without any problems.

Defense counsel did not cross examine the probation officer and Regina Carlisle was not called to testify at Ross's punishment hearing.

Ground (1) was raised in Ross's state habeas application and adjudicated on the merits. The state habeas court determined that Ross failed to present any evidence showing that defense counsel failed to investigate Carlisle's criminal history[3]; Ross failed to demonstrate how defense counsel

---

[3]Ross's habeas counsel did not provide any statements or affidavits from trial counsel during the state habeas proceedings. Although federal habeas counsel have provided affidavits from trial counsel, such affidavits will not be considered in this proceeding. *See Cullen v. Pinholster,* ___ U.S. ___, 131 S. Ct. 1388, 1398 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

could have introduced evidence of Carlisle's criminal history or how it would have been admissible because she did not testify at the punishment stage; the witness presented some mitigating evidence concerning Ross's version of the events in Missouri; Ross pleaded guilty, thus admitting his culpability, to the Class B felony assault and Class C felony appropriation of a vehicle; and it is unclear whether Carlisle had criminal history evidence that was admissible under Texas law even if she had testified. Using the *Strickland* standard, the state habeas court concluded that Ross had failed to demonstrate that trial counsel's performance was objectively deficient or present evidence of prejudice. This Court agrees. Thus, Ross has not demonstrated that the state court's denial of his ineffective-assistance-of-counsel claim in Ground (1) was contrary to, or an unreasonable application of, clearly established Supreme Court law.

### Ground (2) Did trial counsel ineffectively fail to investigate and present mitigating evidence that called for a sentence less than death at the punishment phase?

Defense counsel presented the following evidence during the punishment stage of Ross's capital murder trial:

(1)     A fraternity brother testified that Ross had studied architecture at Texas Tech University and paid for his own education while attending school; he had never seen Ross with a gun, weapon, or knife; he had observed Ross to be pretty calm and never violent or upset; and he saw him occasionally drink alcohol but never use drugs.

(2)     Ross's ex-roommate described Ross as a diligent student who was very calm, polite, and nice, and who rarely drank but did not use drugs.

(3)     Ross's mother testified that she had three daughters in addition to Ross and he was born with pneumonia. He was also an asthmatic, he had had no contact with his father since he was eight years old, and there were no men living in their home during his formative years. Ross attended public school, where he ran track and played football and participated in Cub Scouts and Boy Scouts until junior high when the family moved to the outskirts of St. Louis where his mother purchased a single-family home. This community was predominantly white with racially mixed schools.

Ross's mother also testified that there were no guns in their house, Ross had no familiarity with weapons, and he did not hunt. He attended church where his step-grandfather was the preacher. Other than one curfew violation, he had no trouble with the law as a juvenile and he did not get into trouble at school. He had a small group of friends at school, described as "good kids." He was not involved in any gang activity and worked at Norwood Country Club, just outside St. Louis, as a teenager.

After graduating from high school, Ross attended Central Missouri State College for four years, where he received an Associate of Science degree and a Bachelor of Science degree. He was president of his fraternity chapter in his senior year. After graduation, Ross worked for three different architectural firms. He was never in trouble with the law until 1997. After this incident, which his mother blamed on the girl, he wanted to continue his education and had already made the decision to attend Texas Tech. While a student at Texas Tech, Ross paid for his own education and had no mental or health problems except for a hernia.

Ross argued in his state habeas application that defense counsel ineffectively failed to investigate, discover, and present additional relevant mitigating evidence. In support of this argument, he attached an investigator's summary of witness interviews with Ronnie Martin, Lydia Davis, Marsha Green, Michelle Ross, Regina Carlisle, Valeria Martin, and Tiffany Ross to his state application, but he did not attach sworn affidavits from any of these witnesses except his sister Valeria Martin. There were no sworn affidavits from trial or appellate counsel in the state habeas proceedings.

The state habeas court determined that Ross failed to allege any facts establishing deficient attorney performance; that is, Ross specifically failed to allege facts to show why trial counsel acted as they did. The state habeas court pointed out that the record showed that (1) Ross had previously insisted that no punishment witnesses be called on his behalf; (2) Ross dissuaded some punishment witnesses from testifying on his behalf; (3) Ross advised his friends and family not to cooperate with defense counsel; and (4) on another occasion, Ross's mother told defense counsel to leave her alone.

The trial court then determined that Ross failed to show that counsel's punishment investigation was deficient and, further, that Ross had actually obstructed counsel's attempts to investigate and present a punishment case.

The Court has reviewed the state records and finds that Ross has indeed presented little or no evidence to support his claim that defense counsel failed to investigate and present mitigation evidence. Although an investigator for Ross interviewed seven witnesses and summarized their evidence in a statement for the state habeas court, only one of these witnesses, Valeria Martin, signed a sworn affidavit stating that she would have testified if asked. Valeria also stated that defense counsel met with her, her sisters Tiffany and Michelle, and her mother prior to trial. Another witness, Ronnie Martin, advised Ross's investigator that Ross's father did not want him to receive the death penalty but Chester Ross refused to speak with the investigator. Martin also advised the investigator that Chester Ross had been contacted by another investigator, apparently one who worked for defense counsel. These statements confirm that defense counsel conducted an investigation, but Ross has failed to provide any further proof of the extent of the investigation, the completeness of the investigation, or counsel's punishment strategy.

Furthermore, the state habeas court compared the evidence actually presented at the punishment hearing with Ross's proposed additional mitigating evidence, determined that the additional evidence was "neither powerful nor compelling" but similar to the evidence introduced by his attorneys, and concluded that Ross could not show that "if the newly proffered evidence had been presented and explained, there [was] a reasonable probability that the result of the sentencing phase would have been different." The state habeas court concluded that Ross did not show that he was prejudiced by counsel's performance at his punishment hearing. Clearly, his claim of ineffective

assistance of counsel for failure to investigate and present mitigation evidence was adjudicated on the merits.

Ross raises the same claim in this federal petition. As previously noted, in a case such as this, when the state court has already adjudicated the ineffective-assistance-of-counsel claim, federal review is "doubly deferential." *Harrington v. Richter,* 131 S. Ct. at 788. Thus, the question for the federal habeas court under § 2254(d)(1) "is not whether counsel's actions were reasonable . . [but] whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

It is "indisputable that, in the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett,* 286 F.3d 230, 236-37 (5th Cir. 2002) (quoting *Baldwin v. Maggio,* 704 F.2d 1325, 1332-33 (5th Cir. 1983)). The "failure to develop or present mitigating background evidence is not per se deficient performance," *Moore v. Johnson,* 194 F.3d 586, 615 (5th Cir. 1999); rather, the "failure to present mitigating evidence 'if based on an informed and reasonable practical judgment, is well within the range of practical choices not to be second-guessed' under *Strickland,*" *Drew v. Collins,* 964 F.2d 411, 422 (5th Cir. 1992) (quoting *Wilkerson v. Collins,* 950 F.2d 1054, 1065 (5th Cir. 1992) (quoting *Mattheson v. King,* 751 F.2d 1432, 1441 (5th Cir. 1985))).

The Supreme Court has long referred to standards articulated by the American Bar Association (ABA) for capital defense work as "'guides to determining what is reasonable.'" *Wiggins v. Smith,* 539 U.S. at 524 (quoting *Strickland v. Washington,* 466 U.S. at 688 and *Williams v. Taylor,* 529 U.S. 362, 396 (2000)). "The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any

aggravating evidence that may be introduced by the prosecutor.'" *Id.* (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added)). "In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. Thus, "in deciding whether [defense counsel] exercised 'reasonable professional judgmen[t],'" the principal concern "is not whether counsel should have presented a mitigation case," but "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [a defendant's] background *was itself reasonable.*" *Wiggins v. Smith,* 539 U.S. at 522-23 (quoting *Strickland v. Washington,* 466 U.S. at 691).

Ross first argues that his trial counsel's performance at the punishment stage was so deficient that it is best analyzed by reviewing the Supreme Court's decisions in *Williams v. Taylor, supra,* and *Wiggins v. Smith, supra.* In *Williams v. Taylor,* defense counsel primarily focused the punishment hearing on evidence that Williams had turned himself in, expressed remorse, and cooperated with the police after the fact. *Williams v. Taylor,* 529 U.S. at 368-69. The Supreme Court subsequently found that defense counsel's failure to investigate and present the following evidence constituted ineffective assistance of counsel:

> The record establishes that counsel did not begin to prepare for [the sentencing phase] of the proceeding until a week before the trial. They failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records. Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that

he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

Counsel failed to introduce available evidence that Williams was "borderline mentally retarded" and did not advance beyond sixth grade in school. . . .

Of course, not all of the additional evidence was favorable to Williams. The juvenile records revealed that he had been thrice committed to the juvenile system . . . . But . . . the failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession.

*Williams v. Taylor,* 529 U.S. at 395-96 (internal citations and footnotes omitted). *See also id.* at 395 n.19 (describing the unsanitary conditions of Williams' home). The Supreme Court discussed review of an ineffective-assistance claim under § 2254(d)(1), found that the state court unreasonably applied the Supreme Court law in *Strickland,* and reversed and remanded the case for further proceedings. *Id.* at 398-99.

Ross additionally contends that the facts in *Wiggins v. Smith, supra,* also support his claim of ineffective assistance of counsel for failure to investigate and present mitigation evidence. In *Wiggins,* defense counsel presented only one significant mitigating factor to the jury at punishment-Wiggins had no prior convictions. *Wiggins v. Smith,* 539 U.S. at 537. The Supreme Court concluded that the evidence of severe privation and abuse suffered by Wiggins in the first six years of his life while in the custody of his alcoholic, absentee mother; the physical torment, sexual molestation, and repeated rape suffered during his subsequent years in foster care; and the time he spent homeless, along with his diminished mental capacity-evidence which was not offered at the punishment hearing-was "the kind of troubled history" that the Court has "declared relevant to assessing a defendant's

moral culpability." *Id.* at 535 (citing *Penry v. Lynaugh,* 492 U.S. 302, 319 (1989)).  The Court further noted that, unlike the petitioner in *Williams v. Taylor, supra,* "Wiggins did not have a record of violent conduct that could have been introduced by the State to offset this powerful mitigating narrative." *Id.* at 537 (citing *Williams v. Taylor,* 529 U.S. at 418 (Rehnquist, C.J., dissenting (noting that Williams had savagely beaten an elderly woman, stolen two cars, set fire to a home, stabbed a man during a robbery, and confessed to choking two inmates and breaking a fellow prisoner's jaw))).

Ross's arguments are specious.  As determined by the state habeas court, Ross's additional mitigating evidence-that he felt abandoned by his father and wanted a male role model, his father did not want him to receive a death sentence, his mother was unable to control her anger, Ross and his sisters practically raised themselves, Ross's former girlfriend found him to be thoughtful and mild-mannered, and his former girlfriend Regina Carlisle had a violent criminal past-simply does not rise to the level of the powerful, compelling evidence omitted from the punishment phases in *Williams* and *Wiggins* (evidence of abandonment, sexual molestation, physical abuse, criminal neglect, diminished mental capacity, foster care, alcoholism, homelessness).

Ross has not demonstrated that the state court's adjudication of this claim was contrary to or an unreasonable application of clearly established Supreme Court law as required by § 2244(d)(1).

**Ground (4)  Did trial counsel ineffectively fail to object to hearsay testimony from State's witnesses Ronnie Martin and Liza McVay regarding Ross's possession of a firearm and subsequently fail to request an instruct to disregard and/or an instruction for a mistrial after the hearsay testimony was erroneously admitted?**

On direct examination, Ronnie Martin testified, in part, as follows:

Martin: And at the time, [Clarence Garner] told Liza he really didn't care for Vaughn [Ross] anyway because he felt as though he was a coward from a recent incident they had had where he said Vaughn had pulled a gun . . . .

> Defense Attorney:  Your Honor, I object to him talking about what someone else told him.
>
> The Court:  Sustained.

Defense counsel did not request a curative instruction or make a request for a mistrial.  The prosecution continued the questioning of Ronnie Martin.

> The State:  Okay.  And, Mr. Martin, was it your understanding that the comment regarding "coward" was because of some incident where there had been a threat with a gun that the Defendant had used?
>
> Martin:  Yes.

Defense counsel did not object to the question or answer.  The state habeas court addressed Ross's claims that counsel ineffectively failed to object to Martin's hearsay testimony and request a curative instruction and/or an instruction for a mistrial; therefore, the claim was adjudicated on the merits.

The state habeas court determined that (1) Ross failed to allege facts that would show or explain his trial counsel's motives for failing to object to Martin's testimony; (2) even if there were violations of the Confrontation Clause, such violations were subject to harmless error analysis; (3) Martin's hearsay statement was relatively unimportant and did not relate to the incident in question; (4) the hearsay statement introduced evidence of Ross's possession of a firearm that was cumulative because witness Liza McVade had testified that she was told by Ross that he possessed a firearm and Ross himself had made an incriminating statement regarding his control over the murder weapon; and (5) the evidence against Ross was overwhelming.  The state habeas court concluded that even if counsel had erred, the alleged error was harmless because of "the relative unimportance of the hearsay statement, cumulative nature of the testimony, and the overwhelming evidence of [Ross's] guilt."  When the "doubly deferential" standard described in *Harrington v. Richter, supra,* is applied to the

state court's adjudication of this claim, Ross has failed to satisfy the AEDPA standards in § 2254(d).

*Harrington v. Richter,* 131 S. Ct. at 788 ("Federal courts must guard against the danger of equating

unreasonableness under *Strickland* with unreasonableness under § 2254(d); [w]hen § 2254(d) applies,

the question is not whether counsel's actions were reasonable; [rather], [t]he question is whether there

is any reasonable argument that counsel satisfied *Strickland's* deferential standard.").

In the second part of Ground (4), Ross complains that counsel failed to object to the following

hearsay testimony from witness Liza McVade, the sister of the victim Viola Ross:

> The State:  Okay, now, did Viola say anything about what the Defendant had as y'all were leaving?
>
> Liza McVade:  Yes.
>
> The State:  What did she say?
>
> McVade:  She say, "He probably got that gun.  He think everybody scared of him and that gun."
>
> The State:  Okay.  Did Viola say she had seen a gun right then?
>
> McVade:  No.  I asked her,  "What did he have in his hand?"
>
> The State:   And she said she had seen the Defendant with a gun?
>
> McVade:  Yes.

Defense counsel did not object, request a curative instruction, or move for a mistrial.

Ross did not argue that counsel was ineffective for failing to object to McVade's hearsay

testimony on direct appeal or in his state habeas application; therefore, he has failed to exhaust the

claim in the state courts as required by 28 U.S.C. § 2254(b)(1) and he will be procedurally barred

from raising the claim in a successive state habeas application under article 11.071 because he cannot

demonstrate that the claim falls within any of the statutory exceptions.  *See* Tex. Code Crim. P. Art.

11.071 § 5(a) (Vernon's Ann. Cumulative Pocket Part 2010) (stating that a court may not consider the merits of a subsequent application for a writ of habeas corpus filed after the filing of an initial application unless the application falls within three specific exceptions).

The procedural default doctrine requires a federal habeas court to refuse review of all claims which are found to have been defaulted in state court pursuant to "an independent and adequate state procedural rule," unless the petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *Bousley v. United States,* 523 U.S. 614, 622 (1998).

"With regard to the issue of cause [to excuse a procedural default], the Supreme Court has stated that

> the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule . . . . [A] showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable, would constitute cause under this standard.

*Barrientes v. Johnson,* 221 F.3d at 763-64 (quoting *Murray v. Carrier,* 477 U.S. 478, 488 (1986) (internal citations and quotations omitted)). To establish the "prejudice" requirement, a petitioner must first show "cause" and then demonstrate actual prejudice resulting from that cause. *Keeney v. Tamayo-Reyes,* 504 U.S. 1, 11 (1992).

The "fundamental miscarriage of justice" exception is reserved for cases of actual innocence, that is, "'where the petitioner shows, as a factual matter, that he did not commit the crime of conviction.'" *Fairman v. Anderson,* 188 F.3d 635, 644 (5th Cir. 1999) (quoting *Ward v. Cain,* 53 F.3d

Page 24 of 35

106, 108 (5th Cir. 1995)). "To establish the requisite probability that he was actually innocent, the petitioner must support his allegations with new, reliable evidence that was not presented at trial and must show that it was 'more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *Id.* (quoting *Schlup v. Delo,* 513 U.S. 298, 327 (1995)). *See Bousley v. United States,* 523 U.S. at 623 ("'[A]ctual innocence' means factual innocence, not mere legal insufficiency.").

The Fifth Circuit Court of Appeals "has consistently held that Texas' abuse-of-the-writ rule is ordinarily an 'adequate and independent' procedural ground on which to base a procedural default ruling." *Aguilar v. Dretke,* 428 F.3d 526, 533 (5th Cir. 2005) (quoting *Henderson v. Cockrell,* 333 F.3d 592, 605 (5th Cir. 2003); *Horsley v. Johnson,* 197 F.3d 134, 137 (5th Cir. 1999); *Matchett v. Dretke,* 380 F.3d 844, 848 (5th Cir. 2004). Furthermore, Ross has failed to argue or demonstrate cause and prejudice or "actual innocence."

Accordingly, the Court agrees with Respondent and finds that Ross's claim of ineffective assistance regarding McVade's hearsay testimony should be dismissed as unexhausted and procedurally defaulted. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 839 (1999) (citing 28 U.S.C. §§ 2254(b)(1), (c) (1994 ed. and Supp. III)) ("Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court."); *Aguilar v. Dretke,* 428 F.3d at 532-33 (denying a certificate of appealability on district court's dismissal of claim as procedurally barred from federal review because of the abuse-of-the-writ doctrine under Texas Code of Criminal Procedure article 11.071 §5(a)).

**Ground (6)    Did trial counsel fail to object to the State's questioning of Kevin Knobbe based on violations of Ross's rights to confront and cross examine witnesses under the Sixth Amendment?**

The State's third witness at the punishment hearing, Kevin Knobbe, a law enforcement officer from the State of Missouri, testified with limited objections to the following:

(a)      On July 13, 1997, he was employed by the City of Normandy, Missouri, as a police officer and was on patrol when he responded to a call about a stabbing at a city park.

(b)      When he arrived at the park, he observed Regina Carlisle, who appeared very shaken, screaming, bleeding from some of her extremities, in pain, in need of medical attention, and "in a very excitable state."

(c)      He called an ambulance and, while waiting for the ambulance, asked what had happened to put her in that state.

Defense counsel objected, but the trial court overruled the objection, ruling that the statement was an excited utterance. He was told by Carlisle that her boyfriend had stabbed and cut her and took off with her vehicle. She gave him a description of her vehicle and her boyfriend.

(d)      She identified her boyfriend as Vaughn Ross. Knobbe identified Ross in the courtroom.

(e)      He followed Carlisle to the hospital and photographed her injuries. He identified the photographs and described the injuries, and the photographs were admitted into evidence without objection.

(f)      As he was describing the injuries, Knobbe started to repeat what he was told by an emergency room physician regarding one of Carlisle's lacerations.

Defense counsel objected to the statement as hearsay and the trial court sustained the objection. The State re-phrased the question, and Knobbe testified without objection that there were some concerns in the emergency room that a laceration to her neck could potentially have been life threatening.

(g)      Later in the morning, Knobbe took a statement from Ross, who told him that he had called Carlisle to meet with him so that he could retrieve some money that she owed him. Although Ross waited around for about five minutes, he stated that she never showed, so he went home, showered, and went to bed. Ross advised that he never saw Carlisle that night.

(h)      Knobbe stated that Regina Carlisle's car was located about "a half a mile or less" from Ross's residence in Missouri and the front end was damaged.

When Knobbe started to repeat what Carlisle had told him about the damage to her car, defense counsel objected to the statement as hearsay and the trial court sustained the objection. The State re-phrased the question, and Knobbe testified without further objection that Carlisle had damaged the front end of the vehicle when she ran her own vehicle into a tree in an attempt to make Ross quit stabbing and cutting her.

(i)    Knobbe further stated that he was surprised to learn, after the fact, that Ross had pleaded guilty and no one had consulted him or sought his opinion about the case.

Defense counsel cross examined Officer Knobbe, who admitted that Carlisle was treated and released from the hospital; that is, she did not spend the night in the hospital. As previously noted, the State did not call Regina Carlisle to testify.

Ground (6) was raised in Ross's state habeas application, adjudicated on the merits, and is now subject to review under § 2254(d)(1).

The state habeas court determined that Officer Knobbe's testimony regarding Regina Carlisle's statements was admissible under the "excited utterance" exception to the hearsay rule; Ross's right to confront and cross-examine a witness was not violated because the statements were non-testimonial "due to the ongoing nature of the emergency[4] as the armed Applicant [Ross] conceivably was still in the vicinity and the bleeding victim was in need of medical attention"; Ross

---

[4]On February 28, 2011, the Supreme Court decided *Michigan v. Bryant,* ___ U.S. ___, 131 S. Ct. 1143 (2011): a case about "a nondomestic dispute, involving a victim found in a public location, suffering from a fatal gunshot wound, and a perpetrator whose location was unknown at the time the police located the victim." *Id.* at 1156. The Court considered the existence of an ongoing emergency, the threat to the public and the police, the medical condition of the victim, the informality of the encounter between the victim and the police, the primary purpose of the interrogation, and the fact that a weapon was used, and concluded that the victim's identification and description of the shooter and location of the shooting "were not testimonial and . . . their admission at Bryant's trial did not violate the Confrontation Clause." *Id.* at 1167. The Supreme Court left it up to the state courts to decide on remand whether the victim's other statements were otherwise admissible under state hearsay rules. *Id.* This case seems to be quite similar to Ross's case and clearly supports the state court's adjudication.

was not harmed by the admission of the excited utterances because he pleaded guilty to appropriating Carlisle's car and stabbing her; defense counsel was not ineffective for failing to object, continuing to object, or renewing objections to the statements which were admissible as excited utterances; defense counsel was not ineffective for failing to raise objections under *Crawford v. Washington,* 541 U.S. 36 (2004), which was decided on March 4, 2004, well after this trial; and the Texas Court of Criminal Appeals had already found that the evidence against Ross was overwhelming. *See Ross v. State,* 133 S.W.3d at 626. The state habeas court concluded that trial counsel was not ineffective and did not violate Ross's constitutional rights to confront and cross examine witness Carlisle.

This Court has reviewed Ross's arguments, the state court's adjudication, and the state court record through the "doubly deferential" requirements of *Strickland* and § 2254(d)(1) and finds that Ross has not demonstrated that the state court's adjudication was contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Cullen v. Pinholster,* ___ U.S. ___, 131 S. Ct. at 1403 (internal quotations and citations omitted) (noting that federal habeas review of a state court's adjudication of an ineffective-assistance-of-counsel claim is "doubly deferential;" that is, "the court must take a highly deferential look at counsel's performance. . . through the deferential lens of § 2254(d)").[5]

Moreover, even if Ross could show that defense counsel's performance was objectively deficient, he has failed to demonstrate prejudice. In assessing prejudice, a federal habeas court must

_____

[5]In *Crawford,* the Supreme Court overruled its prior decision in *Ohio v. Roberts,* 448 U.S. 56 (1980), and held that the Sixth Amendment requires that testimonial statements of witnesses absent from trial are admissible only if the witness is unavailable and there has been a prior opportunity for cross-examination. *Crawford v. Washington,* 541 U.S. at 59-60, 68. *Crawford* is not applicable to Ross's case, however, because the Supreme Court has determined that the decision does not apply retroactively to cases on collateral review. *Whorton v. Bockting,* 549 U.S. 406, 421 (2007).

"reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*

*v. Smith,* 539 U.S. at 534. The state habeas court performed this task and concluded that, even with

the additional mitigating evidence offered by Ross, he had failed to show that there was a reasonable

probability that the result of his sentencing proceeding would have been different. Ross has failed

to demonstrate that the state court's adjudication of Ground (6) was contrary to, or an unreasonable

application of, clearly established Supreme Court law.

**2.      Was the decision by the Texas Court of Criminal Appeals that the erroneous jury charge at punishment did not mislead the jury contrary to, or an unreasonable application of, clearly established Supreme Court law?  (Ground 3)**

The trial court submitted the following parole charge at the punishment phase:

> Under the law applicable in this case, the defendant, if sentenced to a term of life imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

> It is also possible that the length of time for which the defendant will be imprisoned on a life sentence might be reduced by the award of parole.

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, he will not become eligible for parole until the actual calendar time served without consideration of good conduct time, equals forty calendar years. Eligibility for parole does not guarantee that parole will be granted. It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment for life, because the application of these laws will depend on decisions made by prison and parole authorities.

> You may consider the existence of the parole law and good conduct
> time.  However, you are not to consider the extent to which good
> conduct time may be awarded or forfeited by this particular defendant.

*Ross v. State,* 133 S.W.3d at 622-23 (emphasis and footnotes omitted).  On appeal, "[t]he State

concede[d] that th[is] parole charge should not have included the good conduct time language . . . ."

*Id.* at 623.  The Texas Court of Criminal Appeals agreed "that the parole charge was erroneous since

it [did] not comply with Article 37.071 §2(e)(2)(B) [of the Texas Code of Criminal Procedure]."[6] *Id.*

The Court of Criminal Appeals found that, based on the record in Ross's case, (1) the parole charge

informed the jury that a life-sentenced defendant "may" be released from prison after 40 years, not

that he necessarily would; (2) the jury was instructed not to consider how good time would be applied

to Ross, and there was no evidence in the record to rebut the presumption that the jury followed this

instruction; (3) nothing in the record suggested the jury discussed, considered, or tried to apply what

they were told about good conduct time and parole; (4) the jury did not send out any notes expressing

confusion about good conduct time and parole; and (5) during closing arguments at punishment,

Ross's attorney informed the jury several times that a life-sentenced defendant would serve a

---

[6]"In accordance with Article 37.071 § 2(e)(2)(B), the trial court should have submitted the following
parole charge at the punishment phase:

> Under the law applicable in this case, if the defendant is sentenced to
> imprisonment in the institutional division of the Texas Department of
> Criminal Justice for life, the defendant will become eligible for release on
> parole, but not until the actual time served by the defendant equals 40
> years, without consideration of any good conduct time.  It cannot be
> predicted how the parole laws might be applied to this defendant if the
> defendant is sentenced to a term of imprisonment for life because the
> application of those laws will depend on decisions made by prison and
> parole authorities, but eligibility for parole does not guarantee that parole
> will be granted."

*Ross v. State of Texas,* 133 F.3d at 622.

minimum of 40 years in prison and this was not disputed by the State. *Id.* at 623-24 (citing *Luquis v. State,* 72 S.W.3d 355, 366-68 (Tex. Crim. App. 2002). The Court of Criminal Appeals held that "[w]e cannot conclude that there is a reasonable likelihood that the good conduct time language in the parole charge misled the jury into believing that a life-sentenced [defendant] would be released from prison in forty years[, and Ross,] therefore, suffered no harm from the erroneous jury charge." *Ross v. State of Texas,* 133 S.W.3d at 624. Thus, Ground (3) was adjudicated on the merits.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions . . . and a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991). The fact that a jury instruction is allegedly incorrect under state law is not a basis for federal habeas relief. *Id.* at 71-72. *See Galvan v. Cockrell,* 293 F.3d 760, 764 (5th Cir. 2002) ("Improper jury instructions in state criminal trials do not generally form the basis for federal relief.") "The question is '"whether the ailing instruction . . . so infected the entire [sentencing] that the resulting [sentence] violates due process."'" *Middleton v. McNeil,* 541 U.S. 433, 437 (2004) (quoting *Estelle v. McGuire,* 502 U.S. at 72) (quoting *Cupp v. Naughten,* 414 U.S. 141, 147 (1973))). Because his claim was adjudicated on the merits in state court, however, the adjudication is entitled to deference and Ross must demonstrate under § 2254(d)(1) that the adjudication was contrary to, or an unreasonable application of, clearly established Supreme Court law before he will be entitled to federal habeas relief.

Ross alleges that the state court's adjudication was an unreasonable application of Supreme Court law because the Texas Court of Criminal Appeals applied Texas law and failed to apply the Supreme Court's decision in *Simmons v. South Carolina,* 512 U.S. 154 (1994), and its internal

reference to *Bruton v. United States,* 391 U.S. 123 (1968), to the erroneous jury charge.  Ross argues

that *Simmons* stands for the proposition that "a verdict reached by a jury given either an improper

statement of the law or directions which are so confusing that there was a reasonable likelihood that

the jury had applied the instruction in a way that prevented the consideration of constitutionally

relevant evidence is a denial of due process under the Fourteenth Amendment and a sentence carried

out on such a verdict would constitute cruel and unusual punishment under the Eight Amendment";

however, he has failed to provide any citations for this broad supposition.  First, the *Simmons* Court

actually refused to express an opinion on whether "the result . . . reach[ed] [was]  compelled by the

Eighth Amendment."  *Simmons v. South Carolina,* 512 U.S. at 162 n. 4.

Second, although the holding in *Simmons* relied on the due process clause of the Fourteenth

Amendment, the holding was limited to defendants facing death sentences or alternative sentences

of life without parole.  *Id.* at 162.  The *Simmons* plurality reasoned that

> if the State rests its case for imposing the death penalty at least in part
> on the premise that the defendant will be dangerous in the future, the
> fact that the alternative sentence to death is life without parole will
> necessarily undercut the State's argument regarding the threat the
> defendant poses to society.  Because truthful information of parole
> ineligibility allows the defendant to "deny or explain" the showing of
> future dangerousness, due process plainly requires that he be allowed
> to bring it to the jury's attention by way of argument by defense
> counsel or an instruction from the court.

*Id.* at 169 (citing *Gardner v. Florida,* 430 U.S. 349, 362 (1977)).  The *Simmons* plurality did address

the situation of defendants facing alternative sentences of life sentences with the possibility of parole

in the following dicta:

> In a State in which parole is available, how the jury's knowledge of
> parole availability will affect the decision whether or not to impose the
> death penalty is speculative, and we shall not lightly second-guess a

> decision whether or not to inform a jury of information regarding parole.  States reasonably may conclude that truthful information regarding the availability of commutation, pardon, and the like should be kept from the jury in order to provide "greater protection in [the States'] criminal justice system than the Federal Constitution requires."  [*California v. Ramos*, 463 U.S. 992, 1014 (1983)].  Concomitantly, nothing in the Constitution prohibits the prosecution from arguing any truthful information relating to parole or other forms of early release.

*Simmons v. South Carolina,* 512 U.S. at 168.

Ross has not refuted, and the records support, the state court findings that the jury was correctly instructed that Ross would not be eligible for parole until he had served forty years, the jury was presumed to have followed the trial court instructions not to consider the possibility of parole or good-conduct time, and any error in the instructions was harmless.  The record also shows that defense counsel repeatedly argued that Ross would have to serve forty years, without consideration for good time, before he would be eligible for parole; there were no questions from the jury during deliberations about the good-time; and neither party argued the concept of good-time to the jury.  Accordingly, Ross has failed to demonstrate that the state court's adjudication was contrary to, or an unreasonable application of, clearly established Supreme Court law as required by 28 U.S.C. § 2254(d)(1).

**3.     Did the prosecution commit misconduct and violate Ross's right to due process of law by failing to provide Ross's defense counsel with a copy of Regina Carlisle's criminal history and then "ambushing" the defense by introducing her testimony through inadmissible hearsay testimony?  (Ground 5)**

In Ground (5), Ross argues that (1) despite the trial court's granting his discovery requests for copies of the criminal histories of all the State's witnesses, the State did not provide him with a copy of Regina Carlisle's criminal history and (2) the State prevented the impeachment of Regina Carlisle

by introducing her testimony through inadmissible hearsay testimony; therefore, the State has violated his rights to due process under the Fifth and Fourteenth Amendments to the United States Constitution; *Brady v. Maryland,* 373 U.S. 83 (1963); and *Strickler v. Greene,* 527 U.S. 263 (1999).

Respondent points out that Ross has not exhausted Ground (5) because it was not raised in any state court and Ross will be procedurally barred from raising the claim in a successive state habeas application under article 11.071 because he cannot demonstrate that his claim falls within any of the statutory exceptions. *See* Tex. Code Crim. P. Art. 11.071 § 5(a) (Vernon's Ann. Cumulative Pocket Part 2010) (stating that a court may not consider the merits of a subsequent application for a writ of habeas corpus filed after the filing of an initial application unless the application falls within three specific exceptions).

As previously noted, the procedural default doctrine requires a federal habeas court to refuse review of all claims which are found to have been defaulted in state court pursuant to "an independent and adequate state procedural rule," unless the petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. at 750; *Bousley v. United States,* 523 U.S. at 622.

Ross has failed to  argue or demonstrate cause and prejudice or "actual innocence." Accordingly, the Court agrees with Respondent and finds that Ross's Ground (5) should be dismissed as unexhausted and procedurally defaulted. *See Aguilar v. Dretke,* 428 F.3d at 532-33 (denying a certificate of appealability on district court's dismissal of claim as procedurally barred from federal review because of the abuse-of-the-writ doctrine under Texas Code of Criminal Procedure article 11.071 §5(a)).

## IV. CONCLUSION

For the reasons stated above, the Court finds:

1.      Vaughn Ross has failed to demonstrate that the state court's adjudication of his claims was contrary to, or an unreasonable application, of Supreme Court law and the instant Petition for Writ of Habeas Corpus should be DENIED and dismissed with prejudice.

2.      All relief not expressly granted should be denied and all pending motions not previously ruled on should be denied.

3.      Pursuant to Rule 22 of the Federal Rules of Appellate Procedure and 28 U.S.C. § 2253(c), this Court finds that a certificate of appealability should be denied.  For the reasons set forth herein, Vaughn Ross has failed to show that reasonable jurists would find (1) this Court's "assessment of the constitutional claims debatable or wrong," or (2) "it debatable whether the petition states a valid claim of the denial of a constitutional right" and "debatable whether [this Court] was correct in its procedural ruling."  *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).

SO ORDERED.

Dated December _____/_____, 2011.

SAM R. CUMMINGS
United States District Judge